IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEONARD BECKER | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | No. 11-6460 |
| THE BANK OF NEW YORK MELLON TRUST | : | |
| COMPANY, N.A. and J.P. MORGAN TRUST | : | (Consolidated with No. 12-6412) |
| COMPANY, NATIONAL ASSOCIATION | : | |

MEMORANDUM

Legrome D. Davis, District Judge                                    March 23, 2016

Plaintiff Leonard Becker and Defendants The Bank of New York Mellon Trust Company,

N.A. ("BNYM") and J.P. Morgan Trust Company, National Association ("JP Morgan")

respectively move for summary judgment.   Fed. R. Civ. P. 56.   For the history of this case, see

footnote.[1]   Jurisdiction is diversity, 28 U.S.C. § 1332.

Plaintiff Becker, individually and on behalf of similarly situated holders of revenue bonds,[2]

sues Defendants BNYM and JP Morgan as successive Indenture Trustee under multi-party

agreements creating a bond financing transaction.   On January 13, 2010, the bond debtor, Lower

Bucks Hospital ("LBH"), filed a petition for reorganization under Chapter 11 of the Bankruptcy

Code, 11 U.S.C. §§ 101, et seq. (Bankr. No. 10-10239 (Bankr. E.D. Pa.)).   The Complaint in

---

[1]   By Order, dated March 18, 2013 (Doc. No. 64), two actions were consolidated:   Becker v. The Bank New York Mellon Trust Company, N.A., and J.P. Morgan Trust Company, National Association, No. 11-6460 ("Becker I") and Becker v. New York Mellon Trust Company, N.A., No. 12-6412 ("Becker II"). The history of this litigation has previously been set forth at length.   See Order & Mem., dated Oct. 31, 2012 (Doc. No. 39); In re Lower Bucks Hosp., 471 B.R. 419, 425-43 (Bankr. E.D. Pa. 2012) (Frank, J.), aff'd, 488 B.R. 303 (E.D. Pa. 2013) (Savage, J.), aff'd, 571 F. App'x 139 (3d Cir. 2014) (Ambro, J.).

[2]   "Borough of Langhorne Manor Higher Education and Health Authority Hospital Revenue Bonds, Series of 1992 (The Lower Bucks Hospital)."   Plaintiff separately moves to certify a class comprising all bondholders entitled to a distribution under the Plan for reorganization of the Debtor Lower Bucks Hospital, which Plan was confirmed under Chapter 11 of the Bankruptcy Code.   Fed. R. Civ. P. 23(a), (b); see Pl. Mot. Class Certif. (Doc. No. 67).   That motion is pending decision.

Becker I alleges that Defendants were negligent and breached their fiduciary and contractual duties to the bondholders by failing to maintain perfected security interests in the property securing the bonds.[3]   It is alleged that the bondholders were awarded less in bankruptcy than they would have been awarded, if the security interests had been perfected.   The Complaint in Becker II sues for a declaratory judgment and equitable remedies for the claimed losses.

Defendants disclaim any duty to maintain perfection of the security interests.   They disclaim any duties whatsoever—contractual or common law—except those specifically stated in the bond transaction agreements.   They deny breach of any duty owed to the bondholders.   They acknowledge responsibility only for losses caused by their gross negligence or wilful misconduct. In their view, the record is devoid of allegations or evidence meeting that standard.   In addition, they maintain there is no evidence that impaired security interests caused a reduced recovery in bankruptcy for the bondholders.   Plaintiff's evidence of damages also fails, they say, because the amount awarded to the bondholders in bankruptcy was the entire amount that was in fact available for distribution to secured creditors.   Plaintiff challenges these assertions.

On January 19, 2012, the confirmed Plan for reorganization of the bankruptcy Debtor LBH became effective.   On January 24, 2012, BNYM received a cash distribution of the funds awarded under the Plan to the bondholders, a sum of $8,150,000.00.   BNYM has not paid any of those funds to the bondholders.   BNYM refuses to do so based on cited provisions of the Plan

---

[3]   The negligence claim stated in Count II of the Complaint in Becker I was previously dismissed. See Order & Mem., dated Oct. 31, 2012 (Doc. No. 39).   That claim was "based on Defendants' failure 'to use reasonable care to assure that the Bondholders' rights and interests were protected [under the Agreements].'"   Id. at 12 (quoting Complaint) (alteration in original).   It was found that "this duty arises from the Agreements and is therefore purely contractual."   Id.   The gravamen of the breach of contract claim stated in Count III of the Complaint in Becker I is that Defendants negligently performed their contractual duties as Indenture Trustee to maintain perfected security interests in and liens on the property securing the bonds.

and the transaction agreements.   Under those provisions, BNYM asserts a right to be paid first for its fees, expenses, and costs, including legal costs and attorneys' fees, incurred in the bankruptcy case and appeals, and in this litigation.   For those expenditures, BNYM also asserts rights to be indemnified from, and to exercise a first-priority charging lien against, the bondholders' funds.   Plaintiff's position is that Defendants have no such rights under the Plan, the transaction agreements, or the common law.

Plaintiff's motion (Doc No. 125) requests summary judgment on the claim for breach of contract stated in Count III of the Complaint in <u>Becker I</u>.   The motion also requests under Count I of the Complaint in <u>Becker II</u>, a declaration that the bondholders are entitled to immediate disbursal of the funds awarded under the Plan, and that Defendants are entitled to deduct only BNYM's reasonable fees and expenses incurred after January 19, 2012, for the limited purpose of disbursing the funds to the bondholders.   In addition, the motion requests under Count III of the Complaint in <u>Becker II</u>, an injunction prohibiting BNYM from dissipating the funds and requiring BNYM to promptly distribute the funds.   Defendants' motion (Doc. No. 126) requests summary judgment on all claims stated in <u>Becker I</u> and <u>Becker II</u>.

Defendant BNYM counterclaims to recover its fees, expenses, costs, and attorneys' fees incurred solely in this litigation.   Answer (Doc. No. 48).   In their briefs, the parties cross-move for summary judgment on the counterclaim.   Defs. Resp. at 38-40 (Doc. No. 129); Pl. Reply at 12-13 (Doc. No. 132).   As to those expenditures, BNYM asserts that under the Plan and transaction agreements, it has the same rights mentioned above to payment, indemnification, and a first-priority charging lien against the bondholders' funds.   Counterclaim ¶¶ 2-3, 13, 32-35. Plaintiff requests dismissal of the Counterclaim.

3

I.   Background

In 1992, The Lower Bucks Hospital (also, "LBH") entered into the bond financing transaction, aiming to refinance debts and fund capital improvements.   The Borough of Langhorne Manor Higher Education and Health Authority ("Authority") agreed to issue $35,980,000.00 of hospital revenue bonds, and loan to the hospital the proceeds from sales of the bonds.   LBH agreed to pay principal and interest on the bond debt.   The transaction began with two agreements, each dated November 1, 1992:   a Loan and Security Agreement between the Authority and LBH, and a Trust Indenture between the Authority and the original Indenture Trustee, Continental Bank.   Loan Agreement, Schell Decl., Ex 2 (Doc. No. 126-7); Indenture, Schell Decl., Ex. 1 (Doc. Nos. 126-6).   JP Morgan succeeded Continental Bank as Indenture Trustee.   On October 1, 2006, The Bank of New York Trust Company, N.A. succeeded JP Morgan as Indenture Trustee.   On October 31, 2007, BNYM became Indenture Trustee.

The transaction agreements created broad rights to indemnification, running from LBH to the Authority and from LBH to the Indenture Trustee.[4]   LBH granted the Authority security interests and liens against LBH's unrestricted gross revenues, and other property, as collateral securing the bond debt.   Loan Agreement §§ 6.2, 6.4.   It was agreed that the Authority would assign its rights to the Indenture Trustee, for the benefit of the bondholders.   Id. § 6.3.   The

---

[4]   LBH agreed to indemnify the Authority against "all claims, losses, damages or liabilities . . . to which the Authority . . . may become subject, insofar as such losses, claims, damages or liabilities . . . arise out of a Project or are based upon any other alleged act or omission in connection with a Project by the Authority unless the losses, damages or liabilities arise from . . . gross negligence, wilful misconduct . . . of the Authority."   Loan Agreement § 11.4(b).

LBH agreed to indemnify the Indenture Trustee "against all liabilities which it may incur in the exercise and performance of its powers and duties under the Indenture, provided that such liabilities are not caused by the gross negligence or wilful misconduct of the Trustee . . . ."   Loan Agreement § 11.4(e).

assigned rights were those set forth in the Loan Agreement.   Indenture, recitals at 2-3, § 6.02.
Under an Assignment also executed on November 1, 1992, the Authority assigned most of its
rights under the Loan Agreement to the Indenture Trustee, including "all security therefore, the
same to be held in trust and applied by the Trustee as provided in said Indenture . . . ."
Assignment, Schell Decl., Ex. 3, at 1 (Doc. No. 126-9).   It was agreed that all "money received by
the Trustee under this Indenture shall be considered trust funds . . . ."   Indenture § 7.01.

Initially, two UCC-1 financing statements for the agreed security interests were filed in the
bond-debtor hospital's name, The Lower Bucks Hospital.   One perfected a security interest in the
hospital's unrestricted gross revenues as pledged under the Loan Agreement, and the other
perfected a security interest in the trust assets pledged under the Indenture.   Sometime in 1997,
statements were filed that continued the effectiveness of the initial financing statements for five
years.   After March, 1997, the hospital changed its name to Temple Lower Bucks Hospital, Inc.
For about six years after the name change, no amendments to financing statements and no new
financing statements correctly identifying the renamed debtor hospital were filed.

In February, 2003, the hospital notified the Indenture Trustee, then JP Morgan, of the
change in the hospital's name.   On March 19, 2003, JP Morgan filed a new financing statement
with Pennsylvania's Secretary of State correctly identifying the hospital by its new name, Temple
Lower Bucks Hospital, Inc.   About May 12, 2006, the hospital again changed its name, this time
to Lower Bucks Hospital.   During JP Morgan's tenure as Indenture Trustee, no financing or
continuation statements were filed to correctly record that second change in the hospital's name.

As of October 30, 2007, the debtor hospital was still named Lower Bucks Hospital.   On
that date, the Indenture Trustee, then BNYM, filed a statement continuing the financing

statement filed by JP Morgan on March 19, 2003, which had identified the hospital as Temple Lower Bucks Hospital, Inc.   On October 16, 2009, BNYM filed an amendment to the financing statement filed on March 19, 2003, and a new financing statement, each of which correctly named the debtor hospital, Lower Bucks Hospital.   See Pl. Br. at 3-5 (Doc. No. 125-1); Defs. Br. at 2, 10-11, 13 (Doc. No. 126-3); Pl. Statement of Facts & Defs. Resp. (Doc. Nos. 125-2, 129-2).

On January 13, 2010, Lower Bucks Hospital petitioned for relief under Chapter 11 of the Bankruptcy Code,[5] which constituted a defined event of default under the transaction agreements.   Loan Agreement § 10.1(d); Indenture § 10.01(f).   The Indenture Trustee, BNYM, chose to act as the bondholders' sole representative in the bankruptcy case.   See Indenture § 10.04(a) ("If any Event of Default has occurred and is continuing, the Trustee in its discretion may . . . enforce all rights of the Owners of Bonds.").   On August 18, 2010, BNYM filed a proof of claim for the bondholders against the bankruptcy Debtor LBH, for the outstanding bond debt, $25,906,294.98, plus some fees and expenditures.   LBH represented that the property securing the bond debt totaled about $15,353,325.00.   The claim was filed as a secured claim.

On April 30, 2010, LBH filed a bankruptcy adversary proceeding against the Indenture Trustee, BNYM.   Primarily, LBH sued to avoid the security interests and liens against the hospital's gross revenues and reserve accounts, which interests BNYM had perfected on October 16, 2009, during the 90-day period before LBH's filing of the bankruptcy petition.   On September 1, 2010, LBH amended the adversary complaint.   Am. Compl., Bankr. Adversary No. 10-00174, Schell Decl., Ex. 6 (Doc. No. 126-15).   That pleading alleged:   The security interests in the

---

[5]   LBH's affiliates separately filed for reorganization under Chapter 11 of the Bankruptcy Code. See In re Lower Bucks Health Enterprises, Inc., No. 10-10241 (Bankr. E.D. Pa.); In re Advanced Primary Care Physicians, No. 10-10243 (Bankr. E.D. Pa.).   Those cases are not at issue here.

6

bond-debtor hospital's assets had lapsed in 2006, because neither an amended nor a new financing statement was filed within four months after the hospital changed its name on May 12, 2006, from Temple Lower Bucks Hospital, Inc. to Lower Bucks Hospital.   That change in name made the financing statement filed by JP Morgan on March 19, 2003, which identified the debtor as Temple Lower Bucks Hospital, Inc., "seriously misleading" under Pennsylvania's enactment of the UCC. See 13 Pa.C.S.A. § 9506(b),(c).   Therefore, the bonds were unsecured and the lien was ineffective and voidable as of September 12, 2006.   See id. §§ 9502, 9503(a)(6), 9506(b),(c), 9507(c)(2).   It was also alleged that on October 16, 2009, when BNYM filed an amended and a new financing statement to correct the lapse and perfect the security interest in the hospital's gross revenues, those financing statements constituted a preferential transfer of an interest within 90 days of LBH's bankruptcy filing on January 13, 2010, which was subject to avoidance under the Bankruptcy Code.   See 11 U.S.C. §§ 547(e), (b), 550.   It was further alleged that BNYM had transferred moneys from the hospital's bank accounts and bond reserve funds, which transfers were also preferential and voidable for the benefit of the bankruptcy estate.

As Indenture Trustee, BNYM also chose to act as the bondholders' sole representative in the adversary proceeding.   BNYM strongly opposed the claims presented by LBH.   During June-July, 2011, the parties—primarily the Debtor LBH, the Committee of Unsecured Creditors, and BNYM—engaged in court-mediated negotiations for a global settlement leading to a consensual plan for reorganization.   BNYM negotiated on behalf of the bondholders.   BNYM also participated as a corporate person to protect its own interests as an indemnitee-creditor of LBH under the transaction agreements and as a potential defendant in relation to foreseeable claims by bondholders that the security interests and liens had not been properly maintained.

In part, BNYM's dual roles in the bankruptcy case arose as follows.   Under the Loan Agreement, LBH agreed to indemnify the Authority and the Indenture Trustee, provided that their liability was not caused by gross negligence, wilful misconduct, fraud, or deceit.   During settlement discussions, LBH successfully negotiated a promised release of its indemnification obligations.   That release exposed BNYM to potentially substantial liability to the bondholders, without any right of indemnification from LBH.   Specifically, BNYM was exposed to potential claims by bondholders that they suffered a reduced recovery in the bankruptcy case for the value of their bonds, which was caused by BNYM's failure to maintain perfection of the security interests and liens against the hospital's assets.   BNYM's firm position was that it was not liable to the bondholders.   However, BNYM strenuously, and successfully, negotiated for a promised release of its potential liability under the transaction agreements.   The release was designed to protect BNYM from liability in regard to claims by LBH in the adversary proceeding and claims by any nondebtor, third parties—in particular, the bondholders.   The bankruptcy parties considered the releases integral to the settlement and the consensual plan for reorganization.

On August 12, 2011, the parties filed a stipulation resolving the adversary proceeding, along with a motion for approval of the stipulated settlement.   Order entered Sept. 15, 2011, approving the settlement and attaching the Stipulation and Term Sheet for the proposed consensual plan of reorganization.   Schell Decl., Ex. 7 (Doc. No. 126-16).   It was stipulated that the Indenture Trustee's claim for the bondholders' recovery would "be allowed as a secured claim in the amount of $8,150,000 plus the amount of the Reserve Fund and the Debt Service Fund."   Stipulation ¶ 2.   It also provided:

8

> the Bond Trustee shall accept from LBH, $8,150,000 (the "Settlement Funds") on or as soon as reasonably practicable after the Plan Effective Date and the Debtors and their estates shall be deemed to have released any and all rights, claims and interests to and in the Reserve Fund and the Debt Service Fund.

Id.  It was further stipulated that the plan of reorganization must "at a minimum" be one that

> provides for a release of any and all claims and causes of action arising under or in any manner related to the Bond Documents against the Debtors, the Debtors' estates, and the Bond Trustee by any and all parties, including without limitation all Bond holders, to the extent permitted by applicable law.

Id. ¶ 8(a)(ii)(B).   Under this paragraph, the bondholders released all claims against the Indenture Trustee, including any potential claims for damages resulting from conduct that caused the security interests and liens to become unperfected and voidable.   It was the genesis of a third party release that was initially contained in, but was ultimately excised from, the confirmed Plan.

During a hearing on September 14, 2011, the bankruptcy court approved the stipulated settlement as fair and equitable to the bankruptcy estate.   On September 15, 2011, the approval Order was entered.   Order, Schell Decl., Ex. 7.   At that time, the court did not fully understand the third party release that was contained in the stipulation and proposed plan for reorganization.[6] "Instead, the existence of the Third Party Release was unknown to the court until mid-November 2011, shortly before the first scheduled date for the confirmation hearing."   In re Lower Bucks Hosp., 471 B.R. 419, 464 (Bankr. E.D. Pa. May 10, 2012) (Frank, J.).

---

[6]   During the hearing on September 14, 2011, BNYM acknowledged that LBH and the Indenture Trustee were "essentially co-liable with respect to claims of bondholders" and the potential "losses that emanate" from impairment of the security interests and liens against the hospital's assets.  Hr'g Tr., at 13 (Bankr. Doc. No. 1390).  BNYM's position was "that the claims against the bond trustee are claims that would be made over against the debtors and would deplete the estate."   Id. at 14.   However, the court was not informed that once LBH's indemnification duties were discharged under the Plan, BNYM, and not the bankruptcy estate, would be exposed to liability for claims by the bondholders.  The parties and their counsel did little to enlighten the court, and did much to avoid candidly revealing, that an intensely negotiated, integral part of the settlement was a release by the bondholders of any claims against BNYM.

On September 27, 2011, the Debtors filed the Plan for reorganization that was subsequently confirmed, along with the Disclosure Statement relating to the Plan.   Schell Decl., Exs. 8, 9 (Doc. Nos. 126-17, 126-18, 126-19).   The Plan § 15.7 and Disclosure Statement § K(2) each contained a third party release of claims by the bondholders against the Indenture Trustee.[7]

On September 29, 2011, Becker moved for reconsideration and vacation of the approval Order entered September 15, 2011.   Mot. (Bankr. Doc. No. 1357).   The motion asserted that the Debtors, Committee, Indenture Trustee, and court all lacked authority to release or discharge the bondholders' claims against the Indenture Trustee.   It also asserted that the bondholders were not provided with notice of the stipulation before it was signed, or the approval Order before it was entered.   It further asserted that the bondholders were not adequately represented in the settlement process, because there was a "clear" and "actual conflict of interest between the Bond Trustee and the Bondholders resulting from the alleged failure to perfect the liens required under the Indenture."   Id. at ¶¶ 12, 44.   On October 21, 2011, Becker withdrew the motion, stating that he did so "after having obtained the representations of the Debtors and . . . Committee . . .

---

[7]   The Plan stated:  "In furtherance of, and not in limitation of, the various releases and discharge provisions contained in this Plan, the occurrence of the Effective Date shall constitute a release of any and all claims and causes of action arising under or in any manner related to the Bond Documents against the Debtors, each of the Debtors' estates, and the Bond Trustee by any and all parties, including without limitation all Bondholders, to the extent permitted by applicable law."  Plan, Article 15, "Miscellaneous Provisions, Release—Bond Documents," § 15.7, at 42, Schell Decl., Ex.8.

Similarly, the Disclosure statement also referred to a third party release of claims by the bondholders against the Indenture Trustee:  "In furtherance, and not in limitation of, the various releases and discharge provisions contained in the Plan, the occurrence of the Effective Date shall constitute a release of any and all claims and causes of action arising under or in any manner related to the Bond Documents against the Debtors, each of the Debtors' estates, and the Bond Trustee by any and all parties, including without limitation all Bondholders, to the extent permitted by applicable law.  The Debtors intend to present the Bankruptcy Court with a proposed form of Confirmation Order that provides that all claims and causes of action of Bondholders against the Bond Trustee arising under or in any manner related to the Bond Documents are released and discharged."  Disclosure Statement, "Discharge Provisions, Release—Bond Documents," § K(2), at 55, Schell Decl., Ex. 9.

that neither will assert that this withdrawal . . . waives, releases, discharges or prejudices Becker's rights to object at plan confirmation to the third party releases to be granted to BNYM by the Bondholders as set forth in the Plan, on any basis . . . ."  (Bankr. Doc. No. 1402).

On October 14, 2011, in between the filing and the withdrawal of Becker's motion for reconsideration, Plaintiff Becker commenced this litigation.   Also on that date, the Plan voting period began.   On November 10, 2011, Becker objected to confirmation of the Plan, stating several reasons why the Plan should not be confirmed if it contained the third party release. (Bankr. Doc. No. 1443).   The court found that the objections presented serious issues as to whether the Plan could be confirmed.   By Order entered November 16, 2011, the court ruled that the settlement was approved provided "that nothing in the Stipulation or this Order shall waive, release, discharge or impair any claims that the Bondholders may have against the Bond Trustee." (Bankr. Doc. No. 1457)

On December 2, 2011, the court heard argument on confirmation of the Plan.   During a recess, the parties agreed that the Plan should be confirmed as stipulated, but questions regarding the third party release should be decided later.   The Plan was confirmed "without regard to the permissibility, enforceability and scope of the release contained in Plan § 15.7."   Order entered Dec. 7, 2011 (Bankr. Doc. No. 1538).

On March 2, 2012, the bankruptcy court heard Becker and BNYM as to whether the third party release should be approved.   On March 10, 2012, the court denied confirmation because the release was inadequately disclosed.   Lower Bucks Hosp., 471 B.R. at 464.   BNYM appealed that order.   On January 2, 2013, the District Court affirmed the ruling.   Id., 488 B.R. 303, 325 (E.D. Pa. 2013) (Savage, J.).   BNYM appealed again.   On June 12, 2014, the Third Circuit

11

affirmed, discerning no abuse of discretion in the bankruptcy court's ruling that the third party release was not adequately disclosed.   Id., 571 F. App'x 139 (3d Cir. 2014) (Ambro, J.).

II.   DISCUSSION

A federal court exercising diversity jurisdiction must apply the law of the state that governs the issue to be decided.   Mitchell Partners, L.P. v. Irex Corp., 656 F.3d 201, 203 (3d Cir. 2011) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496-97 (1941); Thabault v. Chait, 541 F.3d 512, 521 (3d Cir. 2008) (validity of a theory of damages is "a matter uniquely subject to state law principles" (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).   In diversity cases, "'where the applicable rule of decision is the state law, it is the duty of the federal court to ascertain and apply that law, even though it has not been expounded by the highest court of the state.'"   Id. (citing Pennsylvania v. Brown, 373 F.2d 771, 777 (3d Cir. 1967)).   The choice of law rules of the state in which the district court sits must also be applied to determine which state's laws govern each issue.   Klaxon, 313 U.S. at 496.

Under Pennsylvania law and the Restatement (Second) of Conflict of Laws § 187 (1971), "the first question to be answered is whether the parties explicitly or implicitly have chosen the relevant law."   Assicurazioni Generali, S.P.A. v. Clover, 195 F.3d 161, 164 (3d Cir. 1999).   An "instrument creating a trust of interests in movables is construed in accordance with the rules of construction of the state designated for this purpose in the instrument."   Restatement (Second) of Conflict of Laws § 268(1) cmt. b (1971).   Where the legal effect of a trust agreement is the predominant issue, the law of the state in which the agreement was executed, and in which the company whose property is the subject matter of the trust is located, governs.   Robinson v. Chance, 213 F.2d 834, 835-36 (3d Cir. 1954).

12

Here, the forum's choice of law rules require application of Pennsylvania's law.   The parties agreed that Pennsylvania law governs interpretation and construction of the transaction agreements.   Indenture § 15.06; Loan Agreement § 11.6.   Pennsylvania law also governs administration of the parties' rights and interests under those agreements.   The record shows that the agreements were executed in Pennsylvania.   It also shows that the Authority was a "body corporate and politic" under 53 Pa.C.S.A. § 5607, LBH was a non-profit corporation organized under Pennsylvania's law and operating in Pennsylvania, and the property securing the bonds was located in Pennsylvania.   In addition, the security interests and liens at issue were created under Pennsylvania law and recorded in Pennsylvania.   Those encumbrances were required to be perfected and maintained under Pennsylvania law.   Loan Agreement § 6.4; Indenture § 9.12.

A.      Plaintiff 's Claim for Breach of Fiduciary Duty

The gravamen of Count I of the Complaint in <u>Becker I</u> is that Defendants breached fiduciary duties owed to the bondholders by not maintaining perfected security interests in the property securing the bonds.   Compl. ¶¶ 33-35.   Otherwise, Count I does not specify a cause of action or the remedies sought, either legal or equitable.   <u>Id.</u> ¶¶ 34-35 (suing for "economic injury" resulting from "defendants' breaches of fiduciary duty"); <u>id.</u> at 11 (requesting "damages").

Defendants contend that as Indenture Trustee, they had "no duties to ensure lien perfection under the Indenture and Loan Agreement," and "no duties to bondholders other than those specifically set forth in the Indenture."   Defs. Br. at 6.   It is also contended that under the Indenture, they can be held liable only for their gross negligence or wilful misconduct.   <u>Id.</u> at 13, 19, 21; Defs. Resp. at 11; Defs. Reply at 1 (Doc. No. 133).   In their view, the record is devoid of allegations or evidence meeting the requisite standard of conduct.   Defendants are mistaken.

13

Defendants were fiduciaries of the bondholders' interests in property—that is, LBH's unrestricted gross revenues as well as the security interests, liens, and reserve funds created by the transaction agreements.   Loan Agreement §§ 6.2, 6.3, 6.4; Indenture, recitals at 2-3, §§ 6.02, 6.03, 6.07, 7.01; Assignment at 1.   Under these agreements, Defendants were required to manage the entrusted assets for the benefit of the bondholders.   See U.S. Trust Co. of N.Y. v. Comm'r of Internal Revenue, 296 U.S. 481, 487 (1936) (it is "elementary . . . that every kind of vested right which the law recognizes as valuable may be transferred in trust") (internal quotation marks and citation omitted); Lewis v. Alexander, 685 F.3d 325, 332 (3d Cir. 2012), cert. denied, 133 S. Ct. 933 (2013) ("A trust is a legal instrument in which assets are held in the name of the trust and managed by a trustee for the benefit of a beneficiary."); Restatement (Third) of Trusts § 2 (2003) (a trust "is a fiduciary relationship with respect to property, arising from a manifestation of intention to create that relationship and subjecting the person who holds title to the property to duties to deal with it for the benefit of . . . one or more persons").   Accord In re Estate of Warden, 2 A.3d 565, 572 (Pa. Super. Ct. 2010), appeal denied, 17 A.3d 1255 (Pa. 2011) (citing In re Trust of Hirt, 832 A.2d 438, 447-48 (Pa. Super. Ct. 2003), appeal denied, 862 A.2d 1255 (Pa. 2004)).

"Like all beneficiaries of an express trust," the bondholders "have a property interest in the trust res that is enforceable either in law or in equity."   Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc., 72 F.3d 361, 367 (3d Cir. 1995) (citing Restatement (Second) of Trusts §§198-199 (1959)).   A "trust beneficiary has an option to pursue either equitable or legal relief in an action against a trustee."   Am. Express Travel Related Servs. Co., Inc. v Laughlin, 623 A.2d 854, 856 (Pa. Super. Ct.), appeal denied, 633 A.2d 149 (Pa. 1993).   Where a person is in a fiduciary relationship to another, "the existence of a remedy at law is irrelevant."   Id.

In general, the "standard of care imposed upon a trustee is that which a man of ordinary prudence would practice in the care of his own estate." Estate of Warden, 2 A.3d at 573 (citing Estate of Pew, 655 A.2d 521, 541 (Pa. Super. Ct. 1994) (citing In re McCrea Estate, 380 A.2d 773, 775-76 (Pa. 1977); In re Musser's Estate, 17 A.2d 411, 415 (Pa. 1941)).   In addition, the Supreme Court of Pennsylvania "has made it quite clear that where a fiduciary either possesses or represents that it possesses a skill greater than ordinary prudence, the fiduciary will be required to exercise the commensurate degree of care when making investment decisions." In re Estate of Niessen, 413 A.2d 1050, 1052 (Pa. 1980) (citing In re Estate of Killey, 326 A.2d 372, 374-75 (Pa. 1974) (citing Restatement (Second) of Trusts § 174) (1959)).   It is "an equally important precept" of Pennsylvania law "that where a trust instrument is explicit as to the duty owed, it, as evidencing the settlor's . . . intent, should govern." Id., 413 A.2d at 1052.

Importantly for this case, the Supreme Court of Pennsylvania has ruled that the "nature and extent of the duties of a corporate trustee are primarily to be ascertained from the trust instrument." Estate of Niessen, 413 A.2d at 1052 (citing Gouley v. Land Title Bank & Trust Co., 198 A. 7 & n.4 (Pa. 1938); Restatement (Second) of Trusts §§ 164, 174 cmt. d (1959)).   "Such duties are those assumed under the terms and conditions of the contract itself; rather than inherent in the general law governing trust relationships." Gouley, 198 A. at 9.   This rule allows the standard for a trustee's care and skill to be relaxed or modified.   It also allows an instrument to prescribe powers, duties, and liabilities of the trustee.   However, it does not exempt a corporate or an indenture trustee from all common-law fiduciary duties, as Defendants propose.

Pennsylvania law imposes upon trustees common law duties arising from the nature of the fiduciary relationship.   "Of course, any limitation in a trust instrument of the duties of a

15

trustee which is opposed to public policy, or which is illegal in any way, will not be given effect." Gouley, 198 A. at 9.   No exculpatory provision in a trust instrument can permit a trustee to act fraudulently, dishonestly, in bad faith, or with improper motive.   Id.   Another duty inhering in the fiduciary relationship:   "'The primary duty of a trustee is the preservation of the assets of the trust and the safety of the trust principal.'"   Estate of Warden, 2 A.3d at 573 (quoting Estate of Pew, 655 A.2d at 542); In re Estate of Hamill, 410 A.2d 770, 775 n.7 (Pa. 1980) (a fundamental duty to protect assets from destruction) (citing Restatement (Second) of Trusts § 176 (1959) (discussing a trustee's a duty to use reasonable care and skill to preserve the trust property)). These and other "[s]tandards imposed by the substantive law of Pennsylvania cannot be diluted by the separate provisions contained within a trust instrument."   In re Scheidmantel, 868 A.2d 464, 483, 481 (Pa. Super. Ct. 2005) (citing Estate of Niessen, 413 A.2d at 1052-53).   Accord Estate of Warden, 2 A.3d at 574-75; United States v. Pa. Shipbuilding Co., 255 F. Supp. 2d 351, 403-05 (E.D. Pa. 2002), aff'd on other grounds, 473 F.2d 506 (3d Cir. 2007).

Fundamental common law duties arising from the nature of the fiduciary relationship apply to an indenture trustee as well.   The Supreme Court of Pennsylvania held that an indenture trustee "stood in a fiduciary relation to the bondholders," and as their trustee "it was bound to exercise the utmost good faith in dealing with them and with the property of the trust; its first obligation was to safeguard their interests."   Land Title Bank & Trust Co. v. Baron, 19 A.2d 62, 66 (Pa. 1941); see Restatement (Second) of Trusts § 170(1), cmt. j (1959) ("trustee violates his duty to the beneficiary if he purchases the encumbrance [on trust property] for himself individually"); Restatement (Third) of Trusts§ 78(1), (2) (2007) (a "trustee is strictly prohibited from engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary

16

duties and personal interests").   See also Gouley, 198 A. at 7, 9 (a trustee under a corporate

mortgage securing an issue of bonds was subject to historic, common-law fiduciary duties).

Defendants cite Peak Partners, LP v. Republic Bank for the proposition that an indenture

trustee is "a different legal animal" because:

> "Unlike the ordinary trustee, who has historic common-law duties imposed beyond
> those in the trust agreement, an indenture trustee is more like a stake holder whose
> duties and obligations are exclusively defined by the terms of the indenture
> agreement."

191 F. App'x 118, 122 (3d Cir. 2006) (Barry, J.) (quoting Meckel v. Cont'l Res. Co., 758 F.2d 811,

816 (2d Cir. 1985)) (applying New York law).   This general statement supports Defendants'

position—that in their role as Indenture Trustee, they owed no duties whatsoever to the

bondholders other than those specifically set forth in the Indenture.   However, Peak Partners does

not so hold.   Instead, it was ruled that prior to an event of default under the indenture agreement,

New York common law imposes two duties on an indenture trustee in addition to those specified

in the indenture:   a duty to avoid conflicts of interest with beneficiaries, and a duty to perform

basic non-discretionary ministerial tasks.   Id.   It was also ruled that after a default, an indenture

trustee's duty to beneficiaries becomes more like that of a traditional trustee.   Id.

Even considering the facts of this case under New York law, which does not control the

decision here, Peak Partners would support a ruling that at least as early as January 13, 2010,

when LBH petitioned for bankruptcy protection, which filing was a defined event of default

under the Indenture, Defendants owed the bondholders the complete panoply of fiduciary duties

of a traditional trustee.   That case also persuasively supports a ruling that at all pertinent times

on the facts presented here, Defendants had a duty to act in good faith with undivided loyalty

toward the bondholders' interests.   Defendants have not cited any case law that would relieve

them of their duties under Pennsylvania's general law governing fiduciary relationships.

Defendants assert that they are not responsible for any loss caused by breach of the

Indenture, nor liable for anything else except their own gross negligence or wilful misconduct.

There is no provision to be found in the Indenture to support this assertion, nor is one proffered.

Instead, Defendants cite a provision from the Loan Agreement:

> The Hospital shall indemnify the Trustee against any liabilities which it may incur
> in the exercise and performance of its powers and duties under the Indenture,
> provided that such liabilities are not caused by the gross negligence, or wilful
> misconduct of the Trustee . . . .

Id. § 11.4(e).   This provision required the "Hospital," LBH, to broadly indemnify "the Trustee,"

Defendants.   It exempted from LBH's obligations to indemnify Defendants, and from

Defendants' rights to indemnification from LBH, those liabilities caused by "gross negligence, or

wilful misconduct of the Trustee."   As to the bondholders' secured interests, § 11.4(e) says

nothing about the standard of care governing Defendants' exercise and performance of their

discretion, powers, and duties under the Indenture.   Here, § 11.4(e) is plainly inapplicable.

The Indenture expressly sets forth the standard of care governing the Indenture Trustee's

exercise and performance of its duties and powers with respect to the bondholders' interests:

> The Trustee shall not be answerable for the exercise of any discretion or power
> under this Indenture nor for anything whatever in connection with the trust
> hereunder, except only its own wilful misconduct or negligence.

Indenture § 11.03.   This standard is closely comparable to the general standard of care imposed

upon an ordinary trustee:

> Our [Pennsylvania's] Supreme Court has explained that the "general rule" is that "a trustee must exercise such prudence and diligence in conducting the affairs of the trust as men of average diligence and discretion would employ in their own affairs." . . . In other words, the usual "standard of care imposed upon a trustee is that which a man of ordinary prudence would practice in the care of his own estate."

Scheidmantel, 868 A.2d at 482 (quoting Musser's Estate, 17 A.2d at 415); In re Estate of Scharlach, 809 A.2d 376, 384 (Pa. Super. Ct. 2002)).

It is ruled that under Pennsylvania law, Defendants owed actionable fiduciary duties to the bondholders.   Under both the common law and transaction agreements, Defendants were required to act prudently, in good faith with undivided loyalty, using reasonable care under the circumstances.   Defendants can be held liable for negligent conduct—that is, the failure to use reasonable care to assure that the bondholders' rights and interests were protected and preserved. However, triable disputes are presented as to the scope and particulars of the duties Defendants owed to the bondholders.   In that regard, the parties have submitted extensive expert opinion evidence of custom and practice in the corporate trust industry.   That evidence presents questions for the trier of fact.   The record also establishes triable disputes as to whether Defendants breached any fiduciary duties, and whether any proven breach caused the bondholders to incur losses.   In particular, triable disputes exist as to whether the bondholders incurred damages resulting from the Indenture Trustee's conduct, which caused the security interests and liens against LBH's assets to become unperfected and voidable, thereby relegating the bondholders' claims to an unsecured status in bankruptcy, and forcing the bondholders to compromise their claims in order to obtain a greater recovery through a secured status.   Accordingly, Defendants' motion for summary judgment on Count I of the Complaint in Becker I, will be denied.

B.      Plaintiff's Claim for Breach of Contract

The gravamen of Count III of the Complaint in <u>Becker I</u> is that Defendants breached their

contractual duties under the transaction agreements to use reasonable care to protect the

bondholders by maintaining perfected security interests in and liens on the property securing the

bonds.   Plaintiff's position is based on the Loan Agreement § 6.4[8] and the Indenture § 9.12.[9]

Under Pennsylvania law, a successful claim for breach of contract requires proof of "'(1)

the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the

---

[8]  The Loan Agreement § 6.4 states:  "This Loan Agreement shall constitute a security agreement within the meaning of the Pennsylvania Uniform Commercial Code.  In addition to all other rights and remedies hereunder the Authority, and the Trustee as its assignee, shall have all rights and remedies of a secured party under the Pennsylvania Uniform Commercial Code.  The Hospital will join with the Authority and the Trustee in executing and filing such financing statements, continuation statements and other documents under the Pennsylvania Uniform Commercial Code or other applicable law as the Authority or the Trustee may specify and will pay the cost of filing the same in such public offices as the Authority or the Trustee shall designate."

[9]  The Indenture § 9.12 states:  "This Indenture shall constitute a security agreement within the meaning of the Pennsylvania Uniform Commercial Code and the Authority's obligations hereunder shall be secured pursuant to such Code by the security interests herein granted with respect to the Authority's right, title and interest in and to the Loan Agreement, all Funds and Accounts established hereunder (except the Rebate Fund) and in all Pledged Revenues.  The Authority shall cause this Indenture or an appropriate financing statement or memorandum relating thereto to be filed, registered and recorded in such manner and at such places as may be required by law fully to protect, to the extent provided by law, the security of the holders of the Bonds and the right, title and interest of the Trustee in and to the trust estate or any part thereof.  Concurrently with the execution and delivery hereof and thereafter from time to time, as reasonably requested by the Trustee, not less often than once every five (5) years, the Authority shall obtain an opinion of Counsel and furnish a signed copy thereof to the Trustee, setting forth what, if any, actions by the Authority or Trustee should be taken to preserve such security.  The Authority shall perform or shall cause to be performed any such acts, and execute and cause to be executed any and all further instruments as may be required by law or as shall reasonably be requested by the Trustee (which may rely upon an opinion of Counsel with respect to such matters) for such protection of the interests of the Trustee and the Bondholders, and shall furnish satisfactory evidence to the Trustee of recording, registering, filing and refiling of such instrument and of every additional instrument which shall be necessary to preserve the lien of this Indenture upon the trust estate or any part thereof until all obligations secured hereby, including the principal of and interest on the Bonds, shall have been paid.  The Trustee shall execute or join in the execution of any such further or additional instrument and file or join in the filing thereof at such time or times and in such place or places as it may be advised by an opinion of Counsel will preserve the lien of this Indenture upon the trust estate or any part thereof until the aforesaid obligation shall have been paid."

contract[,] and (3) resultant damages.'"   Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir.

2003) (alteration in original) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058

(Pa. Super. Ct. 1999)).   The necessary material facts . . . are simple:   there was a contract, the

defendant breached it, and plaintiff suffered damages from the breach."   McShea v. City of

Philadelphia, 995 A.2d 334, 340 (Pa. 2010).

 "It is beyond cavil that the touchstone of contract interpretation is the intent of the

parties."   Dardovitch v. Haltzman, 190 F.3d 125, 139 (3d Cir. 1999) (Becker, J.).   Accord

Indian Harbor Ins. Co. v. F & M Equip., Ltd., 804 F.3d 310, 313 (3d Cir. 2015); Commonwealth

ex rel. Kane v. UPMC, 129 A.3d 441, 446 (Pa. 2015).   "Likewise, the settlor's intent is the

primary guide to interpreting a trust instrument."   Dardovitch, 190 F.3d at 139.   Accord In re

Trust Under Deed of Tracy, 346 A.2d 750, 753 (Pa. 1975); In re Benson, 615 A.2d 792, 794-95

(Pa. Super. Ct. 1992) ("The polestar in every trust is the settler's intent and that intent must

prevail.").   "Often, a writing itself is the best evidence of the parties' or settlor's intent."

Dardovitch, 190 F.3d at 139.   Accord Lesko v. Frankford Hosp.–Bucks Cnty., 15 A.3d 337, 342

(Pa. 2011) ("the intent of the parties is the writing itself"); In re Benson, 615 A.2d at 795 ("'[T]he

writing itself must be considered to be the best and controlling evidence of the settlor's intent.'")

(quoting In re Girard Trust Corn Exch. Bank, 208 A.2d 857, 859 (Pa. 1965)).

 Plaintiff's position is that the Loan Agreement § 6.4 and the Indenture § 9.12 imposed

three duties requiring the Indenture Trustee to:   (1) obtain from the Authority, at least once every

five years, a signed copy of an opinion of counsel setting forth what actions the Indenture Trustee

or the Authority should take in order to preserve the security interests in and liens on the property

securing the bonds; (2) implement the advice contained in the opinion of counsel as to what

21

should be filed in order to preserve the liens; and (3) obtain satisfactory evidence from the Authority that all financing statements necessary to preserve the liens had been properly recorded, registered, and filed, and do so until the bond debt was paid.   Pl. Br. at 10, 8-12; Pl. Resp. at 7, 7-13, Pl. Reply at 6-7.

Defendants' position is that the duty to maintain perfected security interests "rested with the Authority and LBH—not the Indenture Trustee."   Defs. Br. at 6-7; Defs. Reply at 2-3; Defs. Resp. at 3-5.   And the Indenture Trustee was not required to investigate or oversee the security interests and liens.   Defs. Br. at 9-10.   The Indenture Trustee was granted permission to request an opinion of counsel, but was not required to do so.   Id. at 8-9, 12-13; Defs. Resp. at 6-8.   It was the Authority's "sole responsibility" to do so.   Defs. Br. at 12 (emphasis omitted).

Reading the Loan Agreement § 6.4 and the Indenture § 9.12 together, the Hospital, the Authority, and the Indenture Trustee were each required to execute or join in the execution and filing of the requisite financing statements.   The Hospital alone was required to pay the filing costs.   And "not less often than once every five (5) years," the Authority was required to "obtain an opinion of Counsel and furnish a signed copy thereof to the Trustee."   Id. § 9.12.   It is not clear whether the Indenture Trustee was required to do so as well:

> Concurrently with the execution and delivery hereof and thereafter from time to time, as reasonably requested by the Trustee, not less often than once every five (5) years, the Authority shall obtain an opinion of Counsel and furnish a signed copy thereof to the Trustee, setting forth what, if any, actions by the Authority or Trustee should be taken to preserve such security.

Indenture § 9.12.   The duty imposed by the phrase, "as reasonably requested by the Trustee," is uncertain.   It might impose upon the Indenture Trustee a mandatory, independent duty to not only request, but also receive an opinion of counsel at least once every five years, and then act

22

upon counsel's advice to preserve the security interests and liens. The phrase, "from time to time, as reasonably requested," fairly implies, at the least, some oversight and investigation by the Indenture Trustee. It is difficult to conceive of a scenario where the request for an opinion alone would be an useful end in itself. In addition, "we may not discard carefully worded language in a trust instrument as meaningless surplusage in construing the trust." In re Benson, 615 A.2d at 795. On the other hand, the phrase might be read as permissive, granting discretion to the Indenture Trustee. Even so read, the Indenture Trustee was plainly required to exercise that discretion "not less often than once every five (5) years." Indenture § 9.12.

It is also not clear whether the Indenture Trustee was independently responsible for obtaining satisfactory evidence that the requisite financing statements were duly recorded:

> The Authority shall perform or shall cause to be performed any such acts [necessary to preserve the security], and execute and cause to be executed any and all further instruments as may be required by law or as shall reasonably be requested by the Trustee (which may rely upon an opinion of Counsel with respect to such matters) for such protection of the interests of the Trustee and the Bondholders, and shall furnish satisfactory evidence to the Trustee of recording, registering, filing and refiling of such instrument and of every additional instrument which shall be necessary to preserve the lien of this Indenture upon the trust estate . . . .

Id. § 9.12. Again, the phrase, "as shall reasonably be requested by the Trustee," is not clear for the same reasons. However, "shall" clearly imports a mandatory obligation that the Indenture Trustee exercise its discretion to request an opinion of counsel, using due care to assure that the bondholders' rights and interests were protected and preserved.

For these reasons, it is ruled that the Indenture § 9.12 is ambiguous. "'A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" Dardovitch, 190 F.3d at 139 (quoting Hutchison v.

23

Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1986)).   Where a contract is ambiguous, the trier

of fact must make findings as to the parties' intent and the meaning of the contract."   Id.   "A

settlor's intent is to be determined from all the language within the four corners of the trust

instrument, the scheme of distribution and the circumstances surrounding the execution of the

instrument."   Farmers Trust Co. v. Bashore, 445 A.2d 492, 494 (Pa. 1982).   See In re Wolters'

Estate, 59 A.2d 147, 149 (Pa. 1948) ("As in the case of all contracts, the deed of trust is properly

to be construed with reference to its subject matter and purpose to which end resort to

surrounding facts and circumstances may be had."); accord In re Shoemaker, 115 A.3d 347, 354

(Pa. Super. Ct. 2015).

The parties proffer extensive expert opinion evidence of custom and practice in the

corporate trust industry to establish the contractual intent and meaning of the transaction

agreements.   Each side's experts provide opinions that conflict with those of the other side's

experts.   The trier of fact must resolve the questions presented by that evidence.   For largely the

same reasons mentioned above as to Plaintiff's claim for breach of fiduciary duties, the record

also establishes triable disputes as to whether Defendants breached any contractual duties, and

whether any proven breach caused the bondholders to incur loss or damage.   Plaintiff has met

his burden to defeat an adverse summary judgment by submitting evidence from which damages

may be calculated to a "reasonable certainty."   ATACS Corp. v. Trans World Commc'ns, Inc.,

155 F.3d 659, 669-70 (3d Cir. 1998).   Accordingly, Plaintiff's and Defendants' cross-motions for

summary judgment on Count III of the Complaint in Becker I, will be denied.

C.      Plaintiff's Claim for a Declaration of Rights as to the Bondholders' Funds

Count I in <u>Becker II</u> sues for a declaration that the bondholders are entitled to prompt disbursal of the funds awarded under the Plan, and Defendants are not entitled to deduct any amounts that they incurred asserting their personal interests.   <u>See</u> Pl. Br. at 21-25, 29-36; Pl. Resp. at 2, 4-5, 26-32; Pl. Reply at 10-12.   Specifically, Count I challenges Defendants' asserted rights to be indemnified and exercise a first-priority charging lien for expenditures incurred by: (1) BNYM's efforts to make the third party release part of the confirmed Plan in the bankruptcy case, and its appeals of the bankruptcy court's denial of confirmation of the third party release; (2) BNYM's defense of LBH's adversary proceeding; and (3) BNYM's defense of this litigation. Compl. ¶¶ 47, 48.   Count I further requests that BNYM be ordered to immediately pay the bondholders the sum of $8,150,000.00, plus amounts contained in the reserve and debt service funds, minus only BNYM's reasonable administrative fees, expenses, and costs incurred after the effective date of the Plan, January 19, 2012, for the limited purpose of disbursing the funds to the bondholders.   <u>Id.</u> ¶ 49.

Defendants maintain that the Indenture Trustee has rights to be compensated and indemnified for all of its expenditures in the bankruptcy case and appeals as well as in this litigation, including all legal costs and attorneys' fees, and to exercise a first-priority charging lien for those expenditures against the bondholders' funds.   It is their position that no disbursements are required until this litigation ends and BNYM recoups all expenditures.   <u>See</u> Defs. Br. at 2-3, 19-26, 28-31; Defs. Resp. at 2, 21-26, 29, 31-33; Defs. Reply at 9-13.

Whether the Indenture Trustee has the asserted rights to be indemnified and exercise a charging lien presents questions of law about the meaning and application of proffered provisions

contained in the Plan, the Indenture, and the Loan Agreement.   Again, the contracting parties' or

the settlors' intent as manifested by the written agreements themselves is the primary guide.

Dardovitch, 190 F.3d at 130.   "And, unless contrary to the obvious purpose of the instrument,

force and effect are to be given to every provision thereof, whenever possible, so that the whole

may be rendered effective and no part disregarded or treated as a nullity."   Wolters' Estate, 59

A.2d at 149; accord Lesko, 15 A.3d at 342.

The confirmed Plan expressly required that each bondholder receive, on or as soon as

reasonably practicable after the effective date of the Plan, January 19, 2012, its pro rata share of

$8,150,000.00, and the reserve and debt service funds, minus only the Indenture Trustee's fees,

costs, and expenses payable under the Indenture.   Plan § 5.1.3(A)(i), (ii), § 5.1.3(B), and §

10.3(b).[10]   Reading these provisions of the Plan together, the Indenture Trustee is permitted to

---

[10]   The Plan § 5.1.3(A)(i) and (ii) stated:
(i) on or as soon as reasonably practicable after the Effective Date, the Disbursing Agent shall pay the Bond Trustee $8,150,000.00, to be used for the purposes set forth herein;
(ii) each [bondholder] shall, on or as soon as reasonably practicable after the Effective Date, receive such holder's Pro Rata share of  (a) the Reserve Funds, free and clear of any right, title or interest of any of the Debtors, all of which shall be deemed released as of the effective Date; and   (b) $8,150,000.00, in full satisfaction, settlement, release and discharge of and in exchange for such holder's Allowed Claim . . . .

The Plan § 5.1.3(B) expressly incorporated the Plan § 10.3(b):
All Distributions to pursuant to this Section 5.1.3 shall be subject to Section 10.3(b) hereof including without limitation those provisions relating to the Bond Trustee's fees, costs and expenses payable from such Distributions pursuant to the Indenture or applicable law.

The Plan § 10.3(b) stated:
[A]ll Distributions payable under the Plan to holders of Bonds shall be paid by the Disbursing Agent to the Bond Trustee, which shall distribute such Distributions (net of any Bond Trustee fees, costs and expenses payable from such Distributions under the Indenture or applicable law), or cause such Distributions (net of any Bond Trustee fees, costs and expenses payable from such Distributions under the Indenture or applicable law) to be distributed, to the holders of the Bonds in accordance with the terms of the Indenture.

deduct certain "fees, costs and expenses" from the funds payable to the bondholders, before it is required to distribute the net remainder to the bondholders.   Id. §§ 5.1.3(B), 10.3(b).   However, the Plan expressly states that the only "fees, costs and expenses" payable to the Indenture Trustee are those that it incurred "pursuant to the Indenture," or "under the Indenture," or "in accordance with the terms of the Indenture."   Id.

Also as of January 19, 2012, the confirmed Plan effectively cancelled and extinguished the Indenture, the bonds, and "any other instruments or documents evidencing or creating any indebtedness or obligations of any of the Debtors in connection with the Indenture and/or Bonds ('Bond Documents')."   Plan § 10.10.[11]   See Plan § 1.14, defining "Bond Documents" to have the meaning set forth in § 10.10.   The Plan fully discharged the Debtors' obligations "under any agreements, documents, indentures or other documents governing or related to" the Indenture

---

[11]   "On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, (1) the Indenture, Bonds, and any other instruments or documents evidencing or creating any indebtedness or obligations of any of the Debtors in connection with the Indenture and/or Bonds ("Bond Documents") shall be cancelled and extinguished, and (2) the obligations of each of the Debtors under any agreements, documents, indentures or other documents governing or related to the Bond Trustee Claim shall be discharged, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or by any other Person.   The Bond Trustee's rights and obligations under the Indenture shall be deemed fully discharged, except to the extent provided in the remainder of this section 10.10.   Notwithstanding the foregoing, and solely to the extent permitted by the Bond Documents, any Bond Documents shall continue in effect (and the Bond Trustee shall continue as trustee, paying agent and registrar) solely to the extent necessary (1) to allow the Bond Trustee to make distributions pursuant to the Plan on account of the Bonds, (2) to preserve any rights of the Bond Trustee to payment of fees, expenses, and indemnification obligations, including as against property distributed under the Plan to the Bond Trustee (but excluding any other property of the Debtors or their estates); provided, however, that neither the Debtors nor their estates shall have liability for such fees, expenses and indemnification, (3) to permit the Bond Trustee to assert its charging lien, if any, against distributions on account of the Bonds, (4) if permitted by applicable law, to permit the Bond Trustee to appear in this case and any other proceeding, including, without limitation, in connection with any contested matter or adversary proceeding to which the Bond Trustee is a party, (5) to permit the Bond Trustee to enforce any and all obligations owed to it by any party to the Bond Trustee Settlement Agreement or under the Plan, and (6) to permit the Bond Trustee to perform any functions that are necessary in connection with the foregoing clauses."   Plan § 10.10 (emphasis in original).

27

Trustee's claim on behalf of the bondholders in the bankruptcy case.   Plan § 10.10.   The Plan also fully discharged the Indenture Trustee's rights and obligations "except to the extent provided in the remainder of this section 10.10."   Id. § 10.10.   Here, the parties' dispute focuses on the scope and effect of the stated exceptions, as follows.

The Plan § 10.10 states that on the effective date, "solely to the extent permitted by the Bond Documents, any Bond Documents shall continue in effect (and the Bond Trustee shall continue as trustee, paying agent and registrar) solely to the extent necessary" to achieve six specified objectives.   This language plainly continued BNYM's role under the Indenture beyond January 19, 2012, solely to the extent necessary for BNYM to act as an ordinary "trustee, paying agent and registrar" in performing stated functions.   Three of the specified objectives are at issue:   (1) "to allow [BNYM] to make distributions pursuant to the Plan on account of the Bonds," (2) "to preserve any rights of [BNYM] to payment of fees, expenses, and indemnification obligations, including as against property distributed under the Plan to [BNYM]," and (3) "to permit [BNYM] to assert its charging lien, if any, against distributions on account of the Bonds."   Id. § 10.10.

Importantly, the Plan § 10.10 did not create additional rights beyond those contained in the Bond Documents—instead, it only preserved specific rights and obligations created by the Bond Documents, in order to permit the Indenture Trustee to achieve the specified goals. Whether the Indenture Trustee has a right to payment of its fees, expenses, and indemnification obligations is a question the Plan does not answer.   Whether the Indenture Trustee has a right to charge any amounts against the bondholders' funds is also a question the Plan does not answer. The Plan did not grant the Indenture Trustee a right to exercise a charging lien against the

bondholders' funds.   Accordingly, the rights asserted here by Defendants must be grounded on the terms of the Indenture, Loan Agreement, or other Bond Documents.   If not found there, the asserted rights do not exist.

As to the Indenture Trustee's asserted right to indemnification, Defendants cite the Loan Agreement § 11.4(e).[12]   In particular, BNYM asserts that § 11.4(e) gives it a right to indemnity for all expenditures, losses, or liabilities, even those arising from its own breach of trust, breach of contract, or misconduct, if it is found liable in this litigation.   Again, as ruled above, the effect of this provision was to require the Hospital, LBH, to broadly indemnify the Indenture Trustee. It required LBH to do so "to the same extent and in the same manner" that LBH was required to indemnify the Authority, as described in § 11.4 (b) and (c).[13]   Under subsection (b), LBH agreed to indemnify the Authority, and therefore the Indenture Trustee under subsection (e), "against any and all claims, losses, damages or liabilities . . . unless the losses, damages or liabilities arise from malfeasance or nonfeasance in office, bad faith, gross negligence, wilful misconduct, fraud or deceit . . . ."   Loan Agreement § 11.4(b).

The Loan Agreement § 11.4(e) does not support Defendants' position.   By its express terms, § 11.4(e) required LBH to indemnify the Indenture Trustee.   It does not require the

---

[12]   "The Hospital shall indemnify the Trustee against any liabilities which it may incur in the exercise and performance of its powers and duties under the Indenture, provided that such liabilities are not caused by the gross negligence, or wilful misconduct of the Trustee, to the same extent and in the same manner as is described in subsection 11.4(b) and (c) hereof with respect to the Hospital's indemnity of the Authority."   Loan Agreement § 11.4(e), "Exculpation and Indemnity."

[13]   The Authority's rights to be indemnified by LBH were not assigned to the Indenture Trustee. It was agreed that the "Authority . . . shall assign this [Loan] Agreement . . . and all sums payable hereunder (except the amounts payable under Section 11.4(b) and (c)) to the Trustee . . . ."   Loan Agreement § 6.3.   The Authority assigned all its right, title and interest in and to the Loan Agreement, "except for amounts representing the Authority's . . . rights of indemnification by the Hospital . . . ." Assignment, at 1.

bondholders to indemnify the Indenture Trustee.   Defendants acknowledge as much.   However, they propose that the Indenture Trustee's indemnity rights against LBH can be asserted against the funds that LBH paid in the bankruptcy case under the Plan:

> The right to indemnification has *not* been asserted against the holders.   Instead, the right to be indemnified for any losses, including the costs of defending against Plaintiff's allegations, is a clear contractual right asserted *against the funds paid by LBH in the bankruptcy pursuant to the Plan*.[7]

> [Footnote 7:]   In order for LBH to emerge from bankruptcy and be discharged, the Indenture Trustee had to agree that its right to indemnity (an ongoing obligation of LBH) would be satisfied from the funds LBH paid as part of the bankruptcy process, without recourse to LBH following its discharge.

Defs. Reply at 10 & n.7 (citing Plan § 10.10).   See also Defs. Br. at 30; Defs. Resp. at 23-26, 29. Defendants' position is grounded solely on the Plan § 10.10 (quoted above).

Defendants do not dispute the hard reality that any and all obligations of the Debtor LBH to indemnify the Indenture Trustee BNYM were cancelled, extinguished, and discharged as of the effective date of the Plan, January 19, 2012.   Nonetheless, they propose that the second exception contained in the Plan § 10.10 should be read to preserve the "rights of [BNYM] to payment of fees, expenses, and [LBH's] indemnification obligations, including as against property distributed under the Plan to [BNYM]."   Id. § 10.10 (alterations added).   It is asserted that LBH's indemnity obligations were discharged as to BNYM's recourse against LBH, but that BNYM can still recoup its right to indemnification by LBH from the bondholders' funds.

But, the Plan § 10.10 does not say this.   In the first, standalone clause, § 10.10 states unequivocally that "the obligations of each of the Debtors under any agreements, documents, indentures or other documents . . . shall be discharged."   Id.   The clause makes no exceptions as to discharge of the Debtors' obligations.   Moreover, the record is devoid of evidence that LBH

and BNYM agreed—or that any other parties to the stipulated settlement and consensual Plan for reorganization of the Debtor LBH ever intended—that BNYM's right to indemnification by LBH would be satisfied from funds that LBH paid as part of the bankruptcy process, without recourse to LBH following its discharge.   All of the evidence points to the opposite conclusion—that is, that each Debtor's obligations were discharged categorically and completely.   See Schell Decl., Ex. 7, Approval Order, entered Sept. 14, 2011, Ex. A, Stipulation ¶¶ 2, 3, 8(a)(ii)(A), Ex. A Term Sheet.   BNYM's rights to indemnification from LBH were not among the rights preserved under the Plan § 10.10.

Defendants' proposed interpretation reads content into the Plan § 10.10 that is not to be found in the express terms.   Instead, the second exception stated in § 10.10—which preserved any rights of the Indenture Trustee to "payment of fees, expenses, and indemnification obligations"—is better understood as preserving any rights to indemnification that might arise from the Trustee's performance of the specified goals after the Debtors' discharge and the Indenture's cancellation.   Plan § 10.10.   See, e.g., Indenture § 11.04 (discussed below).

The confirmed Plan was the product of the parties' stipulated settlement and consensual plan for reorganization.   It may not be rewritten now, "even when aided by hindsight and the ingenuity of counsel," to make a different or better contract for Defendants.   In re Estate of Kelsey, 143 A.2d 42, 45 (Pa. 1958).   If the terms of a contract are clear, "'this Court may not rewrite it or give it a construction in conflict with the accepted and plain meaning of the language used.'"   Allstate Fire & Cas. Ins. Co. v. Hymes, 29 A.3d 1169, 1172-73 (Pa. Super. Ct. 2011), appeal denied, 46 A.3d 715 (Pa. 2012) (quoting Wall Rose Mut. Ins. Co. v. Manross, 939 A.2d 958, 962 (Pa. Super. Ct. 2007), appeal denied, 946 A.2d 688 (Pa. 2008)).

Defendants cite the Indenture § 11.04[14] as support for the Indenture Trustee's asserted right to indemnity for "any liabilities the Indenture Trustee may incur."   Defs. Br. at 21, 29 & n.22.   In addition, it is asserted that § 11.04 "directly reinforces the concept of priority in payment following a default."   Id.; Defs. Resp. at 23-24.   This provision is plainly inapplicable.

The Indenture § 11.04 defines the Authority's, the Hospital's, and the Indenture Trustee's respective rights and obligations for the costs to administer the bonds and the trust.   It requires the Authority to pay the Indenture Trustee for its "reasonable services" and its "reasonable expenses and disbursements" under the Indenture.   There is no evidence that the Authority failed to do so. The record shows only that LBH defaulted on its obligations.   There is also no evidence that the Hospital, Authority, and Indenture Trustee agreed in advance that the bondholders would compensate the Indenture Trustee for any services, expenses, or disbursements whatsoever.

Defendants isolate one phrase from the Indenture § 11.04:   "the Trustee may deduct the amounts owing to it from any moneys coming into its hands before making any payment on any Bonds."   Id.   That phrase is then misapplied, beyond the context in which it is meaningful, to any moneys coming into the hands of the Trustee under the Plan.   In ascertaining "a settlor's intent, it is fundamental that a clause must be read not in isolation but in the context in which it appears." Farmers Trust, 445 A.2d at 494; Judge v. Pyle, 73 A. 919 (Pa. 1909) (a single clause was "not to be read apart from the context" of a declaration of trust, as creating an obligation that was inconsistent with the "whole tenor" of that paper).

---

[14]   The Authority shall pay, or cause the Hospital to pay, the Trustee reasonable compensation for its services hereunder, and also all its reasonable expenses and disbursements, all as shall be agreed upon in advance by the Authority, the Trustee and the Hospital.   If the Authority defaults in respect of the foregoing obligations, the Trustee may deduct the amounts owing to it from any moneys coming into its hands before making any payment on any Bonds.   Indenture § 11.04, "Compensation and Indemnity."

As to the Indenture Trustee's asserted rights to priority in payment and a charging lien, Defendants maintain that the Indenture § 10.11 governs.   In their view, the "language of § 10.11 could not be more explicit," and it is "the controlling provision for the specific point in time in which the parties find themselves—post-Event of Default."   Defs. Br. at 24, 28.   It is asserted that LBH's default "triggered § 10.11," and in the "scenario created by the LBH default," "the Indenture Trustee's fees and expenses are to be paid first."   Defs. Br. at 20; Defs. Resp. at 31. Defendants are mistaken for several reasons.

The Indenture § 10.11[15] must be read in its context, together with the other provisions contained in Article X, Events of Default and Remedies.   See Farmers Trust, 445 A.2d at 494 ("[I]t is fundamental that a clause must be read not in isolation but in the context in which it appears.").   Article X states its purpose expressly:   "It is the purpose of this Article to provide such remedies to the Trustee and Owners of Bonds as may be lawfully granted under the provisions of the Act . . . ."   Indenture § 10.13 (referring to the Municipality Authorities Act of 1945, as amended, which is now codified at 53 Pa.C.S.A. §§ 5601-5623).   "As in the case of all

---

[15]   The Indenture § 10.11, "Application of Moneys in Event of Default," states in full:

Any moneys received by the Trustee under this Article X shall be applied:

First:   to the payment of the costs of the Trustee, including reasonable counsel fees, any disbursements of the Trustee with interest thereon and its reasonable compensation; and

Second:   to the payment of principal or Redemption Price (as the case may be) of and interest then owing on the Bonds and in case such moneys shall be insufficient to pay the same in full, then to the payment of principal or Redemption Price and interest ratably, without preference or priority of one over another or of any installment of interest over another installment of interest.

The surplus, if any, shall be paid to the Authority or the person lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

contracts, the deed of trust is properly to be construed with reference to its subject matter and purpose to which end resort to surrounding facts and circumstances may be had." <u>Wolters'</u> <u>Estate</u>, 59 A.2d at 149.

Article X defines eight events of default under the Indenture § 10.01(a)–(h).   It is not disputed that LBH's filing of the Chapter 11 petition for reorganization was a defined event of default under the Loan Agreement § 10.1(d) and the Indenture § 10.01(f).   Defendants are correct that LBH's bankruptcy filing "triggered" Article X, but only in the sense that the powers and remedies contained in Article X were then available to the Indenture Trustee and bondholders.   However, the record is devoid of any evidence showing that the Indenture Trustee or the bondholders ever availed themselves of the remedies under Article X.   Instead, BNYM exercised the discretion granted under the Indenture § 10.04(a), to "enforce all rights of the Owners of Bonds," choosing to act as the bondholders' sole representative in the bankruptcy case. Article X says nothing about remedies provided or pursued under the Bankruptcy Code.

Defendants are mistaken that LBH's bankruptcy filing triggered application of the Indenture, Article X, § 10.11.   Instead, the first sentence of § 10.11 states:   "Any moneys received by the Trustee under this Article X shall be applied" in the prescribed order.   <u>Id.</u> Accordingly, § 10.11 expressly applies only to moneys received by the Indenture Trustee under the remedies set forth in Article X.   <u>See, e.g.</u>, Indenture § 10.03 ("the Trustee shall apply the balance of the revenues as provided in Section 10.11 hereof"); § 10.14 ("the Trustee shall receive and collect Unrestricted Gross Revenues for the equal and ratable benefit of the holders of Alternative Debt").   There is no evidence that the Indenture Trustee received any moneys under the remedies set forth in Article X.   Moreover, none of the provisions contained in Article X

34

pertaining to the Indenture Trustee's receipt of funds can reasonably be read to mean "moneys received under the Bankruptcy Code and the Plan," as Defendants propose.

Defendants are also incorrect that the Indenture § 10.11 "expressly provides that the Indenture Trustee is to be paid first following an Event of Default." Defs. Br. at 20. Those words are not to be found in § 10.11. Viewed in isolation, the "First" clause of § 10.11 facially lends support to Defendants' position that the Indenture Trustee is to be paid first. However, the proposed reading of § 10.11 violates fundamental rules—again those rules are, that a clause must be read not in isolation but in the context in which it appears; and where the terms of a contract are clear, a court may not rewrite it or give it a construction in conflict with the accepted and plain meaning of the language used.

One provision cited by Plaintiff and Defendants—the Indenture § 14.01(b)—does apply to the facts presented here:

> The release, cancellation and discharge of this Indenture, however, shall be without prejudice to the right of the Trustee to be paid any compensation then due to it hereunder, including, without limitation, any and all losses, liabilities, costs and expenses, including counsel fees, at any time incurred by the Trustee hereunder or connected with any Bond issued hereunder and which, if this Indenture had not been released, cancelled and discharged, the Authority would have been obligated by the terms of this Indenture to pay to the Trustee.

Id., "Defeasance." On January 19, 2012, the Bond Documents—including the bonds, the Indenture, and the Loan Agreement—were cancelled and extinguished. Plan § 10.10. On that date, BNYM had a right to "compensation then due to it hereunder." Id. The phrase, "then due to it," creates a temporal limitation upon BNYM's right to be compensated: the date of release, cancellation and discharge of the Indenture, here January 19, 2012. In addition, that temporal restriction plainly qualifies the phrase that follows: "including, without limitation, any and all

losses, liabilities, costs and expenses, including counsel fees, at any time incurred by the Trustee

hereunder or connected with any Bond issued hereunder."   However, § 14.01(b) is subject to two

different interpretations.   It can be read to preserve BNYM's rights to compensation for

expenditures incurred as of and at any time *before* January 19, 2012, but not after that date.   It

can also be read to preserve BNYM's rights to compensation for expenditures incurred at any

time *before and after* January 19, 2012, provided the latter expenditures are ones that that "the

Authority would have been obligated by the terms of this Indenture to pay to the Trustee."   Id.

Here, the ambiguity is immaterial.   Under either interpretation, the only compensation, losses,

liabilities, costs, expenses, and counsel fees that are payable to BNYM under § 14.01(b), are

those that BNYM incurred pursuant to, under, or in accordance with the terms of the Indenture.

Defendants maintain that the Indenture § 14.01(b) preserved the Indenture Trustee's

asserted rights to payment, indemnification and a first-priority charging lien against the

bondholders' funds under the Indenture §§ 10.11, 11.04, and the Loan Agreement § 11.4(e).

Defs. Br. at 31.   But those asserted rights did not and do not exist under the cited provisions, and

those nonexistent rights were not preserved by the Indenture § 14.01(b).

The record establishes that Defendants had no rights under the Plan, the Indenture, the

Loan Agreement, or any other Bond Documents to be indemnified and exercise a first-priority

charging lien for expenditures incurred by BNYM's defense of this consolidated litigation.   The

plain meaning of the Loan Agreement § 11.4(e) obligated LBH to indemnify the Indenture Trustee

for "any liabilities which it may incur in the exercise and performance of its powers and duties

under the Indenture, provided that such liabilities are not caused by the gross negligence, or wilful

misconduct of the Trustee . . . ."   Id.   However, this explicit language does not provide the

36

Indenture Trustee with indemnity against any claims asserted by anyone in the world.   The

bondholders never agreed to assume any of LBH's obligations.   In addition, this litigation arises

from allegations that the Indenture Trustee breached its fiduciary and contractual duties to the

bondholders.   It is well settled that both an agreement to indemnify another for his own

negligence, and an agreement to indemnify another for his contractual liability to a third party,

"must be stated plainly, in clear and unequivocal language."   Jacobs Constructors, Inc. v. NPS

Energy Services, Inc., 264 F.3d 365, 371 (3d Cir. 2001) (citing Brown v. Moore, 247 F.2d 711,

723 (3d Cir.), cert. denied, 355 U.S. 882 (1957) (disapproved on other grounds) (reviewing and

applying Pennsylvania law).   The agreements in this case in no way express in unequivocal terms

any intent or purpose on the part of the bondholders to indemnify the Indenture Trustee for loss

resulting from its negligence or misconduct.   Instead, the Indenture clearly and unequivocally

states that the Indenture Trustee can be held liable for "its own wilful misconduct or negligence."

Id. § 11.03.   This provision may not be "disregarded or treated as a nullity."   Wolters' Estate, 59

A.2d at 149.   Moreover, the record establishes that the claimed expenditures were largely incurred

by BYNM's assertion of nonexistent rights to indemnification and a charging lien.   BNYM should

bear the risks and the costs of its chosen strategy.

The record establishes that Defendants had no rights under the Plan, the Indenture, the

Loan Agreement, or any other Bond Documents to be indemnified and exercise a first-priority

charging lien for expenditures incurred after January 19, 2012, by BNYM's on-going efforts to

make the third party release part of the Plan in the bankruptcy case, and its appeals of the

bankruptcy court's denial of confirmation of the third party release.   At that time, LBH's

indemnification obligations to BNYM were cancelled, extinguished, and discharged.   BNYM

could not look to LBH for indemnification of the costs of BNYM's potential liability to the bondholders.   BNYM's potential liability could not deplete the bankruptcy estate or affect the bondholders' recovery under the Plan.   After the effective date of the Plan, BNYM asserted the third party release before the bankruptcy court and appellate tribunals to protect only its personal interests.   BNYM should bear the risks and the costs of its chosen strategy.

The record presents triable disputes as to whether Defendants had rights under the Plan, the Indenture, the Loan Agreement, or other Bond Documents to be indemnified and exercise a first-priority charging lien for expenditures incurred before January 19, 2012, by BNYM's efforts to make the third party release part of the Plan in the bankruptcy case, and by BNYM's defense of LBH's adversary proceeding.   At that time, numerous parties were negotiating and litigating complex issues.   Their positions were not final until the Plan was confirmed and became effective.   Before that date, whether Defendants were negligent, and whether BNYM was acting under an impermissible conflict of interest, are questions for the trier of fact to resolve.   See In re Lower Bucks Hosp., 471 B.R. at 452, 454-56 (Judge Frank:   "I need not rule definitively on these issues.").   On this record, it cannot be ruled as a matter of law that BNYM's negotiations for confirmation of the third party release, or BNYM's defense of the adversary proceeding, served only BNYM's personal interests—even though the record suggests as much.

The record also presents triable disputes as to Plaintiff's request that BNYM be ordered to immediately pay the sum of $8,150,000.00, plus the reserve and debt service funds, minus only BNYM's reasonable administrative fees, expenses, and costs incurred after the effective date of the Plan, January 19, 2012, in order to disburse the funds to the bondholders.   Triable disputes exist as to some amounts, if any, BNYM might be permitted to deduct from the funds.

For these reasons, Plaintiff's motion for summary judgment on Count I of the Complaint in <u>Becker II</u> will be granted in part, and denied in part, and Defendants' cross-motion for summary judgment will be denied, consistent with the rulings in this Memorandum.

D.     Plaintiff's Claim for an Injunction as to the Bondholders' Funds

Count III of the Complaint in <u>Becker II</u> sues for an injunction prohibiting BNYM from dissipating the bondholders' funds and requiring BNYM to promptly distribute the funds to the bondholders.   <u>Id.</u> ¶¶ 57-63.   For the same reasons stated above, triable disputes exist as to the amounts that might ultimately be assessed against the bondholders' funds.   Accordingly, Plaintiff's and Defendants' cross-motions for summary judgment on Count III of the Complaint in <u>Becker II</u> will be denied.

E.     Defendant BNYM's Counterclaim

Defendant BNYM counterclaims to recover its fees, expenses, costs, and attorneys' fees incurred solely in this consolidated litigation.   BNYM asserts the same rights to payment, indemnification, and a first-priority charging lien against the bondholders' funds.   Counterclaim ¶¶ 2-3, 13, 32-35.   BNYM also requests a declaration that these expenditures be assessed entirely against Plaintiff.   <u>Id.</u> ¶ 40.   Plaintiff maintains that Defendants have no such rights and the Counterclaim is retaliatory.   As ruled above, Defendants do not have any rights to compensation, indemnification, or a first-priority charging lien against the bondholders' funds for any fees, expenditures, or costs incurred in the defense of this consolidated litigation. Accordingly, Plaintiff's motion for summary judgment on BNYM's Counterclaim will be granted in favor of Plaintiff and against Defendants; Defendants' cross-motion for summary judgment on the Counterclaim will be denied; and the Counterclaim will be dismissed, with prejudice.

F.      Plaintiff's Remaining Claims for Relief in <u>Becker II</u>

Count II of the Complaint in <u>Becker II</u> sues Defendant BNYM for an accounting of all fees, expenses, and costs that BNYM has paid or intends to pay itself from the bondholders' funds.   Count IV and V of the Complaint in <u>Becker II</u> sue Defendant BNYM respectively for conversion of the bondholders' funds, and money had and received.   In addition, the Complaint in <u>Becker II</u> requests an award of exemplary and punitive damages.   As to each of these claims for relief, the record is not fully developed.   For largely the same reasons stated above, triable disputes are presented.   Accordingly, Defendants' motions for summary judgment on Counts II, IV, and V of the Complaint in <u>Becker II</u>, and Defendants' request for summary judgment on the demand in <u>Becker II</u> for exemplary and punitive damages, will be denied.

III.    <u>CONCLUSION</u>

Plaintiff does not contest the $8,150,000.00 sum, which LBH paid to settle the adversary proceeding.   Pl. Br. at 25 n.13.   Plaintiff challenges Defendants' conduct that allegedly caused the bondholders to receive less than they would have been entitled to receive, if Defendants had not breached their duties—a loss of about $4,983,328.00.   <u>Id.</u> at 21.   Whereas the latter sum remains for proof at trial, this Memorandum resolves the lion's share of amounts to be assessed against the funds awarded under the Plan to the bondholders.   As to the remainder, the parties are encouraged to work with Magistrate Judge Timothy R. Rice to resolve their disputes.

An Order accompanies this Memorandum.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.

40