IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEONARD BECKER | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | No. 11-6460 |
| THE BANK OF NEW YORK MELLON TRUST | : | |
| COMPANY, N.A. and J.P. MORGAN TRUST | : | (Consolidated with No. 12-6412) |
| COMPANY, NATIONAL ASSOCIATION | : | |


MEMORANDUM

Legrome D. Davis, District Judge                    October 5, 2016

Plaintiff Leonard Becker moves in this consolidated litigation[1] to certify a class

comprising holders of revenue bonds who are entitled to a distribution under the Plan for

reorganization of the bond debtor, Lower Bucks Hospital ("LBH"),[2] which Plan was confirmed

under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1129, 1101-1146.   Fed. R. Civ. P. 23;

Pl. Mot. (Doc. 67).   It is also requested that Plaintiff be certified as class representative and

Barrack, Rodos & Bacine be appointed as class counsel.   Id.   Defendants The Bank of New York

Mellon Trust Company ("BNYM") and J.P. Morgan Trust Company, National Association ("JP

Morgan") oppose certification.   Defs. Resp. (Doc. 70).   For the history of this litigation, see

footnote.[3]   Jurisdiction is diversity and amount in controversy, 28 U.S.C. §§ 1332, 1332(d)(2).

---

[1]   This action ("Becker I") and Becker v. The Bank of New York Mellon Trust Co., N.A., No. 12-6412 ("Becker II") were consolidated.   Orders, dated Mar. 18, 2013 (Doc. 64; Becker II Doc. 21). Unless noted otherwise, "Doc." refers to the docket number of an ecf filing in this C.A. No. 11-6460.

[2]   The bonds are:   "Borough of Langhorne Manor Higher Education and Health Authority Hospital Revenue Bonds, Series of 1992 (The Lower Bucks Hospital)."   Plaintiff defines the class as "all persons or entities who are holders of an Allowed Class A3 Claim pursuant to Section 5.1.3(A)(ii) of Lower Bucks Hospital's plan of reorganization."   Pl. Mot. at 1; Pl. Br. at 2 & n.2 (Doc. 67-1).

[3]   See Order & Mem., dated Mar. 23, 2016 (Docs. 136, 137); Order & Mem., dated Oct. 31, 2012 (Doc. 39); In re Lower Bucks Hosp., 471 B.R. 419, 425-43 (Bankr. E.D. Pa. 2012) (Frank, J.), aff'd, 488 B.R. 303 (E.D. Pa. 2013) (Savage, J.), aff'd, 571 F. App'x 139 (3d Cir. 2014) (Ambro, J.).

Plaintiff Becker, individually and on behalf of other members of the putative class, sues Defendants BNYM and JP Morgan as successive Indenture Trustee under multi-party agreements that created the bond financing transaction.   On January 19, 2012, the confirmed Plan became effective.   On January 24, 2012, BNYM received a cash distribution of the funds allowed under the Plan to be paid to the bondholders, a sum of $8,150,000.00.   BNYM has not paid any of those funds to the bondholders.

The Complaint in <u>Becker I</u> alleges that Defendants were negligent[4] and breached their fiduciary and contractual duties to the bondholders by failing to maintain perfected security interests in the property securing the bonds.   It is alleged that the bondholders were allowed less in LBH's bankruptcy than they would have been allowed if the security interests had been perfected.   The Complaint in <u>Becker II</u> sues for a declaratory judgment that the bondholders are entitled to prompt disbursal of the funds allowed under the Plan for them, and that Defendant BNYM is not entitled to deduct from those funds any amounts that it incurred asserting its personal interests in the bankruptcy proceedings or in this litigation.   <u>Becker II</u> also sues for equitable remedies—an injunction compelling BNYM to distribute the bondholders' funds, an accounting of those funds, and damages for conversion and for money had and received.

Becker maintains that under Rules 23(a) and 23(b)(3), the requirements for class certification are met for all claims stated in <u>Becker I</u> and <u>Becker II</u>.   In addition, he maintains that under Rules 23(b)(1) and 23(b)(2), the requirements for class certification have been met for the claims stated in <u>Becker II</u>.

---

[4]   The negligence claim stated in Count II of the Complaint in <u>Becker I</u> was dismissed.   Order & Mem., dated Oct. 31, 2012 (Doc. 39).

Defendants oppose all claims stated in <u>Becker I</u> and <u>Becker II</u>, and they oppose class certification.   Principally, they cite Rule 23(b)(3)'s requirement that "questions of law or fact common to class members [must] predominate over any questions affecting only individual members."   Fed. R. Civ. P. 23(b)(3).   A finding of predominance is precluded, they say, because the proximate cause of the bondholders' alleged losses cannot be proved with evidence that is common to all class members.   Defs. Resp. at 19-23.   In their view, the evidence of causation varies widely across the proposed class based on each class member's role and actions in the bankruptcy proceedings that led to the $8,150,000.00 allowance for the bondholders.

Defendants primarily maintain that their affirmative defenses of equitable estoppel, waiver, and judicial estoppel preclude a finding of predominance—and defeat other requirements for class certification as well.   Defs. Resp. at 24-32.   In their view, the evidence supporting these defenses also varies widely across the proposed class based on a multitude of dissimilarities among the class members arising from their individual roles and actions in the bankruptcy proceedings.   <u>Id.</u> at 23, 25.   Adjudication of these defenses, they say, would require the trier of fact to examine massive, individualized facts as to each of the bondholders.   Defs. Resp. at 23, 27, 30, 31.   And there are at least 95 bondholders.   It is also asserted that these defenses would involve a lengthy series of individual trials for numerous groupings of class members.   <u>Id.</u> at 25-28 & nn.9, 10.   In addition, Defendants plan to introduce proof peculiar to "unique defenses" asserted against Becker, who is said to be "a class of one."   <u>Id.</u> at 28-29, 30.   For these reasons among many others, <u>see id.</u> at 3-4, they conclude that class certification should be denied.

Previous rulings in this and three other courts are pertinent to the claims proposed for class treatment here.   On January 13, 2010, LBH petitioned for reorganization under Chapter 11

of the Bankruptcy Code.[5]   Pet. (Bankr. Doc. 1), In re Lower Bucks Hosp., Bankr. No. 10-10239 (Bankr. E.D. Pa.) (Frank, J.).   On April 30, 2010, LBH commenced a bankruptcy adversary proceeding against the Indenture Trustee, BNYM, Lower Bucks Hosp. v. The Bank of New York Mellon Trust Co., N.A., Adv. No. 10-00174 (Bankr. E.D. Pa.) (Frank, J.).   On August 12, 2011, LBH and BNYM settled the adversary proceeding.   LBH, BNYM, and the Official Committee of Unsecured Creditors filed a consensual plan for LBH's reorganization, which incorporated stipulated terms of that settlement.   The proposed plan included a stipulated third party release of potential claims by the bondholders against the Indenture Trustee, then BNYM, based on its alleged failure to maintain perfected security interests and liens against the property securing the bonds.   On December 2, 2011, the bankruptcy judge and parties agreed that the proposed plan should then be confirmed, but questions as to confirmation of the third party release would be severed and decided later.   On December 7, 2011, the proposed plan was confirmed as agreed.

On May 10, 2012, the Bankruptcy Court denied confirmation of the third party release and struck it from the Plan because the release was inadequately disclosed before the bondholders voted to accept the proposed plan.   Order, entered May 10, 2012 (Bankr. Doc. 2041); In re Lower Bucks Hosp., 471 B.R. 419, 459, 464 (Bankr. E.D. Pa. 2012) (Frank, J.).   Judge Frank explained:

> Based on my analysis of the purpose of the Third Party Release, the factors that the Bondholders necessarily needed to consider in evaluating whether the global settlement was in their best interest and the content of the disclosure provided to them . . . , I am firmly convinced that the Bondholders did not receive adequate disclosure before they voted to accept the Plan.

---

[5]   LBH, a debtor in possession, and its two affiliates (collectively, the "Debtors") separately petitioned under Chapter 11, and the three cases were jointly administered.   See In re Lower Bucks Health Enterprises, Inc., No. 10-10241 (Bankr. E.D. Pa. Jan. 13, 2010); In re Advanced Primary Care Physicians, No. 10-10243 (Bankr. E.D. Pa. Jan. 13, 2010).   The cases filed by LBH's affiliates are not at issue here.

Id. at 459 (footnote omitted).   BNYM appealed that order.   On January 2, 2013, the District

Court affirmed the Bankruptcy Court's ruling.   In re Lower Bucks Hosp., 488 B.R. 303, 325

(E.D. Pa. 2013) (Savage, J.).   BNYM appealed again.   On June 12, 2014, the Third Circuit

affirmed, discerning no abuse of discretion in the ruling that the third party release was not

adequately disclosed.   In re Lower Bucks Hosp., 571 F. App'x 139 (3d Cir. 2014) (Ambro, J.).

　　　Importantly, before the bondholders voted to accept the proposed plan, nine notices and a

disclosure statement were issued.   However, none of the notices described the bondholders'

potential claims against BNYM or explained what claims by the bondholders against BNYM

would be subject to the third party release.   Lower Bucks Hosp., 488 B.R. at 320 & n.58

(Savage, J.), aff'g, 471 B.R. at 461-62 (Frank, J.), aff'd, 571 F. App'x 139, 143-44 (Ambro, J.).

The District Court ruled that "there was insufficient information from which the Bondholders

could have concluded that they had a potential claim against BNYM."   Id.   The District Court

also ruled that the disclosure statement was insufficient:

> Significantly, the Bankruptcy Court found that the disclosure statement did not
> provide the Bondholders with information about the merits or value of the
> potential claims against BNYM in the class action [this C.A. No. 11-6460] that
> they would be relinquishing. . . . Consequently, the Bondholders could not
> evaluate whether the benefits of the proposed plan outweighed what they would
> give up by agreeing to the third party release.

Id. at 320-21, aff'g, 471 B.R. at 459-62.

　　　Previous rulings on the parties' respective motions for summary judgment have decided

certain questions of law, and those rulings guide the certification analysis as well.   Order &

Mem., dated Mar. 23, 2016 (Docs. 136, 137).   See Claims to Be Given Class Treatment, infra,

discussing those rulings.

I.       <u>HISTORY</u>

In 1992, The Lower Bucks Hospital (also, "LBH") entered into the bond financing

transaction, aiming to refinance debts and fund capital improvements.   The Borough of

Langhorne Manor Higher Education and Health Authority (the "Authority") agreed to issue

$35,980,000.00 of hospital revenue bonds, and loan to the hospital proceeds from sales of the

bonds.   LBH agreed to pay principal and interest on the bond debt.   The transaction began with

two agreements, each dated November 1, 1992:   the Loan and Security Agreement between the

Authority and LBH, and the Trust Indenture between the Authority and the original Indenture

Trustee, Continental Bank.   Loan Agreement (Doc. 126-7); Indenture (Doc. 126-6).   JP Morgan

succeeded Continental Bank as Indenture Trustee.   On October 1, 2006, The Bank of New York

Trust Company, N.A. succeeded JP Morgan as Indenture Trustee.   On October 31, 2007, BNYM

became Indenture Trustee.

The transaction agreements created broad rights to indemnification, running from LBH to

the Authority and from LBH to the Indenture Trustee.   Loan Agreement §§ 11.4(b), 11.4(e).

LBH granted the Authority security interests and liens against LBH's unrestricted gross revenues

and reserve funds, as collateral securing the bond debt.   <u>Id.</u> §§ 6.2, 6.4.   It was agreed that the

Authority would assign its rights to the Indenture Trustee, for the benefit of the bondholders.   <u>Id.</u>

§ 6.3.   The assigned rights were those set forth in the Loan Agreement.   Indenture, recitals at 2-3,

§ 6.02.   Under an Assignment also executed on November 1, 1992, the Authority assigned most

of its rights under the Loan Agreement to the Indenture Trustee, including "all security therefore,

the same to be held in trust and applied by the Trustee as provided in said Indenture . . . ."

Assignment (Doc. 126-9).   It was agreed that all "money received by the Trustee under this

6

Indenture shall be considered trust funds . . . ."   Indenture § 7.01.   Accordingly, under the transaction documents, the bondholders are intended beneficiaries of the agreed security interests.

UCC-1 financing statements for the agreed security interests were filed in 1992 in the bond-debtor hospital's name, The Lower Bucks Hospital.   At times thereafter, the hospital changed its name—from "The Lower Bucks Hospital" to "Temple Lower Bucks Hospital, Inc.," and then to "Lower Bucks Hospital."   Financing statements that were filed to record a security interest in the hospital's gross revenues did not always correctly reflect the actual name of the debtor hospital.   On October 16, 2009, BNYM filed an amended financing statement and a new financing statement in order to remedy such an insufficient identification, each of which financing statements correctly named the debtor hospital, Lower Bucks Hospital.

Under Pennsylvania's Uniform Commercial Code, if a change in the debtor's name renders a previously filed financing statement "seriously misleading," then "the financing statement is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the filed financing statement becomes seriously misleading," unless an amended or a new financing statement is filed "within four months after the filed financing statement became seriously misleading."   13 Pa.C.S.A. §§ 9506, 9507.   Here, there are triable disputes as to whether the filed financing statements effectively perfected or continued perfection of the security interests in the hospital's gross revenues, and reserve and debt service funds.

On January 13, 2010, LBH and its affiliated Debtors separately petitioned for reorganization under Chapter 11 of the Bankruptcy Code.   LBH Pet. (Bankr. Doc. 1).   On August 18, 2010, BNYM, acting as Indenture Trustee on behalf of the bondholders, filed a proof of claim against the bankruptcy Debtor LBH.   Proof of Claim & Suppl. (Doc. 126-14).   The amount

7

claimed was $25,906,294.98, representing principal and interest due on the bonds as of the date

LBH's petition was filed.   Id.   The proof of claim presented a "Secured Claim," which was

described as:   "Lien on and security interest in the Debtor's Unrestricted Gross Receipts, as

defined in the Loan Agreement, Debt Service Reserve Fund and Debt Service Fund," with a stated

value "of no less than $15,353,325."   Id.

On April 30, 2010, LBH commenced the bankruptcy adversary proceeding against the

Indenture Trustee, BNYM, and on September 1, 2010, LBH amended its pleading.   Am. Compl.

(Adv. Doc. 23)   The Official Committee of Unsecured Creditors ("Committee") intervened as a

plaintiff, joining in LBH's amended pleading.   Order, entered Nov. 18, 2010 (Adv. Doc. 36);

Joinder (Adv. Doc. 37).   Primarily, LBH sued to avoid the security interests and liens against the

hospital's unrestricted gross revenues, and reserve and debt service funds (together, "reserve

funds"), which the transaction agreements defined as collateral securing the bond debt.   The

amended pleading alleged:   On October 16, 2009, BNYM filed amended and new financing

statements.   BNYM did so to correct lapsed or seriously misleading recordings and perfect the

security interest in the hospital's gross revenues.   Those financing statements constituted a

preferential transfer of an interest within 90 days of LBH's bankruptcy filing, which transfer was

subject to avoidance under the Bankruptcy Code.   See 11 U.S.C. §§ 547(e), 547(b), 550.   In

addition, BNYM transferred moneys from the hospital's bank accounts and bond reserve funds,

which transfers were also preferential and voidable for the benefit of the bankruptcy estate.

BNYM, as Indenture Trustee, chose to act in the bankruptcy case and the adversary

proceeding as the bondholders' sole representative.   BNYM strongly opposed the adversary

claims presented by LBH.   During June and July, 2011, the adversary parties—primarily LBH,

8

BNYM, and the Committee—engaged in court-mediated negotiations.   BNYM negotiated on behalf of the bondholders.   BNYM also participated as a corporate person to protect its own interests as an indemnitee-creditor of LBH under the transaction agreements, and as a potential defendant in relation to foreseeable claims by bondholders.   Specifically, BNYM was exposed to potential claims by bondholders that they suffered a reduced recovery in the bankruptcy case for the value of their bonds, which was caused by BNYM's failure to maintain perfection of the security interests and liens against the hospital's assets.

In part, BNYM's dual roles arose as follows.   Under the Loan Agreement, LBH agreed to separately indemnify the Authority and the Indenture Trustee, provided that their liability was not caused by gross negligence, willful misconduct, fraud, or deceit.   During settlement discussions, LBH successfully negotiated a promised release of its indemnification obligations. That release exposed BNYM to potentially substantial liability to bondholders, without any right of indemnification from LBH.   BNYM's firm position was that it was not liable to the bondholders.   However, BNYM strenuously, and successfully, negotiated for a promised release of its potential liability under the transaction agreements to the bondholders, although they were not parties to the adversary proceeding.   The release was designed to protect BNYM from liability in regard to claims presented by LBH in the adversary proceeding as well as any claims asserted by any nondebtor, third parties—especially, the bondholders.   BNYM considered the third party release integral to a contemplated global settlement leading to a consensual plan for reorganization.

The adversary parties—primarily LBH, BNYM, and the Committee—agreed to settle. On August 12, 2011, LBH moved for the Bankruptcy Court's approval of their agreement.   LBH

9

Mot., ¶¶ 22-23, 30, attaching "Stipulation Resolving Adversary Proceeding," with Ex. A, "Joint

Term Sheet of Debtors, Committee and Bondholders Regarding the Plan," entered into Aug. 12,

2011 (Bankr. Docs. 1272, 1272-1).   The Stipulation provided for dismissal of the adversary

proceeding, with prejudice, as of the effective date of a contemplated consensual plan for the

Debtors' reorganization in the bankruptcy case.   Id., Stipulation, ¶ 5 (Bankr. Doc. 1272-1).

     The Stipulation specified terms that were required to be contained in an acceptable plan

for reorganization.   Among those terms, the proof of claim filed by BNYM, as Indenture Trustee

acting on behalf of the bondholders (the "Bond Trustee"), "shall (i) be allowed as a secured claim

in the amount of $8,150,000 plus the amount of the Reserve Fund and the Debt Service Fund . . .

and (ii) otherwise be disallowed."   Stipulation at 2-3, ¶ 2(a).   Other required terms were:

> the Bond Trustee shall accept from LBH, $8,150,000 (the "Settlement Funds") on
> or as soon as reasonably practicable after the Plan Effective Date and the Debtors
> and their estates shall be deemed to have released any and all rights, claims and
> interests to and in the Reserve Fund and the Debt Service Fund.

Id. ¶ 2(c).   Furthermore, the plan "at a minimum" was required to be one that

> provides for a release of any and all claims and causes of action arising under or in
> any manner related to the Bond Documents against the Debtors, the Debtors'
> estates, and the Bond Trustee by any and all parties, including without limitation
> all Bondholders, to the extent permitted by applicable law.

Id. ¶ 8(a)(ii)(B).   The latter terms would release, "to the extent permitted by applicable law," all

claims by the bondholders against the Indenture Trustee, including potential claims for damages

resulting from conduct that caused the security interests and liens to become unperfected and

voidable.   Id.   Paragraph 8(a)(ii)(B) was the genesis of a third party release that initially was

contained in the proposed plan, but ultimately was not confirmed by the Bankruptcy Court.   The

route to that outcome was circuitous, as explained below.

During a hearing on September 14, 2011, with only the Debtors, Committee, and Indenture Trustee appearing, the Bankruptcy Court approved the stipulated settlement and announced its intention to sign the approval order submitted by those proponents of the settlement.   Hr'g Tr., dated Sept. 14, 2011, 37:24-39:16 (Bankr. Doc. 1390).   The proposed approval order at "romanette" paragraph viii restated the third party release contained in paragraph 8(a)(ii)(B) of the Stipulation.   The Bankruptcy Court approved the release as a "factual finding"—that is, "not a part of the coercive order."   Id., 38:3-8, 39:3-4.   On September 15, 2011, the approval Order was entered (Bankr. Doc. 1320).   At that time, Judge Frank did not understand the full import of all of the stipulated terms that were to be carried forward into the plan for reorganization, and he did not know that the Stipulation and the approval Order contained a third party release.   Lower Bucks Hosp., 471 B.R. at 432-36, 435 n.19, 460-62, 463-64.   Judge Frank was unaware of the release until mid-November, 2011.   Id. at 464.

On September 27, 2011, the Debtors filed their plan for reorganization along with a disclosure statement, as modified in part by the adversary parties' stipulated settlement terms. Plan (Bankr. Doc. 1350); Disclosure S. & Order, entered Sept. 28, 2011, approving Disclosure S. (Bankr. Docs. 1352, 1355).   The Plan § 15.7 and the Disclosure Statement § K(2) each contained a third party release by the bondholders of claims against the Indenture Trustee.[6]

---

[6]   Plan:   "[T]he occurrence of the Effective Date shall constitute a release of any and all claims and causes of action arising under or in any manner related to the Bond Documents against the Debtors, each of the Debtors' estates, and the Bond Trustee by any and all parties, including without limitation all Bondholders, to the extent permitted by applicable law."   Id. § 15.7, at 42 (Bankr. Doc. 1350).

Disclosure Statement:   "[T]he occurrence of the Effective Date shall constitute a release of any and all claims and causes of action arising under or in any manner related to the Bond Documents against the Debtors, each of the Debtors' estates, and the Bond Trustee by any and all parties, including without limitation all Bondholders, to the extent permitted by applicable law."   Id. § K(2), at 55 (Bankr. Doc. 1352).

Plaintiff Becker testified at deposition that he did not receive notice of the settlement of the adversary proceeding before the Bankruptcy Court approved the settlement.   Becker Dep., dated Feb. 12-13, 2013, 136:15-138:11, 205:8-206:5, 208:7-21, 210:2-17 (Doc. 119-18). Sometime during September 14-21, 2011, he learned through his own investigation of the language contained in the settlement Stipulation and approval Order, and he did not like what he read.   He sought legal advice from Daniel Bacine, Esq. of Barrack, Rodos & Bacine (together, "Bacine"), who contacted Edmond M. George, Esq. of Obermayer Rebmann Maxwell & Hippel LLP (together, "Obermayer").   Id., 38:10-40:24, 69:7-24;see also George Decl., dated Sept. 11, 2013, ¶¶ 3-4 (Doc. 81-2).   Obermayer was retained during mid-September, 2011, as "special counsel" to Becker, "providing bankruptcy related legal services."   Id.   George's partner, Charles M. Golden, Esq., testified that "Obermayer was only retained as special bankruptcy counsel on the issue of the release.   That was - - that was our engagement, that was our focus." Golden Dep., dated July 21, 2014, 67:3-7, 112:10-18 (Doc. 119-10).

On September 29, 2011, the tenth business day after entry of the approval Order on September 15, 2011, Becker moved for reconsideration and vacation of that Order.   Mot. Recons. (Bankr. Doc. No. 1357).   Therein, Becker stated "no objection to the extent that the Settlement Agreement settles any and all claims by and between the Debtors, the Committee, and the Bond Trustee."   Id. ¶ 8.   Becker's principal position was that the Stipulation and the approval Order attempted to improperly effectuate an impermissible third party release.   The motion averred that the bondholders were not given notice of the Stipulation before it was signed or the approval Order before it was entered.   Id. ¶ 7.   It also averred that the bondholders were not adequately represented in the settlement process, because there was a "clear" and "actual conflict of interest

between the Bond Trustee and the Bondholders resulting from the alleged failure to perfect the liens required under the Indenture."   Id. at ¶¶ 12, 44.   In essence, the motion asserted that the Debtors, Committee, Indenture Trustee, and the court all lacked authority to release or discharge the bondholders' claims against the Indenture Trustee.   See id. ¶¶ 9-12.

On October 6, 2011, Debtors' counsel, Adam H. Isenberg, Esq. of Saul Ewing LLP (together, "Saul Ewing"), and Becker's counsel, George, discussed the motion for reconsideration. Isenberg Dep., dated Jul. 2, 2014, 90:1-94:20 (Doc. 119-8).   Isenberg tried to convince George to withdraw the motion.   Id., 92:8-14, 94:10-15.   Isenberg understood that Becker challenged only one aspect of the stipulated settlement—that was, "the language in the settlement agreement regarding a release of the indenture trustee."   Id., 136:5-137:1.   In Isenberg's view, the Bankruptcy Court approved that language as a finding of fact, not an order, so George "did not need to be taking the action that he was taking to protect his client."   Id., 104:24-105:13.

By letter dated October 13, 2011 (Doc. 119-3), Isenberg informed George that Obermayer was "long-time counsel" to LBH, referencing five state court medical malpractice lawsuits filed against LBH, in which Obermayer represented LBH.[7]   In addition, the letter demanded that

---

[7]   J. Kurt Straub, Esq. of Obermayer defended LBH in medical malpractice, personal injury lawsuits filed in the Court of Common Pleas of Bucks County.   Each suit commenced before LBH filed its Chapter 11 petition on January 13, 2010, except Scott which was filed three weeks thereafter on February 4, 2010.   Upon the filing of LBH's petition, a stay of any claims against the debtors or their estates was imposed automatically by 11 U.S.C. § 362.   Plaintiffs in three of those suits—Scott, Webster, and Bright—moved in LBH's bankruptcy case to modify the automatic stay to permit them to recover solely to the extent that insurance proceeds were available to respond to any judgment.   These plaintiffs stipulated with LBH through its bankruptcy counsel, Saul Ewing, that the stay should be so modified, and the Bankruptcy Court so ordered.   In the other two suits—Razler and Kirk, Obermayer filed on January 20, 2010, suggestions of bankruptcy in the state court, and the suits were stayed.   These plaintiffs did not seek relief in the bankruptcy case from the automatic stay.   After the Plan for LBH's reorganization became effective on January 19, 2012, Razler and Kirk were dismissed for lack of prosecution, respectively on November 20, 2015, and September 23, 2014.   See Scott ex rel. Scott v. Lower Bucks Hosp., No. 2010-01193:  Mot. ¶¶ 2-3 (Bankr. Doc. 369), Stipulation & Order entered Jun. 30, 2010 (Bankr. Docs.

Obermayer withdraw from its representation of Becker because the motion for reconsideration of

the approval Order was in conflict with LBH's interests:

> Inasmuch as the Debtors intend to object to the Motion [for reconsideration], Obermayer's status as counsel to one or more of the Debtors presents a conflict of interest, which the Debtors do not waive.   Demand is hereby made that Obermayer withdraw from its representation of Mr. Becker, effective immediately.

Id.   The letter demanded that Obermayer respond by Friday, October 14, 2011.   Id.   See also

Isenberg Dep., 120:4-121:16.

On October 14, 2011, Becker filed this class action.   Also on that date, the period began

for creditors to vote as to whether they accepted the proposed plan for LBH's reorganization.

Later that day, Golden met with Isenberg and his colleague, Jeffrey C. Hampton, Esq., to discuss

the asserted conflict of interest.   Isenberg Dep., 127:14-22, 129:21-24.   At that meeting:

> We [Saul Ewing] reiterated our view that he doesn't need to seek that motion for reconsideration.   We told him that the motion for reconsideration jeopardized the settlement agreement for bondholders that we believed was extremely favorable for bondholders because of the requirement in the settlement agreement for finality of an order - - for an approval order by I believe it was October 31, 2011, and that the mere filing of his motion risks upending the entire bankruptcy case and putting 900 people out of work and killing the hospital.
>
> *     *     *
>
> We talked about the conflict.   He [Golden] was quite clear that if it were not Obermayer Rebmann involved in the case, it would be another law firm involved in the case.   The issue was not going to go away.

Id. 128:1-18; see also id., 132:10-20, 140:7-10, 153:19-154:1.   Obermayer's position was that

there was no conflict:

---

444, 469); Webster v. Temple Univ. Health Sys., Inc., No. 2005-03038, and Webster v. Temple Lower Bucks Hosp., Inc., No. 2006-05293:  Mot. ¶¶ 2-3 (Bankr. Doc. 505), Stipulation & Order entered Jul. 30, 2010 (Bankr. Docs. 524, 527); Bright ex rel. Bright v. Lower Bucks Hosp., No. 2007-04993:  Mot. ¶¶ 2-3 (Bankr. Doc. 1007), Stipulation & Order, entered Apr. 11, 2011 (Bankr. Docs. 1061, 1071); Razler v. Lower Bucks Hosp., No. 2006-07035; Kirk v. Lower Bucks Hosp., No. 2004-06972.

> And I indicated to them at all times that I never, ever on behalf of Leonard Becker wanted to be a stumbling block to confirmation, I had no desire to prevent confirmation of this plan, and I had no desire to set aside the monetary settlement, that my only issue was the third-party release which I thought, under appropriate law, was improperly granted.   That was the purpose of the motion to reconsider.

Golden Dep., 62:3-13; see also id., 58:1-63:3, 99:24-101:15, 102:4-103:2, 107:3-19.   Both sides "decided to try to figure out some solution."   Id., 60:15-17, 61:8-19.

During the next week, counsel achieved a resolution.   LBH would waive any conflict of interest presented by Obermayer's representation of Becker, and Becker would withdraw the motion for reconsideration, reserving all rights to challenge the third party release.   Becker would present his objections to the third party release at the hearing scheduled to confirm the proposed plan for LBH's reorganization.   Golden Dep., 109:8-110:12, 125:12-127:17.   Counsel for the Committee—Regina Stango Kelbon, Esq. and John E. Lucian, Esq. of Blank Rome LLP—were then consulted and joined the discussions as to how that agreement should be effected and recorded.   Id., 67:8-69:13, 172:17-173:3, 192:8-17; George Dep., dated Jul.18, 2014, 99:12-101:1 (Doc. 119-24).   See counsels' communications (Docs. 119-2, 119-4, 119-5, 119-6, 119-12, 119-13, 119-14, 119-17, 119-21, 119-22, 119-25).

Eventually, those discussions led to a letter agreement between counsel for LBH and counsel for Becker, which confirmed that LBH waived any conflict of interest which had been asserted with respect to Obermayer's representation of Becker as to bankruptcy issues and its representation of LBH in the medical malpractice suits.   Conflict waiver letter, dated Oct. 21, 2011 (Doc. 119-7).   LBH consented to Obermayer's continued representation of Becker with respect to an objection to LBH's proposed plan for reorganization, as amended from time to time, provided that the objection was addressed only to the propriety of the third party release of the

Indenture Trustee by the bondholders.   Id.   LBH affirmed that "it waive[d] any right or claim

relating to any alleged conflict of interest with respect to the Becker representation, including

disqualification, relating to such an objection."   Id.

On October 21, 2011, Becker withdrew the motion for reconsideration, stating that he did

so after having obtained the representations of the Debtors and the Committee that

> neither will assert that this withdrawal . . . waives, releases, discharges or prejudices
> Becker's rights to object at plan confirmation to the third party releases to be
> granted to BNYM by the Bondholders as set forth in the Plan, on any basis . . . .

Withdrawal Mot. Recons. (Bankr. Doc. 1402).   Becker withdrew the motion for reconsideration

before BNYM responded to the motion and before Judge Frank "had any reason to study it

closely."   Lower Bucks Hosp., 471 B.R. at 441 n.28.   On October 26, 2011, BNYM filed a

"response" to the withdrawal (Bankr. Doc. 1407), asserting that the Order approving the

stipulated settlement was a "final order," and by withdrawing the motion for reconsideration,

Becker had waived, released, or relinquished his rights to challenge the approval Order.   BNYM

reserved its rights to challenge the withdrawal in connection with plan confirmation.   Id.

On November 10, 2011, Becker filed objections to confirmation of the proposed plan,

stating several reasons why the plan should not be confirmed if it contained the third party release.

Objections (Bankr. Doc. 1443).   Upon review of the filing, the Bankruptcy Court found that the

objections presented serious issues as to whether the proposed plan could be confirmed at the

hearing then scheduled for November 18, 2011.   Lower Bucks Hosp., 471 B.R. at 440.   On

November 16, 2011, the court *sua sponte* issued a corrective order.   Order, entered Nov. 16, 2011

(Bankr. Doc. 1457).   Therein, the Bankruptcy Court observed that the approval Order "might be

interpreted to provide that, upon the effective date of the Debtor's plan of reorganization, the

Bondholders shall be deemed to have released the Bond Trustee from any and all claims and causes of action arising under or in any matter related to the Indenture," and the Court ruled that "the Approval Order is inconsistent with the court's announced decision and its stated intent at the hearing." Id., at 2, ¶¶ F, G (Bankr. Doc. 1457); see also Hr'g Tr., dated Sept. 14, 2011, 37:24-39:16.   Correcting the record, the Court _sua sponte_ modified the approval Order:

> The Stipulation between and among the Debtors, the Bond Trustee, and the Committee . . . is **APPROVED; PROVIDED HOWEVER,** that nothing in the Stipulation or this Order [initially entered Sept. 15, 2011, approving the stipulated settlement] shall waive, release, discharge or impair any claims that the Bondholders may have against the Bond Trustee.

Id., at 3.   The Court's ordered modification of the approval Order prompted an emergency conference with the parties the next day, during which the Court granted BNYM leave to move for reconsideration of the November 16 Order.   The Court continued the scheduled hearing to confirm the proposed plan to December 2, 2011.   See Lower Bucks Hosp., 471 B.R. at 441.

On November 17, 2011, BNYM responded to Becker's objections to confirmation of the third party release (Bankr. Docs. 1458, 1459, 1460).   On November 23, 2011, BNYM moved for reconsideration and vacation of the November 16 Order, and restoration of the approval Order. BNYM Mot. Recons. (Bankr. Docs. 1476, 1477, 1478).   Among other assertions, BNYM again took the position that Becker had waived and was otherwise foreclosed from challenging the third party release as initially approved by the Bankruptcy Court on September 14-15, 2011.   See, e.g., BNYM Resp. to Becker's Objections (Bankr. Doc. 1458 at 10 ¶ (ii), 18, 20, 24); BNYM Mot. Recons. (Bankr. Doc. 1477 at 9, 16-17, 25-27).   On November 30, 2011, Becker, the Debtors, and the Committee, respectively, opposed BNYM's motion for reconsideration.   See Becker (Adv. Doc. 125); Debtors (Bankr. Doc. 1496); Committee (Bankr. Doc. 1500).

17

On December 2, 2011, the Bankruptcy Court heard argument on confirmation of the proposed plan, BNYM's motion for reconsideration of the November 16 Order, and the parties' submissions.   Hr'g Tr., dated Dec. 2, 2011 (Bankr. Doc. 1819).   The Court began with BNYM's motion for reconsideration; however, counsel for the Indenture Trustee, Thomas Schell, Esq. of Bryan Cave, LLC, deferred to counsel for the Debtors, Isenberg.   Speaking on behalf of the Debtors, the Indenture Trustee, and the Committee jointly, Isenberg announced a "partial resolution," one in which Becker did not entirely concur.   Id., 5:6-9:5, 34:16-24.   In the lengthy colloquy that followed, Becker's counsel made it clear that the third party release was the sole ground for his objection to confirmation of the proposed plan.   Id., 23:8-14, 24:12-25:25, see id., 19:12-25:25.   Whereas everybody appearing in the courtroom wanted the plan to be confirmed that day, not everyone agreed to all proposed terms of the plan.   Lower Bucks Hosp., 471 B.R. at 441-43.   The parties recessed to negotiate further.

During a lengthy recess, all parties agreed that the proposed plan should be confirmed that day, as stipulated, but questions as to confirmation of the third party release should be decided later.   Hr'g Tr., dated Dec. 2, 2011, 35:6-37:9.   Two essential judicial actions were needed to implement the agreement.   First, the Bankruptcy Court would restore the initial approval Order in its entirety, except for one change—the deletion of romanette paragraph viii, which stated a finding that upon the effective date of the plan the bondholders released their claims against the Debtors, the Debtors' estates, and the Indenture Trustee.   Id., 36:2-7.   Second, the Court's confirmation order would contain certain stipulated language, including terms stating that entry of the order was "without regard to the permissibility, enforceability and scope of the release contained in Plan Section 15.7."   Id., 36:8-37:9.   The rights of all parties to later assert their

respective positions as to confirmation of the release would be reserved.   Id.   This agreement was in compromise of BNYM's motion for reconsideration and Becker's objections to confirmation of the proposed plan.

Based on the parties' agreement as to the proposed contents for the final approval and confirmation orders, which agreement the Bankruptcy Court approved, Becker withdrew his objections to confirmation of the plan.   Hr'g Tr., Dec. 2, 2011, 42:2-9.   The Court found that all requirements for confirmation of the proposed plan had been satisfied and announced its intention to "enter an order of confirmation that includes the various modifications that were discussed on the record."   Id., 75:4-76:7; 11 U.S.C. § 1129(b).

On December 7, 2011, the November 16 Order was vacated and the initial approval Order was restored with the agreed modification—deletion of romanette paragraph viii.   Order, entered Dec. 7, 2011 (Bankr. Doc. 1542).   The proposed plan was confirmed as the Plan for LBH's reorganization, "without regard to the permissibility, enforceability and scope of the release contained in Plan § 15.7."   Confirmation Order, entered Dec. 7, 2011, ¶ 4, see id. ¶¶ 3-6 (Bankr. Doc. 1538).   See also Plan, as modified and filed on September 27, 2011 (Bankr. Doc. 1350); id. § 15.7 (Bankr. Doc. 1350 at 48).

The record shows that the Stipulation and the confirmed Plan were not conditioned or dependent upon confirmation of the third party release contained in paragraph 8(a)(ii)(B) of the Stipulation and the Plan § 15.7.   The Indenture Trustee acknowledged as much.   Hr'g Tr., dated Dec. 2, 2011,13:16-25, 15:13-18, 17:11-22, 35:23-36:21; Lower Bucks Hosp., 471 B.R. at 425 ("It was agreed that the outcome of that later hearing regarding the Third Party Release would not affect the Confirmed Plan.").   See also Confirmation Order, ¶ 4 ("The outcome of such hearing

[as to confirmation of the third party release] **WILL NOT AFFECT** the confirmation of the Plan [entered on Dec. 7, 2011] in any manner whatsoever."); Isenberg Dep., 175:1-176:12, 229:14-230:7; Debtors' Resp. to BNYM's Mot. Recons. (Bankr. Doc. 1496 at 3-7); Committee Resp. to BNYM's Mot. Recons. (Bankr. Doc. 1500 at 2); Hr'g Tr., dated Mar. 2, 2012, 7:19-20, 8:8-18, 31:4-16 (Bankr. Doc. 1918); Lower Bucks Hosp., 471 B.R. at 457-59 (the Stipulation's terms were "fundamentally conditional" and contingent upon confirmation as part of the Plan).

On March 2, 2012, the Bankruptcy Court heard Becker and BNYM as to whether the third party release should be approved.   Hr'g Tr., dated Mar. 2, 2012 (Bankr. Doc. 1918).   On May 10, 2012, the Court denied confirmation because the release was inadequately disclosed.   Order, entered May 10, 2012 (Bankr. Doc. 2041); Lower Bucks Hosp., 471 B.R. at 459, 464 (Frank, J.). BNYM appealed that order.   On January 2, 2013, the District Court affirmed the Bankruptcy Court's ruling.   Id., 488 B.R. at 325 (Savage, J.).   BNYM appealed again.   On June 12, 2014, the Third Circuit affirmed, discerning no abuse of discretion in the Bankruptcy Court's ruling that the third party release was not adequately disclosed.   Id., 571 F. App'x at 143-44 (Ambro, J.).

On November 13, 2012, Becker separately sued BNYM, primarily to compel BNYM to pay the bondholders the funds that had been allowed under the Plan for them.   On December 14, 2012, BNYM moved to dismiss the action for failure to state a claim.   BNYM Mot. (Becker II Doc. 4).   Becker opposed dismissal and separately moved for summary judgment.   Resp. & Mot. Summ. J. (Becker II Docs. 6-8).   BNYM's dismissal motion was denied, and Becker's motion for summary judgment was denied without prejudice.   Orders, dated respectively Jan. 25, 2013, & Mar. 18, 2013 (Becker II Docs. 9, 20).

20

In this action, on March 8, 2013, class discovery initially closed.   On March 26, 2013,

Becker filed the present motion for class certification.   Pl. Mot. (Doc. 67).   The parties were

permitted to conduct supplemental class discovery.   On February 27, 2015, the parties filed briefs

supplementing their positions as to class certification.   Pl. & Defs. Suppl. Brs. (Docs. 118, 119).

On April 10, 2015, the parties respectively moved for summary judgment on the claims presented

in Becker I and Becker II.   Pl. & Defs. Mots. Summ. J. (Docs. 125, 126).   Whereas rulings on

those motions for summary judgment decided certain questions of law under Pennsylvania's

common law and the transaction agreements, triable disputes were found as to all of the claims

stated in Becker I and Becker II.   Order & Mem., dated Mar. 23, 2016 (Docs. 136, 137).


II.    CLASS CERTIFICATION

Under Federal Rule of Civil Procedure 23, a proponent of class certification must meet the

requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), 23(b)(2), or 23(b)(3).   In

re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 426 (3d Cir. 2016).   Rule

23(a) permits one or more members of a class to sue as representative parties only if four threshold

requirements are established:

> "(1) the class must be 'so numerous that joinder of all members is impracticable'
> (numerosity); (2) there must be 'questions of law or fact common to the class'
> (commonality); (3) 'the claims or defenses of the representative parties' must be
> 'typical of the claims or defenses of the class' (typicality); and (4) the named
> plaintiffs must 'fairly and adequately protect the interests of the class' (adequacy
> of representation, or simply adequacy)."

Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 590-91 (3d Cir. 2012) (quoting In re Cmty.

Bank, 622 F.3d 275, 291 (3d Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(1)-(4))).

If the requirements of Rule 23(a) are met, then it must be determined whether the proposed class fits within one of the three categories of class actions set forth in Rule 23(b).   Rule 23(b)(3), the principal basis for certification here, requires that "(1) common questions predominate over any questions affecting only individual class members (predominance) and (2) class resolution is superior to other available methods to decide the controversy (superiority)."   Nat'l Football, 821 F.3d at 426; Marcus, 687 F.3d at 591; Cmty. Bank, 622 F.3d at 291.

Parties seeking class certification "bear the burden of establishing by a preponderance of the evidence that the requirements of Rule 23(a) have been met."   In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig., 795 F.3d 380, 391 (3d Cir. 2015); see In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 316 (3d Cir. 2009) (Rule 23's requirements "are not mere pleading rules.").   A proponent of class certification is required to "affirmatively demonstrate" that "there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."   Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).   Our Court of Appeals has often emphasized that "'[a]ctual, not presumed conformance' with the Rule 23 requirements is essential."   Hydrogen Peroxide, 552 F.3d at 326 (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167 (3d Cir. 2001) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982)); accord Marcus, 687 F.3d at 591.   "This reasoning applies with equal force to certification questions surrounding [Rule] 23(b)(3)."   Newton, 259 F.3d at 167.

A.      Rules 23(a) and 23(b)(3) Govern This Class Certification

Becker sues under Rules 23(a) and 23(b)(3) for class certification of all claims stated in Becker I and Becker II.   In addition, Becker sues under Rules 23(b)(1) and 23(b)(2) for class certification of the claims stated in Becker II.   For any class certified under Rule 23(b)(3), "the

court must direct to class members the best notice practicable under the circumstances."   Fed. R. Civ. P. 23(c)(2)(B).   In addition, class members have the right to "opt out"—that is, to exclude themselves from class membership.   Id. 23(c)(2)(B)(v).   In contrast, for any class certified under Rules 23(b)(1) or 23(b)(2), "the court may direct appropriate notice to the class," but is not always required to do so.   Id. 23(c)(2)(A).   Furthermore, class membership is mandatory, and absent members have no right to abstain by opting out.   Id. 23(b)(1), 23(b)(2).

The claims presented in both Becker I and Becker II for class treatment seek to aggregate unliquidated damage claims.   Triable disputes exist as to the extent of loss or damage that might be recovered and the amounts that might be assessed against the bondholders' funds, if any. These damage claims "implicate the due process 'principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he had not been made a party by service of process."   Ortiz v. Fibreboard Corp., 527 U.S. 815, 846 (1999) (quoting Hansberry v. Lee, 311 U.S. 32, 40 (1940)).   Other serious constitutional concerns are presented as well.   The record is clear that the bondholders were not given adequate notice in the bankruptcy case of their potential claims against the Indenture Trustee.   The notice provided to them of their rights as creditors to share in distributions from the bankruptcy estate cannot be assumed to be sufficient to meet due process concerns raised by class resolution of their individual legal claims.   For these reasons, absent class members should not be bound to a judgment here, without notice and the right to exclude themselves from the class as a matter of right under Rules 23(b)(3) and 23(c)(2)(B).

Because it is crucial that members of the proposed class receive Rule 23(b)(3)'s constitutional due process protections of notice and the right to opt out of the class, further

analysis will not be provided as to certification of any claims under Rules 23(b)(1) or 23(b)(2).

For reasons that follow below, it is also ruled that the claims stated in <u>Becker I</u> and <u>Becker II</u>

meet the requirements for class certification under Rules 23(a) and 23(b)(3).

> B.      The Class Definition

Rule 23 requires that "[a]n order that certifies a class action must define the class and the

class claims, issues, or defenses . . . ."   Fed. R. Civ. P. 23(c)(1)(B).   This requires that the

"contours of the class along with the issues, claims, and defenses to be given class treatment"

must be clearly delineated.   <u>Marcus</u>, 687 F.3d at 591.   Specifically, the order must include:

> "(1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis."

<u>Id.</u> (quoting <u>Wachtel v. Guardian Life Ins. Co.</u>, 453 F.3d 179, 187 (3d Cir. 2006)).

Becker sues to certify a class comprising holders of the hospital revenue bonds who are

entitled to a distribution under LBH's confirmed Chapter 11 Plan for reorganization.   The

proposed class is defined as "all persons or entities who are holders of an Allowed Class A3

Claim pursuant to Section 5.1.3(A)(ii) of Lower Bucks Hospital's plan of reorganization."   Pl.

Mot. at 1; Pl. Br. at 2 & n.2 (Doc. 67-1).   That provision of the Plan states:

> (ii) each holder of an Allowed Class A3 Claim shall, on or as soon as reasonably practicable after the Effective Date, receive such holder's Pro Rata share of: (a) the Reserve Funds, free and clear of any right, title or interest of any of the Debtors, all of which shall be deemed released as of the Effective Date; and (b) $8,150,000.00, in full satisfaction, settlement, release and discharge of and in exchange for such holder's Allowed Claim . . . .

Plan § 5.1.3(A)(ii) (Bankr. Doc. 1350 at 19-20).   Excluded from the proposed class are

Defendants and "any person, firm, trust, corporation, or other entity related to or affiliated with

any defendant and any officers and directors thereof."   Pl. Mot. at 1; Pl. Br. at 2 & n.2.

Defendants do not challenge the proposed class definition *qua* definition.

The proffered class definition is clear and precise.   The Plan organizes claims against the

Debtors into classes.   Plan, Article 3 (Bankr. Doc. 1350 at 16-18).   One classification is:

"Class A3 consists of the Bond Trustee/Bondholders Secured Claim."   Plan § 3.2(c) (Bankr.

Doc. 1350 at 16).   Among other pertinent definitions, the "'Bond Trustee/Bondholders Secured

Claim' means that certain proof of claim filed by the Bond Trustee, on behalf of the

Bondholders, on or about August 18, 2010, designated claim no. 377 by the Claims Agent, as and

to the extent such claim has been allowed by order of the Bankruptcy Court entered September

14, 2011."[8]   Id. § 1.18 (Bankr. Doc. 1350 at 8); see Proof of Claim No. 377 & Suppl. (Doc.

126-14).

The Bankruptcy Court ordered that the proof of claim that BNYM filed on behalf of the

bondholders—that is, the "Bond Trustee/Bondholders Secured Claim"

> shall (i) be allowed[9] as a secured claim in the amount of $8,150,000 plus the amount
> of the Reserve Fund and the Debt Service Fund . . . and (ii) otherwise be disallowed;
> [and]
>                                         *      *      *
> on account of the Bond Trustee Claim, LBH shall cause to be distributed to the Bond

---

[8]   See also:   "'Bond Trustee' means Bank of New York Mellon Trust Company, N.A., as successor Indenture Trustee for the Borough of Langhorne Manor Higher Education and Health Authority Hospital Revenue Bonds, Series of 1992 (The Lower Bucks Hospital)."   Plan § 1.16 (Bankr. Doc. 1350 at 8).   "'Bondholders' means the holders of Bonds."   Id. § 1.20 (Bankr. Doc. at 8).   "'Bonds' means the Borough of Langhorne Manor Higher Education and Health Authority Revenue bonds, Series of 1992 (The Lower Bucks Hospital)."   Id. § 1.21 (Bankr. Doc. 1350 at 8).

[9]   Section 502 of the Bankruptcy Code provides rules for determining the allowance and disallowance of claims.   11 U.S.C. § 502.   "Holders of allowed claims may receive distributions . . . under confirmed plans in chapter . . . 11 . . . cases."   Alan N. Resnick & Henry J. Sommer, 4 Collier on Bankruptcy ¶ 502.01, p. 502-9 (16th ed. 2016).   A "claim holder's rights with respect to a proposed plan are measured by the allowed amount of its claim" under 11 U.S.C. § 1129(b).   Id.

Trustee, and the Bond Trustee shall accept from LBH, $8,150,000 (the "Settlement Funds") on or as soon as reasonably practicable after the Plan Effective Date . . . .

Stipulation ¶ 2(a),(c), as approved by Order, dated Sept. 14, 2011, entered Sept. 15, 2011 (Bankr. Doc. 1320), attaching the Stipulation and the Joint Term Sheet (Bankr. Doc. 1320).   See also Order, entered Dec. 7, 2011 (Bankr. Doc. 1542) (vacating the Order, entered Nov. 16, 2011, and restoring the approval Order, entered Sept. 15, 2011); Confirmation Order, entered Dec. 7, 2011, ¶ 1 (Bankr. Doc. 1538).   See also Plan, filed on Sept. 27, 2011 (Bankr. Doc. 1350); id., "Class A3 Claims" § 5.1.3 (Bankr. Doc. 1350 at 19-20); id., Article 10, "Distribution Provisions" (Bankr. Doc. 1350 at 35-38).   Accordingly, the proposed class is sufficiently delineated.

Our Court of Appeals instructs that "an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria." Marcus, 687 F.3d at 592-93.   "The class definition must be clear in its applicability so that it will be clear later on whose rights are merged into the judgment, that is, who gets the benefits of any relief and who gets the burden of any loss." Id. at 593 (quoting Xavier v. Philip Morris USA Inc., 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011)).

Germane to this case, the Bankruptcy Court authorized Donlin Recano & Company, Inc. to act as claims administrator.   The Court ordered Donlin Recano to establish a list of bondholders as of August 9, 2011 (the "record date"), who would be entitled to notice of the stipulated settlement and the hearing to approve the settlement.   Donlin Recano prepared and filed a service list of bondholders, along with their addresses, which were obtained from the Indenture Trustee.   BNYM compiled the list from its own records of those who held bonds evidenced by certificates in their own name ("record holders") and from records provided by

Depository Trust Company ("DTC").   DTC posted notices of the settlement proceedings on its internal website, which were made available to its participant brokers and financial institutions. The DTC participants held the bonds in their "street name" at the request of their customers that held ownership interests in the bonds.   In turn, some DTC participants transmitted notices to those who held beneficial interests in the bonds not in their own name, but under the DTC participant's street name.   Some participants—such as Becker's broker, TD Ameritrade—did not provide customers with notices, unless the trustee forwarded extra copies of the notices and enough postage to cover the cost of mailing those copies.   See Becker Dep. 129:13-130:19; TD Ameritrade email to Becker, dated Jan. 25, 2013, Pl. Reply, Ex. 12.

The Bankruptcy Court found the settlement record date, August 9, 2011, to be fair and equitable and approved the manner of service of notice to the bondholders.   See Donlin Recano Aff. of Service, dated Aug. 12, 2011 (Bankr. Doc. 1277); Stipulation ¶¶ 14, 15; approval Order, entered Sept. 15, 2011, at 2(i).   See also Defs. Resp.to Becker's Objections (Bankr. Doc. 1458 at 25-27); Schessler Decl., ¶¶ 5, 6, 7, 14, Exh. L (Bankr. Doc. 1459, 1459-12).

Here, the proposed class is ascertainable.   Persons or entities holding an allowed Class A3 Claim were defined by objective criteria in the bankruptcy case.   They are identifiable as class members here by the same criteria.   But the notice given to holders of an allowed Class A3 claim for purposes sharing in the bankruptcy settlement funds cannot be presumed to be adequate here. Some potential class members may not have received actual notice of the bankruptcy settlement. Defendants acknowledge as much.   Defs. Resp. at 11 & n.3.   The record is not fully developed as to whether Defendants' current records are adequate to identify the class members in this litigation.   Nonetheless, in a Rule 23(b)(3) action, absent class members may be protected by

27

implementing "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."   Fed. R. Civ. P. 23(c).

      C.      The Claims to Be Given Class Treatment

      Previous rulings on the parties' respective motions for summary judgment decided questions of law pertinent to the claims to be given class treatment.   <u>See</u> Order & Mem., dated Mar. 23, 2016 (Docs. 136, 137).   The Complaint in <u>Becker I</u> alleges that Defendants breached their fiduciary and contractual duties to the bondholders by failing to maintain perfected security interests and liens against the property securing the bonds.   It was ruled that a successful claim for breach of fiduciary duty requires proof of the existence of a fiduciary relationship, breach of a duty imposed by that relationship, and damages resulting from that breach of duty.   <u>Id.</u>, Mem. at 13-19.   And a claim for breach of contract requires proof of the existence of a contract, breach of a duty imposed by the contract and its terms, and resultant damages.   <u>Id.</u> at 20-21.

      Under Pennsylvania's common law and the transaction agreements, it was ruled that Defendants owed actionable fiduciary duties to the bondholders.   Mem., dated Mar. 23, 2016, at 19, 13-19.   It was also ruled that Defendants can be held liable under the transaction agreements for not using reasonable care to protect and preserve the bondholders' rights and interests.   <u>Id.</u> at 19.   It was further ruled that triable disputes exist as to whether Defendants breached any fiduciary duties, and whether any proven breach caused the bondholders to incur loss or damage. <u>Id.</u>   As to the breach of contract claim, it was ruled that the trier of fact must resolve questions presented by the parties' expert opinion evidence of custom and practice in the corporate trust industry, which was proffered to establish the contractual intent and meaning of certain provisions contained in the transaction agreements.   <u>Id.</u> at 24, 14-24.   It was ruled that triable

disputes also exist as to whether Defendants breached any contractual duties, and whether any proven breach caused the bondholders to incur loss or damage.   Id. at 24.

Count I of the Complaint in Becker II sues for a declaration that the bondholders are entitled to prompt disbursal of the funds awarded to them under the Plan, and Defendant BNYM is not entitled to deduct from those funds any amounts that it incurred asserting its personal interests.   Specifically, Count I challenges BNYM's asserted rights to be indemnified and exercise a first-priority charging lien for:   expenditures incurred by BNYM's efforts to make the third party release part of the confirmed Plan, and its appeals of the Bankruptcy Court's denial of confirmation of that release; BNYM's defense of LBH's adversary proceeding; and BNYM's defense of this litigation.   Compl. ¶¶ 47, 48.   Count I further requests that BNYM be ordered to immediately pay the bondholders the sum of $8,150,000.00, plus amounts contained in the reserve and debt service funds, minus only BNYM's reasonable administrative fees, expenses, and costs incurred after the effective date of the Plan, January 19, 2012, for the limited purpose of disbursing the funds to the bondholders.   Id. ¶ 49.   Counts II through V of the Complaint in Becker II sue for equitable remedies—an injunction to distribute the funds, an accounting of the funds, and damages for conversion and for monies had and received.

Under Pennsylvania's common law and the transaction agreements, it was ruled that Defendants do not have the asserted rights to be indemnified and exercise a first-priority charging lien for expenditures incurred by BNYM's defense of this consolidated litigation.   Mem., dated Mar. 23, 2016, at 36-37, 25-36.   It was also ruled that Defendants do not have those asserted rights for expenditures incurred after the effective date of the Plan, January 19, 2012, by BNYM's efforts to make the third party release part of the Plan, and its appeals of the Bankruptcy Court's

29

denial of confirmation of that release.   Id. at 37-38.   It was further ruled that triable disputes exist

as to whether Defendants had those asserted rights for expenditures incurred before January 19,

2012, by BNYM's efforts to make the third party release a part of the proposed plan for LBH's

reorganization and by BNYM's defense of LBH's adversary proceeding.   Id. at 38.

Furthermore, BNYM was not ordered, as Becker requested in Count I of the Complaint in

Becker II, to immediately pay the bondholders the sum of $8,150,000.00, plus certain reserve and

debt service funds, minus only BNYM's reasonable administrative fees, expenses, and costs

incurred after January 19, 2012, in order to disburse the funds to the bondholders.   The request

was denied because triable disputes are presented as to some amounts, if any, BNYM might be

permitted to deduct from the funds.   Mem., dated Mar. 23, 2016, at 38.   As to Counts II through

IV of the Complaint, which state claims for an injunction, an accounting, and damages for

conversion and for monies had and received, it was ruled that triable disputes are also presented

as to the amounts that might be assessed against the bondholders' funds.   Id. at 39-20.

Becker maintains that each bondholder is being damaged by BNYM's refusal to distribute

the funds that rightfully belong to them.   Pl. Br. at 14.   He also maintains that each bondholder

has suffered a uniform, "common injury" by BNYM's refusal to distribute the funds and its

improper use of the funds—which injury is properly remedied by class-wide relief.   Id. at 20.

As to the Becker I claims for breach of fiduciary and contract duties, Becker maintains

that both are founded on the same course of misconduct—that is, Defendants failed to maintain

perfection of the security interests and liens against the property securing the bonds.   Compl. ¶¶

1, 16-26, 33-34, 43-45.   The challenged conduct occurred before LBH filed its Chapter 11

petition and before LBH commenced the adversary proceeding against BNYM.   However, it is

30

alleged that Defendants' pre-petition conduct creating the imperfect security interests had

post-petition consequences:   the bondholders ceased to be secured creditors and instead, became

general unsecured creditors of the bankrupt hospital.   It is further alleged that BNYM, in

negotiating to settle LBH's adversary proceeding, "was forced to compromise" by agreeing to

reduce the amount sued for in the proof of claim that BNYM filed on behalf of the bondholders,

in exchange for that claim being treated as a secured claim.   Id. ¶¶ 35, 45.   Specifically, Becker

maintains that the $8,150,000.00 settlement on behalf of the bondholders "represent[s] a

significant reduction from the amount BNYM listed on the proof of claim . . . , which valued the

subject collateral at 'no less than $15,353,325.'"   Pl. Suppl. Br. at 1, 3 (Doc. 118) (quoting Proof

of Claim & Suppl. (Doc. 126-14 at 2)); Pl. Br. at 4-6, 7-8.   Becker's theory is that each

bondholder's proportional claim—a pro rata allotment depending upon the number of bonds

held—was awarded more than an unsecured creditor received, but less than what a secured

creditor with a perfected security interest would have received without the forced reduction.[10]

In Becker's view, each bondholder was damaged in the same way by Defendants' failure

to maintain perfected security interests and liens against the collateral securing the bonds, which

caused each bondholder to be entitled to less than they would have been entitled if the security

interests had been perfected.   Pl. Br. at 14.   Becker also asserts that BNYM's refusal to

---

[10]   In general, the "absolute priority rule" requires that secured creditors receive payment in full before unsecured creditors can receive or retain property under a Chapter 11 plan of reorganization.   11 U.S.C. § 1129(b)(2)(A)(i)(I), (II); In re Alfaro, 501 B.R. 292, 295-96 (E.D. Pa. 2013) (discussing the rule).   See also Alan N. Resnick & Henry J. Sommer, 4 Collier on Bankruptcy ¶ 506.02, p. 506-9 ("the protections afforded secured creditors under the Code generally adhere first to the principle that the secured creditor is entitled to priority payment out of its collateral, and second to the principle that the secured creditor is entitled to receive the equivalent value of its collateral.").   However, the rule is not necessarily implicated when a settlement is presented for court approval apart from a reorganization plan. In re Jevic Holding Corp., 787 F.3d 173, 183-84 (3d Cir. 2015), cert. granted, 136 S. Ct. 2541 (U.S. 2016).

distribute the bondholders' funds, and its improper use of those funds, egregiously aggravates the loss and damage to each bondholder in the same way.   Id.   Because each bondholder has been injured "in precisely the same manner by defendants' wrongful conduct," which has caused and continues to cause "a uniform type of injury to all members of the class," Becker maintains that this is "a paradigm case for class certification."   Id. at 7-8, 12-13, 17 (asserting that any differences in individual recoveries will be attributable solely to the number of bonds owned); see also Pl. Reply at 2-3, 5, 17-18 (Doc. 72).

Becker does not maintain that BNYM, in settling LBH's adversary proceeding, had any better option than to compromise by agreeing to reduce the amount sued for in the proof of claim, in exchange for that claim being treated as a secured claim under the Plan.   Pl. Reply at 2-3.   He does not challenge the manner in which the settlement was negotiated and achieved, and he does not dispute the fairness or reasonableness of the approved settlement:   "That settlement has already been agreed to and approved, and LBH's plan of reorganization, which included the settlement, is not being challenged in this action."   Id. at 3.   Instead, Becker asserts that Defendants' liability arises from breach of their duties to assure perfection of the security interests and liens, which conduct occurred "*before* the bankruptcy and therefore *before* the adversary proceeding."   Id.   In his view, the settlement was not inappropriate or unsatisfactory, given the hard reality of the imperfect security interests and voidable liens.   Id. at 17-18, 20.

Becker supports his position with a report by Executive Sounding Board, who was a consultant to LBH in the bankruptcy case.   The report analyzes LBH's assets based on information available as of September 16, 2011, and provides liquidation values of assets that should have been subject to perfected security interests for the benefit of the bondholders.   Pl.

Reply at 13-14, Ex. 9, Report (also attached as Ex. C to the Disclosure S., dated Sept. 27, 2011

(Bankr. Doc. 1352-3)).   Based on an assumption that BNYM prevailed in the adversary

proceeding and the bondholders' lien was enforceable, the report estimated the liquidation

proceeds available to pay the bondholders to be $15,373,536.   Id. (Doc. 1352-3 at 13).   Becker

also submits the proof of claim that BNYM filed on behalf of the bondholders on August 18,

2011, which stated the value of the secured property at "no less than $15,353,325."   Pl. Reply at

14; Proof of Claim & Suppl. (Doc. 126-14 at 2).   In addition, Becker cites ten cash collateral

orders, which permitted LBH to use assets in the hospital's operations during reorganization.   Pl.

Reply at 14.   One of those orders, submitted as an exemplar, stated the value of LBH's

unrestricted gross revenues—comprising the reserve and debt service funds, cash, and accounts

receivable—to be a combined total of $15,353,327, as of the time that LBH filed its Chapter 11

petition on January 13, 2010.   Id. at 14 & n.14, Ex. 1, Interim Cash Collateral Order, entered

Jan. 15, 2010, ¶¶ E, F(4) (Bankr. Doc. 47).   Becker also cites a provision contained in each order

giving the bondholders a lien against LBH's real estate for adequate protection against

diminution in value of the secured assets, "but only if and to the extent the Indenture Trustee's

asserted lien on the Prepetition Collateral is determined to be a valid, perfected, enforceable and

non-avoidable first priority lien."   Id. at 15-16 & n.14, Ex. 1, ¶ 6 (Bankr. Doc. 47 at 9-10).

     Evidence of BNYM's settlement of LBH's adversary proceeding is largely irrelevant to the

claims stated in Becker I and Becker II.   In order to prevail, Becker must prove that at the time

that LBH filed its Chapter 11 petition, the security interests and liens against LBH's unrestricted

gross revenues were not perfected and the liens were voidable.   The scope and particulars of

Defendants' duties to the bondholders to maintain the security interests and liens must be

established.   Mem., dated Mar. 23, 2016, at 19, 24.   It must be shown that Defendants, by their

practices or conduct, allowed the security interests and liens to lapse.   The value of the bonds and

the assets that were subject to the security interests and liens must be established.   It must also be

shown that the bankruptcy estate had available funds or property in excess of what the bondholders

were allowed under the Plan.   If Becker proves as much, a jury might draw a reasonable inference

that BNYM agreed in settling the adversary proceeding to reduce the amount sued for in the proof

of claim that BNYM filed on behalf of the bondholders because the security interests and liens had

lapsed as a result of Defendants' misconduct.   That is the inference that Becker made and must

convince a jury to make as well.   Becker Dep., 306:8-307:17.

Defendants oppose all claims stated in Becker I and Becker II, and they oppose class

certification.   Principally, they maintain that the class certification analysis must focus on the

circumstances that led to resolution of the bankruptcy case.   From that vantage, they find that the

bondholders are distinguishable and separable into many sub-groups according to the varying

circumstances of each bondholder's knowledge, participation, consent, and approval as to the

stipulated settlement of the adversary proceeding and the proposed consensual plan for LBH's

reorganization.   Defendants also cite variations as to whether certain bondholders received notice

of the settlement, did not object to it, and voted to accept the proposed plan that incorporated terms

of the settlement stipulation.   These distinctions, they say, create a multitude of dissimilarities

within the putative class as well as unique defenses against Becker, which are not amenable to

class-wide proof.   In essence, it is Defendants' position that the settlement breaks any causal link

between the alleged failure to maintain perfected security interests and liens, and the amount that

was allowed under the Plan for the bondholders.

Defendants assert that the "foundation" of Becker's position is "his theory that [BNYM] was 'forced' to compromise and negotiated an unsatisfactory recovery" for the bondholders. Defs. Resp. at 1 (quoting Compl. ¶ 35 (alleging that BNYM "was forced to compromise its claim" on behalf of the bondholders in the adversary proceeding, "which has caused" the bondholders "to be entitled to receive less . . . .").   Defendants describe the alleged breach of their fiduciary and contractual duties as "failing to negotiate a satisfactory recovery in the bankruptcy."  Id. at 3.   They also say that Becker "framed the settlement as the proximate cause of the bondholders' losses."   Defs. Sur-Reply at 1-2 & n.2 (Docs. 76, 77) (citing Compl. ¶ 35). Defendants oversimplify and distort the allegations contained in the Becker I Complaint. According to Becker, the gravamen of this case is Defendants' pre-petition failure to assure perfection of the security interests and liens, which misconduct caused the bondholders' losses and damages.   Pl. Reply at 3, 5.

Defendants submit voluminous evidence of the bankruptcy proceedings to support their position.   In particular, they proffer materials to evidence the knowledge, participation, consent, and approval of three bondholders—Douglas Nelson of Waddell & Reed, Douglas M. Stevenson of Silvercrest Asset Management Group LLC, and Colin O'Neill (the "Holders").[11]   See, e.g., Defs. Resp., Schell Decl., Ex. 1, Nelson Dep., dated May 29, 2013 (Doc. 70-3).   It is asserted that the Holders together held about "46% of the total face amount of the Bonds—or $12 million," which is less than a majority of the bonds.   Defs. Resp. at 1, 7.   The Holders' role in

---

[11]   During this litigation, these three bondholders have been variously denoted by the parties. Defendants previously used the "Restricted Holders," but presently use the "Active Holders."   Becker prefers the "Restricted Holders."   Pl. Reply at 4 & n.4.   This memorandum denotes the three simply as the "Holders," using a capital letter to identify them collectively or in the singular.

the proceedings is described as:  "consistent, substantive and decisive"; "direct and decisive";

"making continuous assessments and decisions concerning the Bonds and the proposed recovery

based upon their personal knowledge and involvement"; "deeply and directly involved in the

settlement negotiations"; and the bond recovery was "driven by the Active Holders."  Id. at 1-2,

8, 17, 25-26.   The descriptions are overly generous, at best.   The degree of the Holders'

knowledge and involvement is disputed.   See Pl. Suppl. Mem., Ex. L, Stevenson Decl., dated

Feb. 27, 2015, ¶¶ 5-6 (Doc. 118-5) (listing specifics as to how Defendants "overstate the role and

degree of involvement" of his firm, Silvercrest), Ex. M, O'Neill Decl., dated Feb. 27, 2015, ¶¶

3-8 (Doc. 118-6) (same).

Defendants also submit reports by Michael Imber of Grant Thornton LLP, who was

retained by BNYM as its consultant, and then later retained by BNYM at the Holders' request for

assistance in recovering the value of their bonds.   See, e.g., Defs. Resp., Imber Decl. & Exs. 1,

8, 10, Grant Thornton ("GT") Rep., "Final Negotiation Update," dated Sept. 13, 2011, at 2.   In

part, Grant Thornton was retained to provide BNYM "with information and analysis to facilitate

your continued negotiations with LBH."   Id.   The information provided did "not purport to be a

valuation of the Hospital's asserts or an enterprise valuation of the Company and should not be

relied upon for those purposes."   Id. at 3.   Grant Thornton's reports do not mention the

existence or value of the security interests and liens against the property securing the bonds.

The reports do not identify any assets that were subject to the security interests.   Becker

maintains that the bondholders would have been entitled to receive a much larger payout than

what Grant Thornton calculated, if the security interests and liens had been perfected.   See id.,

GT Rep. at 5-6 (calculating a bondholder recovery of $8,650,000.00).

36

Grant Thornton, along with BNYM's representatives, participated in a court-ordered mediation of the adversary proceeding.   GT Rep., dated Sept. 16, 2011, at 4.   Defendants acknowledge that the negotiations were not based on the value of the assets that were subject to the security interests and liens in favor of the bondholders, but instead "were based solely on the financial data provided by LBH, Grant Thornton's analysis of that information and the fact that monies that were to fund the bondholder recovery were to come from a new Bond Issue."   Defs. Resp. at 10 & n.1 (citing Imber Decl. ¶¶ 19-20 (Doc. 70-2)).

None of the Holders attended the mediation.   They have no firsthand knowledge of the negotiations.   They knew primarily what they were told by BNYM and Grant Thornton.   See Nelson Dep., 88:12-24 (he was not aware that the mediation had taken place and he was not invited to attend); Defs. Sur-Reply, Ex. A, Schessler Dep., dated June 19, 2013, 107:14-19, 112:16-113:4) (Docs. 76, 77) (Waddell & Reed and Silvercrest were not present at the mediation and did not participate in calls with the mediator, LBH, or the Committee).

Defendants maintain that these materials evidence that the Holders approved the settlement and consented to the terms contained in the Stipulation resolving the adversary proceeding, and they authorized BNYM to accept the Stipulation.   Defs. Resp. at 1-4, 7-13, 25-26.   Defendants contend that the "Holders' decision to settle," coupled with the fact that no bondholder objected to the Stipulation at the hearing on the September 14, 2011, precludes "any finding of proximate cause."   Defs. Sur-Reply at 7 & n.9.   They also contend that the "knowledge and participation and consent of the Active Holders constitute supervening events, breaking any causal link between an alleged breach and any purported damages."   Defs. Resp. at 22.

The record belies Defendants' assertions.   Silvercrest's representative, Douglas Stevenson, declared that he "did not review the settlement documents" but instead, "relied on the Indenture Trustee and its counsel to undertake such review on behalf of the bondholders" and "relied on statements by the Indenture Trustee and its counsel that the settlement was the best outcome that could be achieved given the facts and circumstances of the case, including the lien perfection issue."   Stevenson Decl. ¶ 6(d), (h).   Colin O'Neill declared that he "did not review or provide input on the settlement agreement or plan terms, but rather relied on the Indenture Trustee and its counsel to undertake such review on my behalf and on behalf of the other bondholders."   O'Neill Decl. ¶ 6.

The factual dispute concerning the Holders need not be resolved.   Defendants' evidence as to the Holders' knowledge, participation, consent, and approval is irrelevant.   The record does not contain any evidence or reason to conclude that the Holders were empowered by the Bankruptcy Court, the transaction agreements, or any other bondholders to authorize BNYM to accept the settlement.   In addition, Defendants acknowledge that BNYM was not authorized to bind the bondholders to the settlement—that would occur only if and when the Court approved the Stipulation and then confirmed the Stipulation's terms as part of the Plan.   Defs. Resp. at 11 & n.2.   Importantly, the record establishes that the Court approved the stipulated settlement, and the bondholders voted to accept the proposed plan for LBH's reorganization, before the claims presented here by Becker against the Indenture Trustee were disclosed to the bondholders.

Defendants contend that Grant Thornton conducted the negotiations on the basis that the bondholders were "in the superior secured position."   Defs. Resp. at 3, 10, 21, 25, 31 (citing Imber Decl. ¶ 20).   This assertion is accompanied by acknowledgments that the adversary

38

proceeding and lien perfection issues were not discussed during the negotiations.   Id. at 3, 11,

25, 31 (citing Nelson Dep., 112:6-14).   None of these statements, even if true, has any relevance

for class certification.   Instead, the asserted facts support an inference that the Holders were in

no better position than Becker or any of the other bondholders as to the true status of the security

interests and liens securing the bonds—all bondholders were uninformed and could not have

made a knowledgeable decision to settle their potential claims against the Indenture Trustee.

Defendants profoundly distort the record in the bankruptcy case as well.   Running

throughout their argument is the incorrect premise that the bondholders' claims against the

Indenture Trustee for failure to maintain the security interests and liens were compromised, settled,

or abandoned in the bankruptcy proceedings.   A corollary assertion is also incorrect—that the

bondholders consented to a settlement of their claims against the Indenture Trustee by voting to

accept the proposed plan.   Again, the record is clear that before the bondholders voted, they did

not receive adequate notice and disclosure of the existence, merits, or value of any claims they had

against the Indenture Trustee, which claims were to be extinguished by the third party release.

Indeed, the Bankruptcy Court, the District Court, and our Court of Appeals have so ruled.   See,

e.g., Lower Bucks Hosp., 488 B.R. at 318-21 (Savage, J.) (holding that there was "insufficient

information from which the Bondholders could have concluded that they had a potential claim

against BNYM" and no "information about the merits or value of the potential claims against

BNYM in [this] class action that they would be relinquishing").   The record is also clear that

neither the settlement Stipulation nor the confirmed Plan was in any way conditioned or dependent

upon confirmation of the third party release.   Defendants acknowledged as much during the

bankruptcy proceedings.   See, e.g., Hr'g Tr., dated Dec. 2, 2011, 35:21-37:9, 75:4-7 (Bankr. Docs.

1819, 1819-1); Hr'g Tr., dated Mar. 2, 2012, 6:2-9:9, 31:4-16, 45:3-25 (Bankr. Docs. 1918, 1918-1).   Contrary to Defendants' suggestions, Becker's present claims were not settled, released, discharged, extinguished, or abandoned by settlement of the adversary proceeding or confirmation of the Plan.

      D.     Rule 23(a)

All four prerequisites for class certification under Rule 23(a) serve as "'guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 597 (3d Cir. 2009) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 626 n.20 (1997) (citations and internal quotation marks omitted)).   The claims presented in Becker I and Becker II meet each requirement for class certification under Rule 23(a).

      1.     Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable."   No minimum number of class members is necessary.   Marcus, 687 F.3d at 595. Generally, "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."   Id. (quoting Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001)).   "Critically, numerosity—like all Rule 23 requirements—must be proven by a preponderance of the evidence."   Id., 687 F.3d at 595 (citing Hydrogen Peroxide, 552 F.3d at 307).

Here, the record contains sufficient circumstantial evidence supporting a finding of numerosity.   It is not disputed that at least 95 bondholders voted to accept the proposed plan.

Each, and likely more, is a holder of an allowed "Class A3 Claim" under the confirmed Plan, and each qualifies as a potential plaintiff within the class definition.   Pl. Br. at 11 & n.4; Defs. Resp. at 15; Defs. Br. on appeal of the bankruptcy rulings (E.D. Pa., Nos. 12-3399, 12-3752, Doc. 26 at 11); Defs. Resp. to Becker's Objection (Bankr. Doc. 1458 at 32, 45, 52).   See also id. (Bankr. Doc. 1458 at 50) (asserting that the bondholders were "too numerous to negotiate individually with the Debtors").   See further Donlin Recano Aff. of Serv., dated Aug. 12, 2011 (Bankr. Doc. 1277) (list of record bondholders as of August 9, 2011).

This determination of numerosity ensures judicial economy.   Joinder of more than 95 plaintiff bondholders would be administratively burdensome, if not impossible.   The record suggests that they reside in different states across the country.   A class action avoids the possibility of a series of many similar individual actions.   It also ensures greater access to judicial relief for those holding small investments in the bonds that "would be uneconomical to litigate individually."   Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985).

### 2.    Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class."   This is not a requirement for identical claims or facts among class members.   Marcus, 687 F.3d at 597.   "For purposes of Rule 23(a)(2), even a single common question will do."   Id. (quoting Dukes, 564 U.S. at 359) (citation, internal quotation marks, and alterations omitted)).   See also Schering Plough, 589 F.3d at 597 & n.10 (citing Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994) ("a single common issue" is enough)).   The criterion of commonality "assure[s] that the action can be practically and efficiently maintained and that the interests of the absentees will be fairly and adequately represented."   Baby Neal, 43 F.3d at 56.

41

Defendants do not deny that at least one common question of fact or law is presented. However, they do not provide a separate analysis of the requirement of commonality. Their brief tends to conflate the requirements of commonality, typicality, and adequacy. See, e.g., Defs. Resp. at 16-19. "Despite their similarity, however, commonality and typicality are distinct requirements under Rule 23." Baby Neal, 43 F.3d at 56. "'Commonality' like 'numerosity' evaluates the sufficiency of the class itself, and 'typicality' like 'adequacy of representation' evaluates the sufficiency of the named plaintiff." Id. (citation, internal quotation marks, and alterations omitted).[12]

The requirement of commonality is satisfied here. As to each element of the claims stated in Becker I and Becker II, there are many questions of law and fact common to the named plaintiff and the proposed class. For example, Becker seeks among other things to proffer evidence about:

- Whether the security interests and liens against LBH's unrestricted gross revenues and other property securing the bonds were perfected and enforceable, or instead were imperfect and lapsed at times pertinent here?

- Whether Defendants had fiduciary or contractual duties to maintain the security interests and liens against the property securing the bonds for the benefit of the bondholders?

- What were the particulars and the scope of the fiduciary and contractual duties that Defendants owed to the bondholders in regard to maintenance of the security interests and liens against the property securing the bonds?

---

[12] Defendants maintain that Becker has not and cannot establish the requirement under Rule 23(b)(3) that "questions of law or fact common to all class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); Defs. Resp. at 19. They propose that this requirement be decided first as a threshold, dispositive issue. Id. For reasons that follow below, Becker has satisfied the predominance requirement of Rule 23(b)(3). And it is necessary to separately analyze and decide whether all of the requirements of Rule 23(a) have been met.

- How does expert opinion evidence of custom and practice in the corporate trust industry affect the duties that Defendants owed to the bondholders?

- Whether Defendants by their pre-petition practices or conduct breached any fiduciary and contractual duties that they owed to the bondholders?

- Did any proven breach of duty cause the bondholders to incur loss or damage; and if so, what is the extent and measure of that loss or damage?

- Are Defendants permitted to withhold amounts from the settlement funds that were allowed under the Plan to be paid to the bondholders?   If so, what amounts? If not so, what amounts must be accounted for and paid to the bondholders?

- Are Defendants liable for damages for conversion of the settlement funds that were allowed under the Plan for the bondholders?   Are Defendants liable for damages for monies had and received that rightfully belong to the bondholders but have not been paid to the bondholders?

- Whether Defendants by their post-petition practices or conduct caused the bondholders to incur loss or damage; and if so, what is the extent and measure of that loss or damage?

- Should punitive damages be awarded against Defendant BNYM on the record developed at trial?

These are issues common to all class members and the named plaintiff, Becker.   The issues presented by the <u>Becker I</u> causes of action for breach of fiduciary duty and contract apply to each of the Defendants.   The issues presented by the <u>Becker II</u> causes of action for equitable remedies apply solely to Defendant BNYM.   However, each bondholder asserts the same claims against each of the Defendants, except for each bondholder's individualized damage claim for a proportional, pro rata recovery based on the number of bonds owned.

     3.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."   Typicality "derives its independent legal significance

from its ability to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present."   Marcus, 687 F.3d at 598 (citation and internal quotation marks omitted).   This requirement "ensures the interests of the class and the class representatives are aligned so that the latter will work to benefit the entire class through the pursuit of their own goals."   Nat'l Football, 821 F.3d at 427-28 (quoting Newton, 259 F.3d at 182-83) (citation and internal quotation marks omitted)).

To evaluate whether a class representative is sufficient, a comparative analysis must be made of "the attributes of the plaintiff, the class as a whole, and the similarity between the plaintiff and the class."   Marcus, 687 F.3d at 589 (citing Schering Plough, 589 F.3d at 597). The analysis must be guided by three concerns:

> "(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying the theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to becomes a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class."

Id. at 598 (quoting Schering Plough, 589 F.3d at 599).   Importantly for this case, "[i]f a plaintiff's claim arises from the same event, practice or course of conduct that gives rise to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class."   Id. (citing Hoxworth v. Blinder, Robinson & Co., Inc., 980 F.2d 912, 923 (3d Cir. 1992)).   "Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct."   Nat'l Football,

821 F.3d at 428 (quoting In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions, 148

F.3d 283, 311 (3d Cir. 1998)) (alteration, citation, and quotation marks omitted).

The legal theories asserted by Becker as class representative are the same as those of the

class members.   The factual circumstances underlying those theories of recovery are also the

same.   Becker's claims arise from the same events, practices, and course of conduct that give

rise to the claims of the class members.   In Becker I, for all plaintiffs whether representative or

absent, the same operative core of facts is alleged—that is, Defendants failed to maintain

perfected security interests and liens against the property securing the bonds.   In Becker II, for

all plaintiffs, the same operative core of facts is also alleged—that is, Defendant BNYM has

wrongfully refused to distribute the funds allowed under the Plan for the bondholder class

members and BNYM has improperly used those funds for its personal interests.   In addition, it is

alleged that Becker and the class members suffered the same loss or damage—a reduced recovery

of the value of their bonds under the Plan and by virtue of Defendants' ongoing misconduct.

Because proof of Becker's claims will prove the class members' claims as well, the interests of

Becker and the class members are aligned.

Here, the representative's and the class members' respective claims are distinct in only

one respect—that is, each bondholder sues for individualized damages based on the number of

bonds owned.   That different amounts are potentially recoverable by individual plaintiffs does

not render Becker's claims atypical.   This is so because "[c]omplete factual similarity is not

required; just enough factual similarity so that maintaining the class action is reasonably

economical and the interests of the other class members will be fairly and adequately protected in

their absence."   Schering Plough, 589 F.3d at 598 (citing Newton, 259 F.3d at 182-85; Hassine

v. Jeffes, 846 F.2d 169, 176-77 (3d Cir. 1988) ("Rule 23 does not require that the representative plaintiff have endured precisely the same injuries that have been sustained by the class members, only that the harm complained of be *common* to the class.")).   Becker and the class members sue for the same kind of loss or damage:   loss of the value of their bonds and damages by virtue of Defendants' ongoing misconduct.   The legal theories, the factual circumstances, and the type of loss and damage supporting the claims by Becker are the same as those supporting the claims by class members, and the damages for each plaintiff may be readily calculated.   And the record establishes that Becker's and the class members' interests and incentives are aligned.

Defendants do not dispute that Becker's claims are generally the same as those of the class in terms of both the legal theories advanced, the factual circumstances underlying those theories of recovery, and the kind of loss or damage claimed.   Instead, Defendants maintain that Becker is not a typical representative plaintiff because he will be subject to unique defenses, based on peculiar facts, which are inapplicable to any other class members and likely to become a major focus of the litigation.   Defs. Resp. at 17-19.   "It is well-established that a proposed class representative is not 'typical' under Rule 23(a)(3) if the representative is subject to a unique defense that is likely to become a major focus of the litigation."   Marcus, 687 F.3d at 599 (alteration omitted) (quoting Schering Plough, 589 F.3d at 598 (quoting Beck v. Maximus, Inc., 457 F.3d 291, 301 (3d Cir. 2006) (internal quotation marks omitted)).   Our Court of Appeals emphasizes "the challenge presented by a defense unique to a class representative—the representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class."   Id. (quoting Beck, 457 F.3d at 297).   However, for reasons discussed

below, the unique defenses asserted here do not render Becker atypical.   And he is not subject to a defense that is inapplicable to many members of the class and likely to become a major focus of the litigation. The requirement of typicality is satisfied here.

Defendants cite differences as to Becker's and the three Holders' degree of participation in the mediation and negotiations to settle the adversary proceeding.   Unlike the Holders, they say, Becker is atypical because he did not receive notice of those proceedings and "remained uninformed and uninvolved."   Defs. Resp. at 17.   However, the cited distinctions are not relevant to the class certification analysis.   See Claims to Be Given Class Treatment, supra. Again, the Holders were in no better position than Becker or any of the other bondholders as to the true status of the security interests and liens securing the bonds—all were equally uninformed and could not have made a knowledgeable decision to settle their potential claims against the Indenture Trustee.   And the record is clear that before the bondholders voted, they did not receive adequate notice and disclosure of the existence, merits, or value of any claims that they had against the Indenture Trustee, which claims Becker asserts in this class action.

Defendants cite the fact the Becker is a beneficial owner of bonds who held his interest in the street name of his broker, as opposed to record owners that held bonds in their own names. Defs. Resp. at 17-18.   They assert that Becker, a beneficial owner, has no rights under the Indenture to assert contract claims against them in this action.   Id. (citing Indenture § 15.02).[13]

---

[13]   Defendants cite:   "Nothing herein contained shall confer any right upon any person other than the parties hereto and the Owners of the Bonds."   Schell Decl., Ex. 1, Indenture § 15.02 (Doc. 126-6). They also cite:   "'Bondholder' or 'Holders of Bonds' shall mean the Registered Owner of any Bond." Indenture, Art. I, p. 5.   And they cite another definition:   "'Registered Owner,' 'Owner' or 'Bondholder,' in connection with a Bond, shall mean the Person or Persons in whose name or names the Bond is registered on the books of the Authority kept for that purpose in accordance with the Indenture and the Bonds."   Id. at 20.

This issue was previously decided, albeit after Defendants filed their present papers.   On the parties' respective motions for summary judgment, it was ruled that the bondholders may sue as intended beneficiaries under the transaction agreements to enforce contractual provisions contained in those agreements against Defendants.   Mem., dated Mar. 23, 2016, at 14, 20-24. And Becker's claims for breach of fiduciary duty are grounded in the common law, not the Indenture.   Id. at 13-19.   See also Mem., dated Oct. 31, 2012, at 9 (Doc. 39) (Davis, J.) (citing Guy v. Liederbach, 459 A.2d 744, 750-51 (Pa. 1983); Restatement (Second) of Contracts § 302 (1981)).   The distinction cited by Defendants is not relevant to class certification.

Defendants cite facts peculiar to Becker:   that on September 29, 2011, Becker filed a motion to reconsider the Bankruptcy Court's approval of the settlement entered on September 15, 2011, and he then withdrew the motion on October 21, 2011.   He withdrew the motion at LBH's request, without prejudice to his right to object to the third party release during confirmation of the plan.   Withdrawal (Bankr. Doc. 1402).   He did so to preserve the timetable for plan confirmation and financing for the reorganization.   See, e.g., Becker Dep., 54:23-56:10, 159:18-161:22. Defendants also cite the agreement among counsel—Saul Ewing on behalf of LBH and Obermayer on behalf of Becker, with the consent of the Committee—to waive an asserted conflict of interest presented by Obermayer's representation of Becker in bankruptcy matters and LBH in the state court medical malpractice suits.   Defendants combine these facts and attendant circumstances, describing them as an unethical and even illegal "secret side agreement" that amounted to a "collusive" "quid pro quo arrangement" among Becker, LBH, the Committee, and their counsel. Defs. Resp. at 17-19, 27-30; Defs. Suppl. Br. at 1-15, 19.   They say that the alleged misconduct is "so egregious" that Becker "cannot be designated the representative of any class."   Id. at 1, 15.

48

Defendants manufacture non-existent improprieties, conflicts, and collusion that are not supported by the record.   The inferences and conclusions drawn from those creations are unfounded and unsound.   Becker had every right to file and then withdraw the motion for reconsideration, and to present his objections to the third party release during plan confirmation. The record does not contain any evidence of an actual concurrent conflict of interest that could not be resolved by consent, and the clients did so consent.   Counsel for LBH, Becker, and the Committee did nothing unethical or wrong.   They had no obligation to apprise BNYM of the waiver of conflict, as proposed by Defendants.   Because the facts and circumstances proffered by Defendants are also irrelevant to class certification, these rulings will be explained separately below.   See Asserted Conflict of Interest and Affirmative Defenses, infra.

Defendants assert that trial will focus on individualized facts pertaining to the notices sent and received by Becker and other class members in the bankruptcy case.   Defs. Resp. at 18, 23 n.7, 28-29.   They find it hard to believe Becker's testimony that he did not receive notice of the settlement of the adversary proceeding before the Bankruptcy Court approved it.   Id.   But even assuming that he did not receive notice, Defendants say "this is an additional key difference from virtually all other proposed class members."   Id. at 18.   In their view, however, Becker most likely did receive notice and he "uniquely lacks credibility," and his credibility will also be another major focus at trial.   Id. at 18, 28; Defs. Suppl. Br. at 4, 11, 23.   They say:   "A lead plaintiff who has testified falsely and who is not credible is not a proper representative."   Id. at 23.   Again, the proffered facts and circumstances concerning notices provided in the bankruptcy case are irrelevant to class certification.   See Claims to Be Given Class Treatment, supra.   In addition, a review of Becker's deposition testimony discloses only the sort of credibility issues

that might be presented by the testimony of any other witness called to testify.   In addition, the suggestion that Becker testified falsely is unfounded.   Defendants mistake their disbelief and litigation strategies for evidence.

      D.     Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."   The adequacy inquiry has two components.   First, it "tests the qualifications of the counsel to represent the class."   In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004) (citation and internal quotation marks omitted).   Second, it serves "to uncover conflicts of interest between named parties and the class they seek to represent."   Id. Accord Windsor, 521 U.S. at 625 (citing Falcon, 457 U.S. at 157-58 & n.13)).   In other words, "[a]dequacy of representation assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class."   Baby Neal, 43 F.3d at 55.

Defendants assert that Becker is not an adequate representative because he will not personally pay the costs to litigate this class action.   Defs. Resp. at 18-19.   Becker testified that his attorneys would advance the litigation costs.   Becker Dep., 43:1-44:4.   "It is not uncommon in class actions to have persons other than the named plaintiff pay the costs of the litigation." Vanderbilt v. Geo-Energy Ltd., 725 F.2d 204, 210 (3d Cir. 1983).   There is no requirement that a class representative pay litigation costs out of their own pocket.   Id.   Becker's counsel has the financial ability to fund this litigation and advance the costs for adequate notice to the class members.   See Pl. Br. at 28-29 & Ex. 3, Bacine firm resume (Doc. 67-5).   And the Barrack, Rodos & Bacine law firm is adequate to serve as class counsel.   Fed. R. Civ. P. 23(g)(1), (4).

Defendants "suggest" that Becker is not an adequate class representative because this case is controlled by counsel.   Defs. Resp. at 19.   The record does not contain any evidence to support this perceived danger.   Becker's deposition testimony convincingly shows that he is committed to fairly and adequately discharging his duties as class representative, and he will work steadily and effectively to benefit the class as a whole through pursuit of his own claims. See, e.g., Becker Dep., 52:19-22, 53:24-54:16, 54:23-56:10, 67:17-24, 274:2-275:10.   And he could not do so without the assistance of his highly able and experienced counsel.

E.      Rule 23(b)(3)

Rule 23(b)(3) requires that "(1) common questions predominate over any questions affecting only individual class members (predominance) and (2) class resolution is superior to other available methods to decide the controversy (superiority)."   Nat'l Football, 821 F.3d at 426; Marcus, 687 F.3d at 591; Cmty. Bank, 622 F.3d at 291.   The claims presented in Becker I and Becker II meet both requirements under Rule 23(b)(3) for class certification.

1.      Predominance

"Predominance 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"   Nat'l Football, 821 F.3d at 434 (quoting Windsor, 521 U.S. at 623).   The predominance requirement "'incorporates the Rule 23(a) commonality requirement,'" but it is "'far more demanding.'"   Id. (quoting Warfarin, 391 F.3d at 528 (citing In re LifeUSA Holding Inc., 242 F.3d 136, 144 (3d Cir. 2001)).   Not only must class members share at least one question of law or fact in common with each other, but also common questions must predominate over any issues affecting only individual members.   Warfarin, 391 F.3d at 527-28. The predominance inquiry focuses on "whether the defendant's conduct was common as to all of

the class members, and whether all of the class members were harmed by the defendant's

conduct." Sullivan v. DB Inv., Inc., 667 F.3d 273, 298-99 (3d Cir. 2011).   This inquiry does

not require an evaluation of "the existence or validity of each class member's claim."   Id.

Instead, "the focus is on whether the defendant's conduct was common as to all of the class

members."   Id.   Commonality and predominance are satisfied "where common questions

generate common answers 'apt to drive the litigation.'"   Id. (quoting Dukes, 564 U.S. at 350).

        Under both the Rule 23(a) commonality requirement and the Rule 23(b)(3) predominance

requirement, "the nature of the evidence that will suffice to resolve a question determines

whether the question is common or individual."   Hydrogen Peroxide, 552 F.3d at 311 (citation

and internal quotation marks omitted).   A "common contention . . . must be of such a nature that

it is capable of classwide resolution—which means that determination of its truth or falsity will

resolve an issue that is central to the validity of each one of the claims in one stroke."   Dukes,

564 U.S. at 350.   And the predominance inquiry focuses on proof of the essential elements of the

class's claims:   "If proof of the essential elements of the cause of action requires individual

treatment, then class certification is unsuitable."   Cmty. Bank, 795 F.3d at 400 (emphasis

omitted) (quoting Newton, 259 F.3d at 172).

        The predominance requirement is satisfied here.   As to each element of the claims stated

in Becker I and Becker II, questions of law and fact common to the class predominate.   The

alleged misconduct is central to the validity of each class member's claims—that is, Defendants

failed to maintain perfection of the security interests and liens against the property securing the

bonds.   And the misconduct specifically alleged against Defendant BNYM is also central to the

validity of each class member's claims—that is, BNYM has refused to distribute and has

52

improperly used funds that rightfully belong to the bondholders.   Each class member sues for the same remedies against each of the Defendants, except for each bondholder's proportional, pro rata damages based on the number of bonds owned.   See Commonality, supra; Claims to Be Given Class Treatment, supra.   The common questions presented are capable of class-wide resolution.   The evidence that would determine the truth or falsity of the common factual questions would be the same as to each one of the class member's claims.   See id.   Answers to questions about Defendants' alleged misconduct and the harm it caused would be common as to each and all of the class members.

Principally, Defendants maintain that Becker has not established that questions of law or fact common to all class members predominate over questions affecting individual members. Defs. Resp. at 19-23.   They challenge only one element of the claims stated in Becker I for breach of fiduciary and contractual duties—the element of causation.   Defendants' position is based on a distorted restatement of Becker's theory of recovery:   "BNYM was 'forced' to compromise and negotiated an unsatisfactory recovery for the holders during the bankruptcy" and Defendants "breached their fiduciary duties and contractual duties by failing to negotiate a satisfactory recovery in the bankruptcy."   Defs. Resp. at 1, 3.   They assert incorrectly that Becker "framed the settlement as the proximate cause of the bondholders' losses."   Defs. Sur-Reply at 1-2 & n.2 (citing Compl. ¶ 35).   In addition, they contend that disparate proof of causation will be required for different groups of class members, depending upon the varying circumstances of each member's role and actions in the settlement of the adversary proceeding and approval of the proposed plan for reorganization.   Defs. Resp. at 1-4, 22-23.   Defendants also assert incorrectly that the "Holders' decision to settle," coupled with the fact that no bondholder objected to the

Stipulation at the hearing held on the September 14, 2011, precludes "any finding of proximate cause."   Defs. Sur-Reply at 7 & n.9.   They err again in asserting that the "knowledge and participation and consent of the Active Holders constitute supervening events, breaking any causal link between an alleged breach and any purported damages."   Defs. Resp. at 22.

The proffered evidence will not resolve any questions of causation presented here because the evidence is irrelevant.   See Claims to Be Given Class Treatment, supra.   Contrary to Defendants' restatement of the issues presented for decision here, the gravamen of the claims to be given class treatment is Defendants' pre-petition failure to assure perfection of the security interests and liens, which misconduct caused the bondholders' claimed losses and damages. Becker's present claims were not settled, released, discharged, or extinguished by settlement of the adversary proceeding or confirmation of the Plan.   The asserted distinctions between and among class members and the proffered disparate proofs as to various groupings of class members are based on erroneous premises and irrelevant facts that do not affect class certification.   The proof proffered by Becker as to the causes of action stated in Becker I and Becker II is common to each and every class member.

Defendants dispute that the requirement of predominance has been satisfied for other interwoven reasons—the asserted conflict of interest presented by Obermayer's representation of Becker as to bankruptcy matters and LBH as a defendant in the state court medical malpractice suits, the allegedly unethical and even illegal, secret and collusive agreement among Becker, LBH, the Committee, and their counsel, and the asserted affirmative defenses of equitable estoppel, waiver, and judicial estoppel.   In their view, the alleged misconduct precludes class certification on the grounds not only of commonality, typicality, and adequacy, but also

54

predominance.   Defs. Resp. at 17-19, 27-28, 28-30; Defs. Suppl. Br. at 1-5, 5-6, 15-19. Because

these theories and their attendant circumstances are irrelevant to class certification, and the

asserted affirmative defenses are not actionable on the record here, they will be discussed

separately below.   See Asserted Conflict of Interest and Affirmative Defenses, infra.

      2.      Superiority

"Rule 23(b)(3)'s superiority requirement 'asks the court to balance, in terms of fairness

and efficiency, the merits of a class action against those of alternative available methods of

adjudication.'"   Nat'l Football, 821 F.3d at 434 (quoting Warfarin, 391 F.3d at 533-34 (internal

quotation marks omitted)).   Several considerations guide this inquiry:   "the class members'

interests in individually controlling litigation, the extent and nature of any litigation, the

desirability or undesirability of concentrating the litigation, and the likely difficulties in

managing a class action."   Id. at 435 (citing Fed. R. Civ. P. 23(b)(3)(A)–(D)).   Superiority is

satisfied here because class resolution is fair and ensures judicial economy.

The class certified here comprises potentially 95 and likely more bondholders.   See

Numerosity, supra.   None of the bondholders has challenged class certification.   The record

does not suggest that any bondholder has prosecuted or intends to prosecute a separate individual

action.   However, a class action avoids the possibility of a series of many similar individual

actions, perhaps commenced in multiple jurisdictions or consolidated in this jurisdiction, and

therefore enables a more expeditious processing of the bondholders' claims.

Bondholders with small investments in the bonds have little incentive to sue separately.

The issues presented are complex, and the costs of prosecuting an action are prohibitively high.

A class action ensures greater access to judicial relief for those holding small claims that "would

be uneconomical to litigate individually."   <u>Shutts</u>, 472 U.S. at 809.   And a class action

facilitates the spreading of litigation costs among the numerous parties.   Although there are

potentially a few class members that hold substantial investments, they along with the other

bondholders will have the option to opt-out of the class, should they decide that it is in their

interest to do so.

Given years of litigation and appeals in the underlying bankruptcy proceedings, as well as

the lengthy litigation and expected appeals in this class action, it is desirable to concentrate the

litigation in this forum.   Given the long experience with this litigation that is shared among the

litigants, their counsel, and the forum, continuing the litigation in this Court is less costly and

more efficient.   Management of the class action does not present any special difficulties.

Defendants suggest that certification of a class is not superior because it would violate the

Rules Enabling Act and the Due Process Clause of the Constitution.   Defs. Resp. at 32-34 (citing

the Act, 28 U.S.C. § 2072 (rules of court "shall not abridge, enlarge or modify any substantive

right")).   Defendants assert that the Holders agreed to indemnify BNYM "for any claims or

losses arising out of the Grant Thornton retention."   <u>Id.</u> at 33 (referring to a letter indemnity

agreement, dated Dec. 20, 2010, at 3, Schell Decl., dated June 7, 2013, Ex. 8 (Doc. 70-3)).   It is

asserted that certification would deprive Defendants of this right to indemnification, thereby

potentially permitting the Holders to recover in the class action what they could not recover in an

individual action.   <u>Id.</u>   However, these assertions do not preclude class certification.

These claims against the Holders do not "bear a logical relationship" to the class's claims.

<u>M.R. v. Ridley Sch. Dist.</u>, 744 F.3d 112, 121 (3d Cir. 2014) (citing Fed. R. Civ. P. 13(a))

(citations and internal quotation marks omitted).   The class's claims do not arise out of the Grant

Thornton retention.   <u>See</u> Claims to Be Given Class Treatment, <u>supra</u>.   Should Defendants

become obligated to pay the bondholders, either by judgment or settlement in this class action,

Defendants would not have a right under the letter agreement to indemnification from the

Holders for that payment.   Although a "court may dispose of all claims between the parties in

one proceeding whether or not they arose in the 'same transaction,'" no counterclaim was pled.

<u>Baker v. Gold Seal Liquors, Inc.</u>, 417 U.S. 467, 469 n.1 (1974) (quoting Fed. R. Civ. P. 13(b)).

    Defendants' claims for indemnification against the Holders would likely be prosecuted by

a separate action filed in New York.   The letter agreement chooses New York law and selects

New York courts to resolve any disputes.   Letter agreement, dated Dec. 20, 2010, at 4.[14]   Under

New York law, moreover, "[a]n indemnification claim accrues only when the party seeking

indemnification has made payment to the injured person."   <u>See, e.g.</u>, <u>Myers Indus., Inc. v.

Schoeller Arca Sys. Serv., Inc.</u>, 171 F. Supp. 3d 107, 125 (S.D.N.Y. 2016) (citing <u>McDermott v.

City of N.Y.</u>, 50 N.Y.2d 211, 216, 428 N.Y.S.2d 643, 460 (1980)); <u>accord</u> <u>Hatco Corp. v. W.R.

Grace & Co.–Conn.</u>, 59 F.3d 400, 405-06 & n.3 (3d Cir. 1995) (applying New York law).   The

record does not suggest that any indemnification claims against the Holders have accrued.

---

[14]   The proffered agreement states:

    (i) the terms of this letter agreement and the Indemnity contained herein will be governed by and construed in accordance with the substantive laws (and not the choice of law rules) of the State of New York and (ii) all actions and proceedings relating to or arising from, directly or indirectly, this letter agreement and the Indemnity contained herein may be brought by any Indemnified Person in courts located within the Borough of Manhattan, City and State of New York, and each such Holder hereby submits to personal jurisdiction of such courts for such actions or proceedings.

Letter agreement, dated Dec. 20, 2010, at 4, Schell Decl., dated June 7, 2013, Ex. 8 (Doc. 70-3).

Defendants suggest that class certification would deprive them of a due process right to present their defenses to the bondholders' claims.   Defs. Resp. at 33-34.   Why this is said to be so is not clearly explained.   Their argument appears to be that there are "fundamental and extensive differences among class members with respect to key defenses."   Id. at 33.   And they say, these distinctions create a multitude of dissimilarities among the class members as well as unique defenses against Becker, which are not amenable to class-wide proof.   In their view, the affirmative defenses of equitable estoppel, waiver, and judicial estoppel, and their unique defenses against Becker, will require individualized proof for various groupings of bondholders, which defeats certification of the class here.   On the other hand, Becker asserts that "no such individualized issues exist," and class certification would not result in any deprivation of constitutional dimension.   Pl. Reply 32, at 31-33.   Becker's position is correct.

The asserted differences among the class members are either unfounded or irrelevant to class certification.   See Claims to Be Given Class Treatment, supra.   In addition, the asserted affirmative defenses and the unique defenses asserted against Becker, are not actionable on the record presented here, as discussed separately below.   See Asserted Conflict of Interest and Affirmative Defenses, infra.

Certification of a class here does not abridge, enlarge, or modify the substantive rights of any party, and it does not deprive any party of any substantive rights.   Rule 23 provides all process fairly due.   Defendants have a full and fair opportunity to present whatever actionable defenses they have to the claims to be given class treatment here.   At trial of the class action, the jury will be asked to determine whether Defendants are liable, or not liable, for failing to maintain perfection of the security interests and liens against the property securing the bonds.

58

And Defendants may present their defenses to those claims.   The jury's findings will apply to each and every bondholder.   Any differences in the bondholders' individual recoveries will be calculated according to the number of bonds owned by each individual class member.   See Claims to Be Given Class Treatment, supra.

III.     The Asserted Conflict of Interest and Affirmative Defenses

        A.      The Asserted Conflict of Interest

        Defendants cite that on September 29, 2011, Becker filed a motion to reconsider the Bankruptcy Court's approval Order entered on September 15, 2011, and he then withdrew the motion on October 21, 2011.   Defendants also cite an asserted conflict of interest arising from Obermayer's representation of Becker as to bankruptcy matters and its representation of LBH as a defendant in the state court medical malpractice suits.   Defendants complain that LBH and Becker agreed, with the Committee's consent, to waive any asserted conflict of interest without apprising BNYM or the Bankruptcy Court.   Defendants assert that Obermayer's concurrent representations created a conflict of interest that could not be resolved by consent of the clients without the Bankruptcy Court's approval.   Defendants combine these actions and attendant circumstances, describing them as an unethical and even illegal, secret and collusive agreement among Becker, LBH, the Committee, and their counsel.   In Defendants' view, the alleged misconduct precludes class certification on the grounds of commonality, typicality, adequacy, and predominance.   Defendants' position is insupportable.

        The federal and the state judicial systems "have autonomous control over the conduct of their officers, among whom . . . lawyers are included."   Surrick v. Killion, 449 F.3d 520, 529 (3d Cir. 2006) (quoting Theard v. United States, 354 U.S. 278, 281 (1957)).   "One of the inherent

powers of any federal court is the admission and discipline of attorneys practicing before it."   In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 160 (3d Cir. 1984) (citing In re Abrams, 521 F.2d 1094, 1099 (3d Cir. 1975) (each court may create independent standards and rules for the admission and discipline of attorneys)).   This Court has adopted the Rules of Professional Conduct promulgated by the Supreme Court of Pennsylvania as the standards for professional conduct of attorneys admitted to practice in the Eastern District of Pennsylvania.   Local Rules of Civil Procedure 83.6, Rule IV, B.

Rule of Professional Conduct ("RPC") 1.7, which governs conflicts of interest that arise from a lawyer's representation of current clients, provides in part:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.   A concurrent conflict of interest exists if:
> > (1) the representation of one client will be directly adverse to another client; or
> > (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client
> > . . . .
> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
> > (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
> > (2) the representation is not prohibited by law;
> > (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
> > (4) each affected client gives informed consent.

The record establishes that under Rule 1.7, Obermayer's concurrent representation of LBH and Becker was permissible and proper, and no actual, nonconsentable conflict of interest arose.

Becker testified that he did not receive notice of settlement of the adversary proceeding before the Bankruptcy Court approved the Stipulation at the hearing held on September 14, 2011,

60

and entered the approval Order on September 15, 2011.   During September 14-21, 2011, Becker

learned about the language contained in the Stipulation and Order.   He sought legal advice from

Bacine.   During mid-September, 2011, Bacine asked Obermayer to provide bankruptcy related

legal services, and Becker selected Obermayer as well as Bacine to be his attorneys.

On September 29, 2011, Becker moved for reconsideration and vacation of the approval

Order.   The motion stated "no objection to the extent that the Settlement Agreement settles any

and all claims by and between the Debtors, the Committee, and the Bond Trustee."   Mot. Recons.

¶ 8 (Bankr. Doc. 1357).   Becker's principal position was that the Stipulation and approval Order

attempted to improperly effectuate an impermissible third party release of the Indenture Trustee by

the bondholders.

When Becker retained Bacine and Obermayer, he was a bondholder creditor of LBH's

bankruptcy estate.   His interest in recovering the full value of his bonds was potentially adverse to

LBH's interest as a debtor in possession in maximizing the estate's assets for the benefit of all

creditors.   See 11 U.S.C. § 1107(a) (a debtor in possession has the same powers and duties as a

trustee); In re The Harris Agency, LLC, 462 B.R. 514, 524 (E.D. Pa. 2011) (citing In re Marvel

Entm't Grp., Inc., 140 F.3d 463, 474 (3d Cir. 1998) (debtor in possession has a "duty to protect

and conserve property in its possession for the benefit of creditors")).   However, once the

Bankruptcy Court approved the settlement, the parties' interests were largely aligned—all were

interested in prompt confirmation of the proposed plan for reorganization.   But Becker's filing of

the motion for reconsideration once again realigned the parties' interests.   The Court would have

to rule on the motion before the plan could be confirmed.   It appeared likely that the scheduled

confirmation hearing would be postponed until the motion was decided.   For this reason, Isenberg

of Saul Ewing found Becker's assertion of the motion to be adverse to LBH's interests, and

Isenberg demanded that Obermayer withdraw the motion.

On October 14, 2011, Isenberg met with Golden of Obermayer, and they "decided to figure

out some solution."   Golden Dep., 60:15-17, 61:8-19.   Isenberg wanted Golden to withdraw the

motion for reconsideration.   It was Golden's position that there was no conflict.   During the next

week, counsel achieved a resolution.   On October 21, 2011, Saul Ewing on behalf of LBH and

Obermayer on behalf of Becker agreed, with the consent of the Committee, that LBH waived any

asserted conflict of interest created by Obermayer's concurrent representation of Becker as to

bankruptcy matters and its representation of LBH as a defendant in the medical malpractice suits.

Conflict waiver letter (Doc. 119-7).   LBH consented to Obermayer's continued representation of

Becker with respect to an objection to LBH's proposed plan for reorganization, provided that the

objection was addressed only to the propriety of the third party release of the Indenture Trustee by

the bondholders.   Id.   LBH affirmed that "it waive[d] any right or claim relating to any alleged

conflict of interest with respect to the Becker representation, including disqualification, relating to

such an objection."   Id.   Also on October 21, 2011, after execution of the agreement waiving the

asserted conflict, Becker withdrew the motion for reconsideration.   He did so before BNYM

responded to it and before Judge Frank had any reason to study it closely.   The filed papers stated

that the withdrawal was without prejudice to Becker's right to object to the third party release

during confirmation of the proposed plan.

On October 26, 2011, BNYM responded to Becker's withdrawal of the motion for

reconsideration.   BNYM asserted that by withdrawing the motion, Becker had waived, released,

or relinquished his rights to challenge the Bankruptcy Court's approval of the settlement and the

Stipulation that contained the third party release of the Indenture Trustee by the bondholders.

BNYM reserved its rights to challenge the withdrawal during plan confirmation.   BNYM

reasserted this position in other filings made before the confirmation hearing was held.   See, e.g.,

BNYM Mot. Recons. of Nov. 16, 2011 Order (Bankr. Docs. 1476, 1477).

On November 10, 2011, Becker filed objections to confirmation of the proposed plan for

reorganization, stating several reasons why the plan should not be confirmed if it contained the

third party release.   BNYM, LBH, and the Committee responded to Becker's objections.

On December 2, 2011, the Bankruptcy Court heard argument on confirmation of the

proposed plan for reorganization and the parties' submissions.   On the record during the hearing,

BNYM did not reassert its position that Becker had waived, released, or relinquished his rights to

challenge the Court's approval of the settlement and the Stipulation that contained the third party

release of the Indenture Trustee by the bondholders.   During a lengthy recess, all parties agreed

that the proposed plan should be confirmed that day, as stipulated, but questions as to

confirmation of the third party release should be decided later.   On March 2, 2012, the Court

heard Becker and BNYM as to whether the third party release should be confirmed.   On May 10,

2012, the Court denied confirmation because the release was inadequately disclosed.   The record

does not reflect that BNYM at any time presented to the Bankruptcy Court the conflict of interest

that is asserted here as to Obermayer's representation of Becker.

"Loyalty and independent judgment are essential elements in the lawyer's relationship to

a client."   RPC 1.7, cmt. 1.   If a lawyer's representation of a client involves a conflict of

interest, the lawyer's loyalty and independent judgment are called into question.   A "concurrent

conflict of interest" exists where:   "the representation of one client will be directly adverse to

another client" or "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client . . . or by a personal interest of the lawyer." RPC 1.7(a)(1), (2). As to directly adverse conflicts, the comments to Rule 1.7 are instructive:

> Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent. Thus, absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated. . . . On the other hand, simultaneous representation in unrelated matters of clients whose interests are only economically adverse, such as representation of competing economic enterprises in unrelated litigation, does not ordinarily constitute a conflict of interest and thus may not require consent of the respective clients.

RPC 1.7, cmt. 6. The conflict of interest asserted here falls somewhere in between these two illustrated extremes.

Obermayer's representation of Becker was not directly adverse to LBH's interests in the bankruptcy case. Becker did not assert any claims directly or indirectly against LBH or the Debtors' estate. And Becker's motion for reconsideration was not in substance directly adverse to LBH's position, interests, or goals. Again, the motion stated "no objection to the extent that the Settlement Agreement settles any and all claims by and between the Debtors, the Committee, and the Bond Trustee." Mot. Recons. ¶ 8. However, the timing of the motion alone created the risk of postponement of confirmation, which entailed a significant risk that the financing and settlement funds for the reorganization would be lost. Postponement also entailed a special risk of harm to LBH of "putting 900 people out of work and killing the hospital." Isenberg Dep., 128:1-18; see also id., 130:14-132:16, 153:20-154:1; Stipulation ¶ 19(B)(ii). Procedurally, the filing of the motion presented potential consequences that would be adverse to LBH's interests in

a prompt confirmation of the proposed plan.   If Becker had continued to assert the motion until

the Bankruptcy Court rendered a decision, the potential conflict likely would have ripened into

an actual concurrent conflict of interest that posed gravely adverse effects for LBH.   Because

Becker withdrew the motion, however, the potential adversity was eliminated.

Alternatively under Rule 1.7, a concurrent conflict of interest exists if "there is a

significant risk that the representation of one or more clients will be materially limited by the

lawyer's responsibilities to another client."   RPC 1.7(a)(2).   The record does not suggest that

Obermayer's representation of Becker was materially limited by its duties to LBH, or vice

versa—that Obermayer's representation of LBH was in any way limited or compromised by

Obermayer's duties to Becker.   Obermayer represented LBH only as a defendant in the medical

malpractice suits.   Obermayer's duties to LBH in the state court suits were entirely unrelated to

Obermayer's duties to Becker in the bankruptcy proceedings.   LBH had no stake in the outcome

of Becker's objections to the third party release.   A ruling on the objections would not impact

the bankruptcy estate—whether it was a grant or a denial.   And LBH and Becker agreed on the

preferred procedure for presenting his objections to the third party release during plan

confirmation.   Becker correctly asserts that "neither the withdrawal nor the waiver had any

impact on the assets or administration of the estate."   Pl. Suppl. Br. at 25.

LBH's insurance carriers, under their duty to defend LBH, appointed Obermayer as defense

counsel in the medical malpractice suits.   Obermayer never represented LBH or the Debtors'

estates in the bankruptcy case in regard to the medical malpractice claims, or any other matter.

Obermayer never provided any advice or services concerning how the medical malpractice claims

should be administered during the bankruptcy case or should be treated under the proposed plan or

the confirmed Plan.   The record is also devoid of any evidence that Obermayer at any time

obtained access to confidential communications, documents, or non-public information about

LBH's bankruptcy strategies or the administration and assets of the estate.   Instead, Isenberg and

his colleagues at Saul Ewing represented LBH in the bankruptcy case.

    The medical malpractice plaintiffs were creditors of LBH's estate, but litigation of their

suits was largely removed from administration of the bankruptcy case.   LBH's reorganization

separated their claims into two classes:   "Class A8-A" stipulated claims and "Class A8-B"

non-stipulated claims.   Plan § 3.2(h), (i) (Bankr. Doc. 1350).   The Plan treated the two classes

differently.   Holders of a stipulated claim were to be granted relief from the bankruptcy

automatic stay, 11 U.S.C. § 362, either during reorganization or upon the Plan's effective date.

Plan § 5.1.8.[15]   They were to be paid solely from any available medical malpractice insurance.

Id.   In contrast, the non-stipulated claims were automatically stayed under § 362; however, upon

the Plan's effective date, litigation could proceed, "with the result of such litigation to constitute

the allowed or disallowed recovery."   Plan § 5.1.9.   Holders of a non-stipulated claim would

recover first from any available malpractice insurance; and second, solely to the extent of any

uninsured deficiency, according to the percentage distribution provided to general unsecured

---

[15] "Pursuant to orders of the Bankruptcy Court, each holder of a LBH Stipulated Medical Malpractice Claim has been, or upon the occurrence of the Effective Date shall be, granted relief from the automatic stay, to the extent applicable, to pursue litigation on account of its Class A8-A Claim against Reorganized [LBH], or to prosecute litigation on account of its Class A8-A Claim that was pending against [LBH] on the Petition Date, with the result of such litigation to constitute the Allowance or Disallowance of the applicable Class A8-A Claim, . . . and, provided further, that each holder of an Allowed Class A8-A Claim shall recover, to the extent entitled under applicable law, solely from any available Malpractice Insurance Coverage.   In no event, shall Reorganized [LBH] be obligated to pay any amount to any holder of a Class A8-A Claim other than from Insurance Coverage.   Each holder of a Class A8-A Claim shall be permanently enjoined from recovering or seeking to recover from Reorganized [LBH], whether directly or indirectly, other than from any available Malpractice Insurance Coverage."   Plan § 5.1.8.

creditors under the Plan.   Id. § 5.1.9(ii)(1), (2).   The non-stipulated claims were "a very small

class . . . only four or five claims, fewer than ten . . . ."   Hr'g Tr., dated Dec. 2, 2011, at 38-39.

As to three of the five medical malpractice suits that Isenberg cited to support the conflict

of interest asserted against Obermayer, Saul Ewing negotiated and executed stipulations with the

plaintiffs to lift the automatic stay so that their suits could proceed to recover insurance proceeds.

See History, footnote 7, supra. The other two medical malpractice suits were stayed and

ultimately dismissed in the state court for lack of prosecution after the Plan's effective date.

Moreover, the docket does not reflect that any of the five cited medical malpractice suits resulted

in a payment of funds under the Plan from the bankruptcy estate.

Becker asserts that Obermayer represented solely LBH's insurance carriers in the medical

malpractice suits, and Obermayer never represented LBH in connection with the bankruptcy case.

Pl. Suppl. Br. at 24-25.   Becker asserts that LBH's insurance carriers were Obermayer's clients

because they paid Obermayer's fees and any judgments were to be paid solely from insurance

proceeds.   Id.   On the other hand, Defendants assert that LBH was Obermayer's sole client in the

medical malpractice suits, asserting that it is "black letter law that Obermayer represented LBH,

not the insurer."   Defs. Suppl. Br. at 22.   For this reason, Defendants suggest that LBH was in

fact Obermayer's client in both the medical malpractice suits and in the bankruptcy case.   Id.

When an insurance carrier appoints defense counsel and funds the defense of its insured, a

question often arises as to whether the insured is the sole client or instead, whether the insured and

its insurance carrier are co-clients.   Pennsylvania's Supreme Court has not addressed this

question.   Camico Mut. Ins. Co. v. Heffler, Radetich & Saitta, LLP, No. 11-4753, 2013 WL

315716, at *3 (E.D. Pa. Jan. 28, 2013) (DuBois, J.).   The "question continues to be the subject of

67

debate among scholars and courts," and "lower state and federal courts interpreting Pennsylvania law have answered this question differently."   Id. (citations omitted).   This question need not be answered here.   Even assuming that LBH was Obermayer's sole client in the medical malpractice suits, Obermayer did not represent LBH in the bankruptcy case.   The record also establishes that Obermayer's representation of Becker did not create any actual concurrent conflicts with the interests of LBH─in either the medical malpractice suits or in the bankruptcy case.

Even if the filing of Becker's motion for reconsideration—which created a risk of postponement of plan confirmation that posed likely adverse consequences for LBH—is viewed as a concurrent conflict of interest under Rule 1.7(a), the record establishes that Obermayer's representation of Becker was permissible.   "Notwithstanding the existence of a concurrent conflict of interest," a lawyer may represent a client if the requirements of Rule 1.7(b) are met. RPC 1.7(1)-(4).   Here, each of the Rule 1.7(b) requirements was met.

Under Rule 1.7(b)(1), a lawyer may represent a client if "the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client."   RPC 1.7(b)(1).   Obermayer reasonably believed that it could advance Becker's challenge to the propriety of the third party release without compromising LBH's interests in the medical malpractice suits or in the bankruptcy case.   As found above, Obermayer's representation of each client was not materially limited by its duties to the other client.   The record also establishes that Obermayer provided competent and diligent representation to both clients.   No evidence or reason to conclude otherwise has been presented.

Under Rule 1.7(b)(3), a lawyer may represent a client if "the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in

the same litigation or other proceeding before a tribunal." RPC 1.7(b)(3). Obermayer did not

represent LBH and Becker in the same litigation. Obermayer represented LBH in the medical

malpractice suits and represented Becker as to the third party release in the bankruptcy case. As

to both the state court litigation and the bankruptcy proceedings, moreover, the record is

clear—Obermayer did not assert any claim by Becker against LBH or the Debtors' estates, and

Obermayer did not assert any claim by LBH against Becker.

Under Rule 1.7(b)(4), a lawyer may represent a client if "each affected client gives

informed consent." RPC 1.7(b)(4). LBH and Becker each gave their informed consent to

waive any conflict of interest presented by Obermayer's concurrent representation of Becker as to

bankruptcy matters and its representation of LBH as a defendant in the medical malpractice suits.

The record does not contain any evidence suggesting otherwise.

Under Rule 1.7(b)(2), a lawyer may represent a client if "the representation is not

prohibited by law." RPC 1.7(b)(2). Defendants submit that the conduct of LBH, Becker, the

Committee, and their counsel "was wrongful, deliberate, and in violation of specific statutes and

rules." Defs. Suppl. Br. at 6. These assertions are without merit, for several reasons that follow.

Defendants assert that LBH, Becker, the Committee, and their counsel committed a

crime. Defs. Suppl. Br. at 3, 12-13, 19-20. They cite the following statutory provision:

> A person who . . . knowingly and fraudulently gives, offers, receives, or attempts
> to obtain any money or property, remuneration, compensation, reward, advantage,
> or promise thereof for acting or forbearing to act in any case under title 11 . . .
> shall be fined under this title, imprisoned not more than 5 years, or both.

18 U.S.C. § 152(6). Defendants contend that § 152 applies here because LBH conferred an

"advantage" upon Becker and Obermayer by waiving the asserted conflict of interest; and in

exchange, Becker forbore asserting the motion for reconsideration by withdrawing it.   And LBH "conferred an additional benefit"—the release of any claim by LBH for disqualification of Obermayer.   Defs. Suppl. Br. at 19.   Defendants assert that LBH, Becker, the Committee, and their counsel agreed to conceal and failed to disclose this "*quid pro quo* arrangement," and they acted "knowingly" and "voluntarily," with calculated, fraudulent intent.   Id. at 13, 19-20.

"Although Section 152 may be violated by persons other than the bankrupt, it appears that the principal objectives of the provisions are to prevent and punish efforts by a bankrupt to avoid the distributions of any part of a liable bankrupt estate."   Stuhley v. Hyatt, 667 F.2d 807, 809 n.3 (9th Cir. 1982).   See, e.g., United States v. Brennan, 326 F.3d 176, 194-95 (3d Cir. 2003) (concealment of bankruptcy assets is "a continuing offense which lasts until it is detected or its consequences are purged"); United States v. Shapiro, 101 F.2d 375, 378-79 (7th Cir. 1939) ("The object of Congress in passing this criminal statute was to punish those debtors who, although wanting relief from their debts, did not want to surrender what property there was to the creditors.").   "The crime is complete when the act of concealment or transfer is performed with a criminal intent."   Id., 101 F.2d at 379.

Defendants' position is founded on fundamental errors.   Neither Becker's withdrawal of the motion for reconsideration nor LBH's waiver of the asserted conflict of interest had any effect upon the bankruptcy estate.   Nor was LBH's potential claim for Obermayer's disqualification an asset or property of the estate.   For one reason, this is so because any claim for Obermayer's disqualification arose after LBH filed its Chapter 11 petition:

> The "estate," as defined in the Bankruptcy Code, includes "all legal or equitable interests of the debtor in property as of the commencement of the case."   11 U.S.C. § 541(a)(1).   This includes causes of action, which are considered property of the

bankruptcy estate "if the claim existed at the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law."

In re Emoral, Inc., 740 F.3d 875, 879 (3d Cir. 2014), cert. denied sub nom. Diacetyl Plaintiffs v. Aaroma Holdings, LLC, 135 S. Ct. 436 (U.S. 2014) (quoting Bd. of Tr. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 169 & n.5 (3d Cir. 2002)).   A "claim, cause of action, or other property acquired post-petition is generally not considered property of the estate and may be pursued by the debtor for her own personal benefit."   In re Harber, 553 B.R. 522, 527 (Bankr. W.D. Pa. 2016) (citing § 541(a) (defining property of the estate to include those interests existing "as of the commencement of the case," with exceptions not applicable here)).

In addition, LBH's potential claim for Obermayer's disqualification was not property of the bankruptcy estate because LBH could not have asserted the claim on its own behalf to recover damages under state law.   Pennsylvania's Rules of Professional Conduct are not a basis for civil liability.   Int'l Longshoremen's Ass'n, Local Union 1332 v. Int'l Longshoremen's Ass'n, 909 F. Supp. 287, 290 (E.D. Pa. 1995) (citing Maritrans GP Inc. v. Pepper, Hamilton & Scheetz, 602 A.2d 1277, 1284 (Pa. 1992)).   The Bankruptcy Court, just like this Court, has inherent powers to disqualify an attorney from representing a particular client.   In re David Cutler Indus., Ltd., 432 B.R. 529, 539 (Bankr. E.D. Pa. 2010) (Frank, J.).   LBH could have moved for Obermayer's disqualification, but LBH would not have recovered damages.   Id. at 540 ("the court must consider whether the social need for ethical practice outweighs the party's right to counsel of his own choice") (citation and internal quotation marks omitted)).   At best, the potential monetary value of LBH's claim to disqualify Obermayer would have been inconsequential court costs to seek that remedy.

71

Contrary to Defendants' assertions of criminal concealment, LBH, Becker, the Committee, and their counsel had no obligations to apprise BNYM of the waiver of conflict agreement.   "An attorney-client relationship is an agency relationship and arises only when the parties have given their consent, either express or implied, to its formation."  Comm. on Prof. Ethics & Grievances of the V.I. Bar Ass'n v. Johnson, 447 F.2d 169, 174 (3d Cir. 1971).   Saul Ewing and Obermayer owed a duty of loyalty and were required to exercise independent judgment on behalf of their respective clients, LBH and Becker.   They were required to disclose to their clients any conflict of interest that impaired their duties as attorneys.   However, Saul Ewing and Obermayer did not owe those duties to BNYM because they did not have an attorney-client relationship with BNYM.   BNYM was a stranger to the attorney-client relationships, with no rights to enforce a breach of duty or demand disclosure.

Section 152 is inapplicable for other reasons as well.   Importantly, the record is devoid of any evidence of criminal intent.   No crime was committed.   Defendants only describe innocent conduct as criminal "collusion," whereas the record discloses commendable cooperation among LBH, Becker, the Committee, and their counsel.   Counsel for these parties acted with dispatch to resolve the potential conflict within two weeks or so after the conflict was asserted.   Counsel chose the path of least litigation that fully protected the interests of their respective clients, in aid of the Bankruptcy Court's prompt confirmation of the Debtors' reorganization.

Defendants assert that LBH, Becker, the Committee, and their counsel violated Bankruptcy Rule 9019,[16] which applies "to settlement of *any* dispute that has an effect on the bankruptcy

---

[16]   The Rule states, in part:   "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.   Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees . . . and to any other entity as the court may direct."   Bankr. Rule 9019(a).

estate."  Defs. Suppl. Br. at 20-21 & n.17.   They assert that LBH's claim for Obermayer's

disqualification belonged to the estate, and the Rule was violated when the disqualification claim

was compromised without the Bankruptcy Court's approval.   Id.   Again, that claim was not

property of the estate, and its compromise had no effect upon the administration of the estate.

Rule 9019 does not apply here.

Defendants assert that LBH and Obermayer violated 11 U.S.C. § 327 of the Bankruptcy

Code and Bankruptcy Rule 2014 by failing to "inform the Bankruptcy Court about the retention of

the Obermayer firm to defend LBH" in the medical malpractice suits.[17]   Defs. Suppl. Br. at 3,

21-22.   It is asserted that "LBH was required to file an application under § 327 to obtain approval

for the retention of the Obermayer firm."   Id. at 21.   It is also asserted that Obermayer "ignored"

its "continuing obligation to disclose any conflicts of interest pursuant to Bankruptcy Rule 2014."

Id.   And "[n]either the Bankruptcy Court nor creditors were apprised of Obermayer's concurrent

representation which created its conflict of interest."   Id.

---

[17]   The cited statute, 11 U.S.C. § 327, applies to a debtor in possession as well as a trustee.   In re Congoleum Corp., 426 F.3d 675, 688 n.13 (3d Cir. 2005) (citing United States Trustee v. Price Waterhouse, 19 F.3d 138 (3d Cir. 1994)); 11 U.S.C. § 1107(a).

Subsection (a) of the statute states:  "Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title."  11 U.S.C. § 327(a).

Subsection (e) of the statute states:  "The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed."   11 U.S.C. § 327(e).

Rule 2014 states, in part:  "An order approving the employment of attorneys . . . , or other professionals pursuant to § 327 . . . shall be made only on application of the trustee . . . . The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."

Whether LBH violated § 327 and Bankruptcy Rule 2014 is irrelevant—LBH is not a party to this litigation nor a member of the proposed class.   Moreover, the record establishes that the cited statute and rule do not apply to Obermayer's representation of LBH in the medical malpractice suits, or its representation of Becker, for several reasons.

Section 327(a) "restricts retention of lawyers and other professionals to those who do not hold or represent an interest adverse to the estate and are disinterested."   In re Congoleum Corp., 426 F.3d 675, 688-89 (3d Cir. 2005); see 11U.S.C. § 1107(b) ("a person is not disqualified for employment under section 327 . . . by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case").   The Bankruptcy Code defines a "disinterested person" as one who does not have an interest materially adverse to the interest of the estate, by reason of any direct or indirect relationship with the debtor, or for any other reason.   11 U.S.C. § 101(14)(c).

Section 327(e) "permits employment of an attorney 'for a specified special purpose,' so long as the attorney does not hold or represent 'any interest adverse to the debtor or to the estate with respect to the matter' on which he is to be employed."   Congoleum, 426 F.3d at 689 (quoting § 327(e)).   "The 'special purpose' must be unrelated to the reorganization and must be explicitly described in the application."   Id.; Alan N. Resnick & Henry J. Sommer, 3 Collier on Bankruptcy ¶ 327.04[9][d], pp. 327-56–327-57 (rev. 16th ed. 2016).   "Applications to approve special counsel to continue employment of a law firm to conclude personal injury or malpractice actions are not unheard of in the bankruptcy arena and are specifically permitted by § 327(e) of the Code."   In re Welch, 324 B.R. 553, 556 (Bankr. M.D. Pa. 2005) (citing In re Vouzianas, 259 F.3d 103 (2d Cir. 2001) (affirming retention of attorney representing debtor for some years in personal injury case).

LBH retained Obermayer for a specified special purpose—LBH's defense in the medical malpractice suits.   However, the state court dockets reflect that in all but one of the cited five medical malpractice suits, J. Kurt Straub, Esq. of Obermayer entered his appearance several years before LBH filed its petition on January 13, 2010.   See History, footnote 7, supra.   As to the one exception, suit was commenced on February 4, 2010, three weeks after LBH filed its Chapter 11 petition, and a suggestion of bankruptcy was filed on March 2, 2010.   Id.   Each of the five cited medical malpractice suits was automatically stayed under 11 U.S.C. §362.   Id.

Furthermore, the Bankruptcy Court was informed of three of the five cited medical malpractice suits.   In each of those three suits, Saul Ewing on behalf of LBH and counsel for the state court plaintiffs negotiated and executed a stipulation to lift the automatic stay under 11 U.S.C. § 362, and then moved for the Court's approval of the stipulation.   In each suit, the Court ordered that the stay was modified and litigation could proceed, provided any judgment would be paid from available medical malpractice insurance proceeds.   By so ordering, the Court in practical effect found that it was in the best interests of the estate to allow LBH to continue to use its chosen counsel, Obermayer, to prosecute the medical malpractice suits.   The docket does not reflect that any objections to Obermayer's services were presented to the Court.   Just as the Second Circuit observed in Vouzianas:   "We must remember that Section 327 at its most basic level is a judicial check on the trustee's [debtor in possession's] power, and that is precisely the role that the bankruptcy court here fulfilled."   259 F.3d at 109.   The other two cited medical malpractice suits were stayed on January 20, 2010, and then dismissed for lack of prosecution after the effective date of the Plan on January 19, 2012.   The state court dockets do not reflect that Obermayer performed any services during that period.

Section 327 and Bankruptcy Rule 2014 do not apply to Obermayer's representation of LBH in the medical malpractice suits for other reasons as well.   The record does not contain any evidence that Obermayer's representation of LBH in the medical malpractice suits was adverse to the interests of the bankruptcy estate.   There also is no evidence that Obermayer had an interest materially adverse to the interests of the estate, by reason of any relationship with the Debtors, or for any other reason.   Furthermore, there is no evidence that Obermayer's representation of LBH in the medical malpractice suits at any time presented any actual conflicts of interest.

Defendants assert that under § 327 and Bankruptcy Rule 2014, Obermayer had a continuing obligation to disclose to the Bankruptcy Court the conflict of interest allegedly created by Obermayer's concurrent representation of LBH and Becker.   There was no such obligation. Becker was a creditor in the bankruptcy case.   Section 327(c) of the Bankruptcy Code provides that representation of a creditor does not disqualify a professional for employment under § 327(a) unless such representation creates an actual conflict of interest.   11 U.S.C. § 327(c).[18]   Section 327 "mandates disqualification when there is an actual conflict of interest, allows for it when there is a potential conflict, and precludes it based solely on an appearance of conflict."   In re First Jersey Sec., Inc., 180 F.3d 504, 509 (3d Cir. 1999) (citing Marvel, 140 F.3d at 476).   Here, the record discloses no actual conflicts of interest.   The record also establishes that the potential conflict of interest created by Obermayer's concurrent representation of LBH and Becker would not have warranted Obermayer's disqualification under § 327 in the bankruptcy case.

---

[18]   The statute provides:   "In a case under chapter . . . 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case, the court shall disapprove such employment if there is an actual conflict of interest."   11 U.S.C. § 327(c).

Principally, Obermayer represented Becker as to the propriety of the third party release of the Indenture Trustee by the bondholders.   Becker's position as to the third party release was not adverse to LBH's interests in the medical malpractice suits.   Nor was Becker's position adverse to the Debtors' estates.   Becker's position was potentially adverse to LBH's duties as a debtor in possession to file a proposed plan for reorganization as soon as practicable.   See 11 U.S.C. §§ 1106(a)(5), 1107(a).   But there was no actual conflict of interest presented, and counsel for LBH and Becker promptly resolved the potential conflict of interest that did arise.   LBH asserted the conflict verbally on October 6, 2011, and by letter dated October 13, 2011, and then counsel resolved it by consent on October 21, 2011.   Becker's position as to the third party release was adverse solely to Defendants' position that they were entitled to a release of any and all potential claims by the bondholders.   Becker provided the Bankruptcy Court with a complete and accurate disclosure of that adversity when on November 10, 2011, he filed his objections to confirmation of any plan for reorganization that contained the third party release.   Defendant BNYM did not present an objection to Obermayer's representation of Becker at any time during the bankruptcy proceedings.   BNYM asserted the conflict of interest for the first time in this litigation.

The record is clear that Becker had every right to file and then withdraw the motion for reconsideration, and present his objections during confirmation of the proposed plan for reorganization.   LBH, Becker, the Committee, and their counsel did nothing unethical or wrong in agreeing to waive the asserted conflict of interest.   They had no obligation to apprise BNYM of the waiver of conflict or obtain the Bankruptcy Court's approval of the waiver agreement.   In addition, the evidence proffered by Defendants is not evidence of misconduct, and it provides no defense at all to class certification.

77

B.      The Asserted Affirmative Defenses

Defendants assert the affirmative defenses of equitable estoppel, waiver, and judicial estoppel.   Fed. R. Civ. P. 8(c).   In their view, these defenses will require individualized proof for various groupings of bondholders, which defeats certification of the class proposed here. Defs. Resp. at 23-34; Defs. Suppl. Br. at 17-19.   Their position is based largely on facts regarding the settlement of the adversary proceeding, the Bankruptcy Court's approval of the settlement and the Stipulation on September 14-15, 2011, without objection by the bondholders, and the bondholders' vote to accept the proposed plan for LBH's reorganization.   See History, supra; Claims to Be Given Class Treatment, supra.   Defendants also cite Becker's withdrawal of the motion for reconsideration, in conjunction with the alleged unethical and even illegal agreement among Becker, LBH, the Committee, and their counsel to waiver any conflict of interest arising from Obermayer's concurrent representation of Becker and LBH.   See Asserted Conflict of Interest, supra.   The record establishes that the affirmative defenses are not actionable, and therefore, the defenses are irrelevant to class certification.

Defendants have the burden of proof at trial as to these defenses.   "The burden of proof is on the party claiming estoppel."   United States v. Asmar, 827 F.2d 907, 912 (3d Cir. 1987) (citing Lyng v. Payne, 476 U.S. 926, 935 (1986) (a party cannot prevail on an estoppel claim without at least demonstrating the traditional elements of estoppel)); accord Thatcher's Drug Store of W. Goshen, Inc. v. Consol. Supermarkets, Inc., 636 A.2d 156, 160 (Pa. 1994).   In addition, the party claiming the waiver must prove the facts on which he relies for such waiver. Brown v. City of Pittsburgh, 186 A.2d 399, 401 (Pa. 1962); Dougherty v. Thomas, 169 A. 219, 223 (Pa. 1933).

Here, there has been more than adequate time for discovery—extensive supplemental discovery was granted.   In this situation, it is appropriate to consider the merits of the affirmative defenses.   "Rule 23 gives no license to shy away from making factual findings that are necessary to determine whether the Rule's requirements have been met."   Marcus, 687 F.3d at 591 (citing Hydrogen Peroxide, 552 F.3d at 307, 316 (requiring a "rigorous analysis of the evidence" resolving "all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action")).

Defendants have not made a sufficient showing as to elements essential to each of the asserted affirmative defenses.   On their merits, the affirmative defenses are not actionable because "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (quoting Fed. R. Civ. P. 56) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)).

Defendants assert the affirmative defense of equitable estoppel.   Defs. Resp. at 24-29; Defs. Suppl. Br. at 18-19.   Under Pennsylvania law, the doctrine of equitable estoppel

> "prevents one from doing an act differently than the manner in which another was induced by word or deed to expect.   A doctrine sounding in equity, equitable estoppel recognizes that an informal promise implied by one's words, deeds, or representations which leads another to rely justifiably thereon to his own injury or detriment, may be enforced in equity."

Shedden v. Anadarko E. & P. Co., L.P., 136 A.3d 485, 492 (Pa. 2016) (emphasis omitted) (quoting Novelty Knitting Mills, Inc. v. Siskind, 457 A.2d 502, 503 (Pa. 1983)).   Accord Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 165 (3d Cir. 2009) (citing Zitelli v. Dermatology Educ. & Research Found., 633 A.2d 134, 139 (Pa. 1993)).   Equitable estoppel

79

"arises when a party 'intentionally or through culpable negligence induces another to believe certain facts to exist' and the other party 'rightfully relies and acts on such belief' to its detriment."   Id. (quoting Zitelli, 633 A.2d at 139).   "The essential elements of equitable estoppel are thus inducement and detrimental reliance."   Id.

Defendants assert that the "Active Holders" authorized BNYM to settle any claims against the Indenture Trustee, and the Holders approved and consented to the third party release of the Indenture Trustee that was contained in the Stipulation.   Defs. Resp. at 25-27.   They contend that they justifiably relied on the Holders' words and deeds, and therefore, the Holders should be estopped from asserting the claims stated in Becker I and Becker II.   Defendants also say that they justifiably relied on the "silence" of the other bondholders that did not reject the proposed settlement, did not object to the Stipulation before the Bankruptcy Court approved the settlement on September 14-15, 2011, and voted to accept the proposed plan for LBH's reorganization that incorporated the terms of the Stipulation.   Id. at 27.

Defendants' application of the doctrine of equitable estoppel to the facts presented here is based on a fundamental fiction—that during the bankruptcy case, the bondholders in one fashion or another settled their claims against the Indenture Trustee, and that the claims stated in this litigation challenge that alleged settlement.   This is a distortion of the record.   See History, supra; Claims to Be Given Class Treatment, supra.   The Holders do not repudiate their approval, consent, and authorization of the proposed plan for reorganization.   Becker does not challenge the settlement allowed under the Plan for the bondholders.   Nor do any of the other bondholders. Becker's and the class's present claims were not settled, released, discharged, extinguished, or abandoned by settlement of the adversary proceeding or confirmation of the Plan.

80

Defendants' position that the bondholders are estopped to assert any claims against the Indenture Trustee is belied by the record.   None of the bondholders induced BNYM to believe it had settled or obtained a release of their claims against the Indenture Trustee.   Before the bondholders voted, they did not receive adequate notice and disclosure of the existence, merits, or value of any claims that they had against the Indenture Trustee.   And the record is also clear that the bondholders were all equally uninformed and could not have made an informed decision to settle their claims against the Indenture Trustee.   In addition, BNYM could not have reasonably relied on the mediated settlement, the executed Stipulation, or the Bankruptcy Court's approval of the same.   Those events did not finally resolve any disputes among LBH, BNYM, and the bondholders—which BNYM acknowledged.[19]   Lower Bucks Hosp., 471 at 457 & n.54. And at the hearing on December 2, 2011, BNYM agreed that confirmation of the third party release should be severed and decided later.   Hr'g Tr., dated Dec. 2, 2011, 35:6-37:9.

---

[19]   As Judge Frank explained:

[T]he Settlement Stipulation was not a stand-alone agreement that was complete and enforceable upon court approval.   The Settlement Stipulation was linked inextricably to confirmation of the Plan.   The enforceability of the material provisions of the Settlement Stipulation were contingent upon the occurrence of the effective date of a plan with provisions consistent with those described in the Settlement Stipulation. . . . Thus, the 9019 [approval] Order did not resolve with finality the treatment of the Bondholders in the Debtors' plan of reorganization.   That could be accomplished only through the plan confirmation process, a process that requires adequate disclosure to the Bondholders. . . .

Indeed, when the Settlement Stipulation is examined closely, it becomes apparent that it was *not* a final settlement of *any* of the interrelated disputes among LBH, BNYM and the Bondholders.   At bottom, it provided only that the adversary proceeding would be dismissed and that certain releases (including the Third Party Release) would be effective if and only if the effective date were reached following confirmation of a chapter 11 plan that included certain agreed-upon provisions affecting the Bondholders.   In other words, at the time it was approved, the Settlement Stipulation did nothing more than terminate the Bond Litigation [adversary proceeding], subject to the resuscitation of that litigation if the confirmation process did not produce a result consistent with the mutual expectations of the Debtors and BNYM.

Lower Bucks Hosp., 471 B.R. at 457 (citations and footnote omitted).

Defendants assert the affirmative defense of waiver.   Defs. Resp. at 29-30; Defs. Suppl. Br. at 19.   "A waived claim or defense is one that a party has knowingly and intelligently relinquished."   Chassen v. Fid. Nat'l Fin., Inc., No. 15-3789, ---F.3d ----, 2016 WL 4698256, at *1 (3d Cir. Sept. 8, 2016) (quoting Wood v. Milyard, 132 S. Ct. 1826, 1832 n.4 (U.S. 2012)). Under Pennsylvania law, a waiver is "the act of intentionally relinquishing or abandoning some known right, claim, or privilege."   Commonwealth ex rel. Pa. Att'y Gen. Corbett v. Griffin, 946 A.2d 668, 679 (Pa. 2008) (quoting Brown, 186 A.2d at 401).   And "there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it."   Id. (quoting Brown, 186 A.2d at 401).

Defendants assert that the Holders intended to waive any claims against the Indenture Trustee.   Defs. Resp. at 30.   In their view, the Holders' intent to do so is supported by proffered evidence that the Holders authorized BNYM to settle the adversary proceeding.   Id.   Defendants assert that the other bondholders as well intended to waive their claims against the Indenture Trustee.   Id.   It is proposed that the bondholders' intent to do so should be determined on a "bondholder-by-bondholder" basis by adducing evidence at trial as to whether each bondholder objected to settlement of the adversary proceeding, directed BNYM to reject the proposed settlement, objected to the Stipulation before the Bankruptcy Court approved it on September 14-15, 2011, and voted to accept the proposed plan for LBH's reorganization.   Id.   Again, the record is clear that before the bondholders voted, they did not receive adequate notice and disclosure of the existence, merits, or value of any claims that they had against the Indenture Trustee.   And the bondholders were all equally uninformed and could not have made a knowing and intelligent decision to waive their claims against the Indenture Trustee.

Defendants assert that Becker intended to waive any objection to a release of the Indenture Trustee by the bondholders.   In their view, Becker did so by filing the motion for reconsideration of the approval Order, and then withdrawing the motion.   Defs. Resp. at 30; Defs. Suppl. Br. at 17, 19.   This assertion is also without merit.   Becker's motion stated "no objection to the extent that the Settlement Agreement settles any and all claims by and between the Debtors, the Committee, and the Bond Trustee."   Mot. Recons. ¶ 8 (Bankr. Doc. 1357). Principally, the motion asserted that the Stipulation and the approval Order attempted to improperly effectuate an impermissible third party release of the Indenture Trustee by the bondholders.   Id.   Becker withdrew the motion for reconsideration, stating that he did so after having obtained the representations of the Debtors and the Committee that

> neither will assert that this withdrawal . . . waives, releases, discharges or prejudices Becker's rights to object at plan confirmation to the third party releases to be granted to BNYM by the Bondholders as set forth in the Plan, on any basis . . . .

Withdrawal Mot. Recons. (Bankr. Doc. 1402).

The record is devoid of any evidence of "'a clear, unequivocal and decisive act'" of Becker with "'an evident purpose to surrender'" his claims against the Indenture Trustee. Griffin, 946 A.2d at 679 (quoting Brown, 186 A.2d at 401).   The record establishes just the opposite—that Becker intended to preserve and assert his objections to the third party release of the Indenture Trustee.   Furthermore, the record shows that BNYM knew that Becker asserted his right to challenge the third party release, and Becker had no evident purpose of surrendering his challenge to the third party release.   On November 10, 2011, Becker filed objections to the release.   At the hearing on December 2, 2011, Becker asserted objections to the third party

release of the Indenture Trustee, and BNYM agreed that confirmation of the third party release should be decided later.   Hr'g Tr., dated Dec. 2, 2011, 35:6-37:9.

Defendants assert the affirmative defense of judicial estoppel.   Defs. Resp. at 30-32; Defs. Suppl. Br. at 17-18.   "Judicial estoppel is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that [it] has previously asserted in the same or in a previous proceeding."   MD Mall Assoc., LLC v. CSX Transp., Inc., 715 F.3d 479, 486 (3d Cir. 2013), cert. denied, 134 S. Ct. 905 (U.S. 2014) (quoting Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 272 (3d Cir. 2012) (internal quotation marks omitted)).   "The doctrine exists to protect the integrity of the judicial process and to prohibit parties from deliberately changing positions according to the exigencies of the moment."   Id. (citation and internal quotation marks omitted).   Our Court of Appeals has "consistently stated that the doctrine should only be applied to avoid a miscarriage of justice."   Id. (quoting Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 319 (3d Cir. 2003)); accord Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA, 779 F.3d 214, 221-22 (3d Cir. 2015).

The precise theory of judicial estoppel asserted by Defendants is not so clear.   It is suggested that the bondholders should not be permitted to assert the claims stated in Becker I and Becker II because the Holders authorized BNYM to settle the adversary proceeding, the bondholders did not object to the settlement or the Stipulation at the hearing on September 14, 2011, and all but a handful of bondholders voted to accept the proposed plan for LBH's reorganization, which contained a third party release of the Indenture Trustee by the bondholders. Defs. Resp. at 31-32.   Apparently, Defendants contend that the bondholders have taken irreconcilably inconsistent positions in the bankruptcy case and this litigation, and have done so

in bad faith.   But the bondholders have not taken two contradictory positions on the propriety of the third party release, or any other matters.   Once again, the record is clear that before the bondholders voted, they did not receive adequate notice and disclosure of the existence, merits, or value of any claims that they had against the Indenture Trustee.   And the bondholders were all equally uninformed and could not have made a knowing and intelligent evaluation of their position as to their potential claims against the Indenture Trustee.   They had no informed position in the bankruptcy case that they could reverse in this litigation.

Defendants clearly assert that Becker took "irreconcilably inconsistent positions."   Defs. Suppl. Br. at 17-18.   In their view, he did so by withdrawing the motion for reconsideration, which amounted to a "waive[r] of his objection that the settlement was inadequate, and then pursued this action alleging that the settlement was inadequate."   Id.   Again, this distorts the record.   Becker never objected to the adequacy of the settlement under the proposed or the confirmed Plan.   The record establishes that Becker intended to preserve all objections to the third party release of the Indenture Trustee by the bondholders.   From the filing of the motion for reconsideration on September 29, 2011, through the Bankruptcy Court's hearing as to confirmation of the third party release on Mar. 2, 2012, Becker persisted in consistently asserting the same position that he asserts in this litigation.   He does not challenge the manner in which the settlement of the adversary proceeding was negotiated and achieved, and he does not dispute the fairness or reasonableness of the approved settlement.   He does not challenge LBH's plan of reorganization, which included terms of that settlement.   Instead, Becker asserts that Defendants' liability arises from breaches of their duties to assure perfection of the security interests and liens against the collateral securing the bonds, which conduct occurred before the

bankruptcy and before the adversary proceeding.   See, e.g., Hr'g Tr., dated Dec. 2, 2011, 19:11-25:25, 31:1-34:25, 35:6-37:12, 75:4-76:7 (Bankr. Doc. 1819); Hr'g Tr., dated Mar. 2, 2012, 29:16-31:16, 35:9-22, 40:19-44:23 (Bankr. Doc. 1918).   Application of the doctrine of judicial estoppel would not avoid a miscarriage of justice in this litigation, it would only create injustice through an improper collateral attack on previous rulings by the Bankruptcy Court, the District Court, and our Court of Appeals.

IV.   CONCLUSION

For the reasons stated above, Becker's motion for class certification will be granted. Under Rules 23(a) and 23(b)(3), the proposed class of bondholders will be certified as a class action, and Becker will be certified as the class representative.   Under Rule 23(g), Barrack, Rodos & Bacine will be appointed as class counsel.

A certification Order accompanies this Memorandum.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.