IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEONARD BECKER | : | CIVIL ACTION |
| *INDIVIDUALLY AND ON BEHALF OF* | : | |
| *ALL OTHERS SIMILARLY SITUATED* | : | No. 11-6460 |
| | : | |
| v. | : | (consolidated with No. 12-6412) |
| | : | |
| THE BANK OF NEW YORK MELLON | : | |
| TRUST COMPANY, N.A., et al. | : | |

**MEMORANDUM**

**Juan R. Sánchez, C.J.**                                    **December 21, 2018**

In this consolidated class action lawsuit, Plaintiff Leonard Becker brings claims against

The Bank of New York Mellon Trust Company, N.A. (BNYM) and J.P. Morgan Trust Company,

N.A. (JP Morgan) on behalf of a class of holders of revenue bonds issued by the Borough of

Langhorne Manor Higher Education and Health Authority for the benefit of Lower Bucks

Hospital (the Hospital), to recover damages for financial losses the bondholders allegedly

sustained as a result of Defendants' failure to maintain a perfected security interest in the

collateral securing the bonds, and to compel BNYM to distribute funds awarded to the

bondholders in the Hospital's bankruptcy plan.  After more than six years of contentious pretrial

proceedings, including multiple rounds of dispositive motions and vigorously contested class

certification proceedings, the case went to trial in April 2018.  Just prior to the start of the

proceedings on the final day of trial, the parties notified the Court that they had reached an

agreement to settle the case for $13.5 million, with additional terms to be negotiated, and

requested that the trial be adjourned.  The parties filed the proposed settlement with the Court on

June 8, 2018, and on June 20, 2018, the Court issued an order preliminarily approving the

proposed settlement as fair, reasonable, and adequate to the class, subject to further consideration

at a fairness hearing to be held on September 20, 2018.  The order also authorized distribution of

a notice regarding the settlement to class members. Plaintiff now seeks final approval of the settlement, over two objections, and class counsel seek an award of attorneys' fees and litigation expenses. For the reasons set forth below, the objections will be overruled, the settlement will be approved, and class counsel's fee and expense request will be granted.

**BACKGROUND**

This case is a consolidation of two class actions brought on behalf of the same Plaintiff class of bondholders. In the original action (*Becker I*), filed in October 2011, Plaintiff brought claims against BNYM and JP Morgan, both of which served as indenture trustee for the bonds, arising out of their failure to maintain a perfected security interest in the collateral securing the bonds. Plaintiff alleged this lapse jeopardized the bondholders' status as secured creditors when the Hospital filed for bankruptcy in 2010, prompted the Hospital to file an adversary proceeding seeking to avoid the bondholders' security interest, and forced BNYM to compromise the bondholders' claim in the bankruptcy, causing the bondholders to receive less in the bankruptcy than they otherwise would have received. Plaintiff maintained the loss to the bondholders as a result of Defendants' failure to maintain a perfected security interest was approximately $5 million—the difference between the value of the collateral at the time of the bankruptcy (some $15.3 million, by Plaintiff's account) and the amount awarded to the bondholders in the Hospital's reorganization plan (approximately $10.3 million).

In the second action (*Becker II*), Plaintiff sought to compel BNYM to distribute the funds awarded to the bondholders in the Hospital's reorganization plan and sought declaratory relief as to BNYM's claimed entitlement to be indemnified and/or exercise a first-priority charging lien for expenses incurred in defending the adversary proceeding in the bankruptcy court, in fighting

BNYM's efforts to include a third-party release in the bankruptcy documents, and in defending this consolidated action. The two actions were consolidated in March 2013.

In both actions, Plaintiff sought to represent a class of bondholders entitled to receive a distribution under the Hospital's reorganization plan. *See, e.g.*, Mem. 24, Oct. 5, 2016, ECF No. 146. After multiple rounds of dispositive motions, a class was certified in October 2016 consisting of:

> All persons or entities who purchased or otherwise acquired the bonds identified as the Borough of Langhorne Manor Higher Education and Health Authority Hospital Revenue Bonds, Series of 1992 (The Lower Bucks Hospital), *and who are holders of an Allowed Class A3 Claim pursuant to Section 5.1.3(A)(ii) of the Plan for reorganization of Lower Bucks Hospital which Plan was confirmed under Chapter 11 of the Bankruptcy Code*. Excluded from the class are Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant and any officers or directors thereof.

Order, Oct. 5, 2016, ECF No. 147 (emphasis added). Under the terms of the reorganization plan, the bondholders' claim in the bankruptcy was classified as a "Class A3" claim and, pursuant to the settlement of the adversary proceeding, was allowed as a secured claim in the approximate amount of $10.3 million. Section 5.1.3(A)(ii) of the reorganization plan provided for distribution of the settlement proceeds to holders of an Allowed Class A3 Claim on a pro rata basis.

In July 2017, Plaintiff sought the Court's approval of an agreed upon notice to be sent to class members advising them of the pendency and status of the consolidated action and affording them an opportunity to opt out of the class. The Court approved the proposed form of notice in September 2017, and the notice was thereafter sent to class members. The notice advised class members of the class definition and further advised that in accordance with the relevant provisions of the Hospital's reorganization plan and the order confirming the plan, "the record date for holders of an allowed Class A3 claim is December 7, 2011." Notice of Pendency of Class Action 2, ECF No. 171.

The December 7, 2011, record date was derived from the reorganization plan, which set a fixed date—the "Distribution Record Date"—for determining who was entitled to a distribution under the plan, providing:

> At the close of business on the Distribution Record Date, the transfer records for Claims shall be closed, and there shall be no further changes in the record holders of such Claims. None of the Reorganized Debtors, the Claims Agent, the Disbursing Agent nor the Bond Trustee shall have any obligation to recognize any transfer of claims occurring after the Distribution Record Date, and they shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders as of the close of business on the Distribution Record Date.

Plan § 10.11, ECF No. 125-28. The plan also gave the Bond Trustee (i.e., BNYM) discretion to establish an alternative record date or dates for the bondholders "for the purposes of distributions on the Bonds hereunder," *id.*, but no alternative record date was ever established. Hence, the applicable record date was the "Distribution Record Date," or December 7, 2011.[1] In addition to establishing a record date for distributions on the bonds, the plan provided that the bonds would be cancelled as of the plan's effective date. *Id.* § 10.10.

Although the notice of pendency of class action was sent to all class members, no class members opted out of the class or raised any objections regarding the class definition with class counsel.

---

[1] The "Distribution Record Date" was defined elsewhere in the plan as "the Confirmation Date or such other date as may be designated in the Confirmation Order." Plan § 1.45, ECF No. 125-28. The "Confirmation Date," in turn, was defined as "the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the dockets of the Chapter 11 Cases," *id.* § 1.30, which occurred on December 7, 2011. Because the "Confirmation Order"—i.e., "the order of the Bankruptcy Court confirming the Plan," *id.* § 1.32—did not designate another date, the "Distribution Record Date" was December 7, 2011.

The case proceeded to trial in April 2018 on two of the three claims in *Becker I* and on all claims in *Becker II*.[2] Prior to the start of the proceedings on April 19, 2018, which was to have been the last day of trial, the parties advised the Court that after intense negotiations over the course of the trial, they had reached an agreement to settle the consolidated action, subject to the Court's approval, for $13.5 million. The parties further agreed that the additional terms of the settlement would be negotiated "using the standard provisions that would be in class actions," and that any disputes regarding settlement terms would be finally resolved by United States Magistrate Judge Timothy R. Rice, who had overseen the parties' earlier efforts to settle the case. *See* Tr. 4, Apr. 19, 2018. They also agreed that since the class had previously been certified and class members had been provided with notice of suit and an opportunity to opt out of the class just months earlier, the settlement would provide that class members would not be afforded a second opportunity to opt out under Federal Rule of Civil Procedure 23(e)(4). *See id.* at 5.

On June 8, 2018, the parties filed the proposed settlement with the Court, together with a motion for preliminary approval of both the settlement and the form, content, and manner of giving notice of the proposed settlement to the class. Under the terms of the settlement, the parties agree to resolve this litigation in its entirety in exchange for a cash payment of $13.5 million for the benefit of the class. The settlement allows class counsel to seek an award of

---

[2] *Becker I* proceeded to trial on Plaintiff's claims for breach of fiduciary duty and breach of contract, the negligence claim having been dismissed at the pleading stage based on the gist of the action doctrine. *See* Order 10-12, Oct. 31, 2012, ECF No. 39. *Becker II* proceeded to trial on all counts, but only as to BNYM's entitlement to deduct from the bondholders' funds expenses incurred in the bankruptcy proceedings prior to January 19, 2012, the Court having ruled on summary judgment that BNYM was not entitled to be indemnified or exercise a first-priority charging lien for bankruptcy-related expenses incurred after January 19, 2012, or for expenses incurred in defending this litigation. *See* Mem. 25-40, Mar. 23, 2016, ECF No. 136.

attorneys' fees and litigation expenses from the $13.5 million settlement fund[3] and to use up to

$100,000 of the fund for notice and administration costs, with the remainder of the fund, net of

certain taxes, to be distributed equitably among authorized claimants based on the face value of

their proportional holdings of the bonds on the record date in relation to the total face value of

the bonds held by all authorized claimants who file a valid proof of claim. To qualify as an

authorized claimant, a class member must submit a proof of claim form stating the face value of

the bonds held by the class member on the December 7, 2011, record date and providing

documentation of that amount. The settlement also includes a broad release, whereby Plaintiff

and the other class members release, inter alia, any and all claims

> that arise out of, are based upon, or relate in any way, directly or indirectly, to (i)
> the purchase, acquisition, transfer, holding, ownership, disposition, or sale of any
> Bonds by any Class Member, or (ii) any facts, matters, allegations, transactions,
> events, disclosures, conduct, statements, representations, acts, failures to act, or
> omissions relating to the Bonds, the bankruptcy proceedings of Lower Bucks
> Hospital, any adversary proceeding in those bankruptcy proceedings, or the bond
> proceeds.

Stipulation and Agreement of Settlement ¶¶ 1(gg), 4, ECF No. 249-1.

On June 20, 2018, the Court issued an order preliminarily approving the proposed

settlement as fair, reasonable, and adequate to the class, subject to further consideration at a

hearing to be held on September 20, 2018, and authorizing distribution of a notice to class

members in the form proposed by Plaintiff. Notice of the settlement was sent to class members

in July and August 2018, and two objections to the settlement were ultimately filed, one by

Stephen A. Steglitz, Vice President of the Municipal Bond Department of Beech Hill Securities,

Inc., on behalf of himself and twelve individual clients, and the other by three related funds—

---

[3] The notice of settlement sent to class members represented that class counsel would seek an
award of attorneys' fees in an amount not to exceed $2.15 million and reimbursement of
litigation expenses not to exceed $325,000. Notice of Proposed Settlement ¶ 55, ECF No. 249-4.

Silvercrest Municipal Advantage Master Fund LLC, Silvercrest Municipal Special Situations Fund LLC, and Silvercrest Municipal Special Situations Fund II LLC (collectively, "the Silvercrest Funds").

Notably, the objectors do not take issue with the amount of the settlement, which they urge the Court to approve. They instead object primarily to the class definition, which they now ask the Court to modify, despite having failed to raise any objection when the class was certified in October 2016 or when notice of the pendency of this class action—in which the class definition was prominently displayed—was sent to class members in September 2017. The Court held a final fairness hearing on September 20, 2018, at which the Silvercrest Funds appeared by counsel and presented testimony. Steglitz did not appear at the fairness hearing.

## DISCUSSION

Under Federal Rule of Civil Procedure 23(e)(2), a district court may approve a class action settlement that would bind class members "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). There is a "strong judicial policy in favor of class action settlement," *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010), and a settlement should be accorded an initial presumption of fairness where "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected," *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001)).

The presumption of fairness applies here as all four prerequisites are met. First, the settlement in this case was the product of arm's length negotiations, as evidenced by the fact that although the parties participated in numerous settlement conferences with Judge Rice, the case

did not settle until it was about to go the jury. Second, discovery was more than sufficient to enable the parties to evaluate the strengths and weaknesses of their positions, having been completed months before a settlement was reached. Third, counsel for both parties are experienced in class action litigation. And fourth, the settlement drew few objections. While the notice of settlement was mailed to more than 500 potential class members and nominees, the Court received only two objections to the settlement.

Apart from the presumption of fairness, the Third Circuit Court of Appeals has identified nine factors to be considered in evaluating the fairness of a proposed class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010) (alteration in original) (quoting *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)). The Court of Appeals has also suggested that, where appropriate, a court considering a proposed class action settlement may wish to consider additional factors such as:

> [t]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Id.* (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 323 (3d Cir. 1998)).

In addition to the factors a district court must (and may) consider in evaluating a class action settlement under Third Circuit precedent, recent amendments to Rule 23 require a court to consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2)(A)-(D).[4]  These factors overlap substantially with the factors identified by the Court of Appeals in *Girsh* and *Prudential*.

Upon consideration of the foregoing factors, the Court finds the proposed settlement is fair, reasonable, and adequate to the class.  The first *Girsh* factor—the complexity, expense, and likely duration of the litigation—"captures the probable costs, in both time and money, of continued litigation."  *Warfarin*, 391 F.3d at 535-36 (citation omitted).  This case was multi-

---

[4] The amendments to Rule 23 took effect on December 1, 2018, while the motion for final approval was pending, and apply not only to cases filed after the effective date but also to pending cases "insofar as just and practicable."  Order (U.S. S. Ct. Apr. 26, 2018).

faceted, involving litigation in the Bankruptcy Court regarding the propriety of a third-party release in the Hospital's reorganization plan that would have barred Plaintiff from bringing the claims in *Becker I*, appeals of the Bankruptcy Court's decision striking the release, and prosecution of the claims in *Becker I* and *Becker II* over a vigorous defense, including multiple rounds of dispositive motions. Although the case had already proceeded through more than six years of motions practice, discovery, and pretrial proceedings—and was about to go to a jury— by the time the settlement was reached, it was highly unlikely that a verdict would have ended the litigation. On the contrary, there was a strong likelihood that a final resolution of this action would have required substantial additional time and expense, given the prospect that any jury verdict would have been the subject of post-verdict motions and an appeal, which Defendants repeatedly pledged to pursue. *See, e.g.*, Defs.' Opp'n to Pl.'s Mot. to Compel Distribution of Funds 5, ECF No. 164 (opposing Plaintiff's motion to compel distribution of a portion of the funds awarded to the bondholders in the Hospital's bankruptcy following a summary judgment ruling rejecting a large part of BNYM's indemnification/charging lien claim because "it would be tremendously difficult, if not impossible, to recoup the payment should Defendants prevail on appeal"). This factor therefore favors settlement. *See Warfarin*, 391 F.3d at 536 (holding the first *Girsh* factor favored settlement where "it was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class").

The second *Girsh* factor requires the Court to consider the reaction of the class to the settlement. Here, although the class reaction has not been uniformly positive, only two objections were submitted in response to the more than 500 notices sent to potential class members and nominees. Notably, the objectors do not challenge the amount of the settlement,

but instead take issue with the class definition, of which they were previously on notice. The substance of the objections is addressed in greater detail below.

The third *Girsh* factor—the stage of the proceedings and the amount of discovery completed—is aimed at ascertaining "whether counsel had an adequate appreciation of the merits of the case before negotiating." *Id.* at 537 (citation omitted). It is thus significant that this case settled during trial, after extensive discovery and investigation had been completed, dispositive motions had been decided, and pretrial proceedings had been conducted, including several attempts at settlement. By the time the case settled, the parties clearly had a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and defenses and potential appellate issues.

The fourth and fifth *Girsh* factors—the risks of establishing liability and damages—"survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement." *Id.* With respect to liability, although Plaintiff's claims withstood summary judgment, Defendants continued to press the Court to dismiss three of the claims, and the Court had reserved ruling on the motion as to two of those claims (the claims for conversion and money had and received in *Becker II*). Moreover, liability in *Becker I* was vigorously contested at trial through the parties' competing experts, and Defendants repeatedly stressed their intention to appeal an adverse summary judgment ruling that limited the extent to which they could seek reimbursement for fees and expenses associated with this litigation in *Becker II*. Plaintiff was thus not assured of establishing liability—or that a finding of liability would survive on appeal. And even if Plaintiff was successful in establishing liability, he faced significant hurdles in establishing damages. The measure of damages in *Becker I*—the amount the bondholders would have

recovered in bankruptcy had their lien been continuously perfected—was vigorously contested by the parties and their experts, both in terms of what the collateral securing the bonds was worth at the time of the bankruptcy and in terms of whether the bondholders would actually have received the full value of the collateral. It was thus by no means certain that Plaintiff would have prevailed on his damages theory.

The sixth *Girsh* factor—the risks of maintaining the class action through the trial—has less relevance in this case, as the class was certified prior to trial and there was no effort to decertify the class. The same is true of the seventh *Girsh* factor—Defendants' ability to withstand a greater judgment. Although Defendants may have the resources to pay a greater amount, the fact they could pay more does not mean they are obligated to pay more than what the class members are entitled to under the theories of liability that existed at the time the settlement was reached. *See id.* at 538. This factor also has minimal relevance to this case.

The final two *Girsh* factors require the Court to consider the range of reasonableness of the settlement fund in light of (1) the best possible recovery and (2) a possible recovery, given all the attendant risks of litigation. Here, the total compensatory damages sought by Plaintiff was approximately $15.3 million, excluding interest, consisting of the approximately $5 million in loss to the bondholders as a result of the perfection issue and the full $10.3 million awarded to the bondholders in the Hospital's reorganization plan, representing a complete rejection of BNYM's asserted indemnification/charging lien rights. The $13.5 million settlement figure represents approximately 88% of this amount. While the best possible recovery would also include punitive damages, the amount of such an award is difficult to estimate. *See In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.*, 296 F.R.D. 351, (E.D. Pa. 2013) (noting the award of punitive damages "is nearly impossible to predict"). Moreover, Plaintiff

faced significant litigation risks, as discussed above. Such risks included the possibility that the jury would reject his compensatory damages theory as well as the risk that the Court would not allow the punitive damages issue to go to the jury. *See* Order, Apr. 16, 2018, ECF No. 229 (reserving ruling on Defendants' motion to dismiss Plaintiff's claim for conversion, one of the two claims on which punitive damages were potentially available); Order, Apr. 13, 2018, ECF No. 222 (reserving ruling as to whether punitive damages are available against a trustee under Pennsylvania law). Plaintiff also faced a strong likelihood of protracted post-trial and appellate proceedings, including an appeal regarding the extent to which BNYM was entitled to indemnification for the substantial expenses it incurred in litigating this case. In light of these risks, the $13.5 million settlement amount is entirely reasonable.

Turning to the Rule 23(e)(2) factors, the Court first finds the class representative and class counsel have adequately represented the class throughout this litigation. As noted, this was a complex and multi-faceted case that was aggressively defended at each stage. Class counsel persuaded the Bankruptcy Court to strike a third-party release in the Hospital's reorganization plan, enabling the class to pursue the claims asserted in this action; successfully defended appeals of the Bankruptcy Court's decision on the release in the District Court and the Court of Appeals; and prosecuted the Complaints in *Becker I* and *Becker II* through multiple rounds of dispositive motions, extensive discovery, class certification, *Daubert* motions, and all but the tail end of trial. Based on the Court's review of the record and observation of the proceedings since September 2017, when this case was reassigned to this Court, it is apparent that class counsel have vigorously prosecuted this action in the face of formidable opposition from the Defendants. The Court also finds the settlement was negotiated at arm's length, as explained above.

With respect to the adequacy of the relief the settlement provides to the class, the Court finds the settlement is adequate in light of "the costs, risks, and delay of trial and appeal" for the reasons explained in the analysis of the *Girsh* factors above. In addition, the methods of distributing relief to the class and of processing class-member claims are fair. To participate in the settlement, class members must complete and submit a proof of claim indicating the face value of the bonds held by the class member on the December 7, 2011, record date and providing documentation of those holdings in the form of a brokerage statement or a letter from the class member's band, broker, or other nominee. *See* Proof of Claim, ECF No. 249-2. The requirement that class members submit documentation to substantiate their holdings of the bonds as of the record date will facilitate the filing of legitimate claims, yet is not overly demanding given the range of permissible documentation. Moreover, notwithstanding the Silvercrest Funds' objection, and as discussed in greater detail below, the fee award sought by class counsel is reasonable, representing less than half of what the fee would be under the lodestar method.

The final Rule 23(e)(2) factor is whether the proposed settlement "treats class members equitably relative to each other." Under the terms of the settlement, the net settlement fund is to be distributed to authorized claimants—i.e., class members who submit a proof of claim form that is approved for payment by the Court—on a pro rata basis based on the face value of the claimant's proportional holdings of the bonds in relation to the total face value of the bonds of all authorized claimants. Stipulation and Agreement of Settlement ¶ 25, ECF No. 249-1. Allocating settlement proceeds to class members based on their proportional shares of the bonds satisfies this factor.

As to the additional factors identified by the Court of Appeals in *Prudential*, several of these factors also weigh in favor of approving the settlement. As noted, given the advanced

procedural posture of this case at the time the settlement was reached, the parties were particularly well situated to assess the probable outcome of the trial and the likelihood of protracted appeals. While class members were not afforded a second opportunity to opt out of the class following the settlement, they were provided with such an opportunity only months earlier in response to the notice of pendency of class action distributed in the fall of 2017, yet no class member chose to opt out of the class. As discussed elsewhere in this Memorandum, moreover, the provisions for attorneys' fees are reasonable, and the procedure for processing individual claims under the settlement is fair and reasonable.

The objectors to the settlement—Steglitz and the Silvercrest Funds—do not take issue with the amount of the settlement. Rather, as noted, the primary objection raised by both objectors concerns the class definition—specifically, the limitation that class members must have held bonds on the December 7, 2011, record date. Steglitz and the Silvercrest Funds held bonds on the record date and are therefore class members with respect to those bonds. However, both objectors also purchased additional bonds after the record date, which are not part of the settlement. The objectors argue the settlement is unfair insofar as it excludes these after-acquired bonds from receiving a distribution.

How the objectors were able to purchase the after-acquired bonds is somewhat of a mystery. As noted, the reorganization plan provided that the bonds would be "cancelled and extinguished" on the plan's "Effective Date," i.e., January 19, 2012. Plan § 10.10, ECF No. 125-28 ("On the effective date, except as otherwise provided in the Plan or the Confirmation Order, (1) the Indenture, Bonds, and any other instruments or documents evidencing or creating any indebtedness or obligations of any of the Debtors in connection with the Indenture and/or Bonds ("Bond Documents") shall be cancelled and extinguished . . . ."); *see* Mem. 2, Oct. 5, 2016, ECF

No. 146 (noting the confirmed plan became effective on January 19, 2012). Yet the bonds apparently continued to trade on the secondary market even after the effective date, unbeknownst to the parties or the Court.[5] The objectors and the parties offer conflicting theories as to who is responsible for the continued trading of the bonds in contravention of the reorganization plan, an issue which cannot be resolved on the existing record.[6]

---

[5] That the parties and the Court were unaware that the bonds were continuing to trade is evidenced by the filings made and orders issued in this litigation. *See, e.g.*, Compl. in Civil No. 12-6412, ¶ 39, ECF No. 1 (referencing the cancellation of the bond documents); Pl.'s Mem. in Supp. of Mot. to Require Corrective Disclosure 3, ECF No. 35-2 (noting the bonds "were cancelled in connection with the confirmation of [the Hospital's] plan of reorganization"); BNYM's Opp'n to Pl.'s Mot. to Require Corrective Disclosure 9 n.8, 12, ECF No. 38 (noting "section 10.10 of the Plan cancels and extinguishes the Indenture, Bonds, and related documents"); Mem. 27, Mar. 23, 2016, ECF No. 136 (remarking that "as of January 19, 2012, the confirmed Plan effectively cancelled and extinguished the Indenture, the bonds, and [related documents]").

[6] The Silvercrest Funds fault BNYM for failing to cancel the bonds. *See* Silvercrest Objs. 4, ECF No. 257. At the September 20, 2018, fairness hearing, Silvercrest Managing Director Edward F. Appel testified that had the bonds been cancelled, he would have expected to receive notification from BNYM in its capacity as indenture trustee and would have expected a cancellation notice to have been posted with the appropriate national repositories, neither of which occurred here. Plaintiff appears to agree with the Silvercrest Funds' position, noting that class counsel's inquiries as to what steps BNYM took to stop further trading after the plan's effective date have been met with silence. BNYM, in contrast, denies that it was responsible for cancelling the bonds, noting that under § 10.10 of the reorganization plan, the trustee's "rights and obligations under the Indenture" were "deemed fully discharged" as of the plan's effective date, subject to certain enumerated exceptions. BNYM argues that upon the plan's effective date, its obligations with respect to the bonds were limited to those listed in § 10.10 and did not include cancelling the bonds. BNYM also points to § 10.9 of the plan, asserting this provision contemplated that the bondholders would be required to surrender the bonds as a condition to receiving a distribution under the plan and placed responsibility for such surrender with another entity, the "Disbursing Agent." *See* Plan § 10.9, ECF No. 125-28 ("As a condition to receiving any Plan Distribution, the holder of an Allowed Claim evidenced by a certificate, instrument or note . . . shall (a) surrender such certificate, instrument or note representing such Claim, and (b) execute and deliver such other documents as may be necessary to effectuate the Plan in the sole determination of the Disbursing Agent. Such certificate, instrument or note shall thereafter be cancelled and extinguished.").

The objectors argue the class is underinclusive insofar as it excludes individuals and entities who purchased or acquired bonds after the record date because those purchasers will receive no distribution with respect to the after-acquired bonds, even though the bonds were never cancelled and continued to trade. The objectors note that while purchasers of after-acquired bonds will receive no settlement proceeds, individuals and entities who held bonds on the record date but sold them thereafter may receive a double recovery—i.e., the sale price plus a share of the settlement proceeds. The Silvercrest Funds further argue this unfairness is compounded by alleged defects in the notice provided in this case. The Funds maintain they never received the notice of pendency of class action that was distributed to class members in September 2017 and thus were unaware of the December 7, 2011, record date until July 2018, when Silvercrest Managing Director Edward F. Appel received the notice of proposed settlement in connection with his personal holdings of the bonds and contacted class counsel about it. *See* Silvercrest Objs. 3-4, 6, ECF No. 257; Decl. of Edward F. Appel ¶¶ 11-13, Aug. 17, 2018, ECF No. 257-1. According to Appel, had the Silvercrest Funds received earlier notice of the record date, they would have objected and brought to the parties' attention the fact that the bonds had continued to trade. *See* Silvercrest Objs. 6, ECF No. 257; Appel Decl. ¶ 14, ECF No. 257-1.[7]

While both objectors maintain the settlement is unfair, neither suggests the Court should reject it. They instead urge the Court to unilaterally redefine the class either by resetting the record date to the date of final approval of the settlement or by ordering that all bonds held as of December 7, 2011, and subsequently sold or transferred, were sold or transferred subject to the

---

[7] Although Steglitz also alludes to notice deficiencies, remarking that the last notice he received from *the Trustee* regarding the funds allocated to the bondholders in the reorganization plan was in July 2015, *see* Steglitz Objs. 2-4, ECF No. 255, he does not mention the notice of pendency of class action and it is thus not clear whether he claims not to have received it.

right to a distribution from the settlement. Alternatively, the Silvercrest Funds ask the Court to modify the release in the settlement to exclude claims against BNYM with respect to bonds that continued to trade after the record date.

The Court finds these objections to be without merit. As an initial matter, it is not at all clear that the Court possesses authority to modify the settlement in the manner requested by the objectors. Although Rule 23(e) "wisely requires court approval of the terms of any settlement of a class action," the Rule "does not authorize the court to require the parties to accept a settlement to which they have not agreed." *Evans v. Jeff D.*, 475 U.S. 717, 726 (1986). Thus, "[w]hen passing upon a proposed settlement agreement of a class action[,] th[e] court either has to accept the settlement agreement or reject it," but "ha[s] no power to modify any terms and force acceptance on the parties to the agreement." *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 490 (E.D. Pa. 2008); *see also Ehrheart*, 609 F.3d at 593 ("A district court is not a party to the settlement [of a class action], nor may it modify the terms of a voluntary settlement agreement between the parties."); 4 William B. Rubenstein, *Newberg on Class Actions* § 13:46 (5th ed. Nov. 2018 update) (noting "the judicial role in reviewing a proposed settlement is . . . limited to approving the proposed settlement, disapproving it, or imposing conditions on it" (alteration in original) (internal quotation marks and citation omitted)). *But see In re Cendant Corp. PRIDES Litig.*, 233 F.3d 188, 194-95 (3d Cir. 2000) (holding a district court had inherent equitable power to modify the terms of a class action settlement by allowing proofs of claim filed and cured beyond the deadlines the court had inserted into the settlement at the parties' request).

In urging the Court to modify the class definition, the Silvercrest Funds note that Rule 23(c)(1)(C) provides that an order granting class certification "may be altered or amended before

final judgment." Silvercrest Objs. 8, ECF No. 257. But the Funds cite no authority for the proposition that a court may unilaterally change the definition of a certified class as part of the settlement approval process. As Plaintiff notes, moreover, doing so would raise a host of practical problems. Changing the class definition would likely change the composition of the class, adding as class members those post-record date purchasers who did not hold bonds on the record date and subtracting current class members who sold their holdings after the record date, and requiring another round of notice and an opportunity for any new class members to opt out. *See* Fed. R. Civ. P. 23(c)(2)(B) (requiring that notice of a class action, including the right to request exclusion from the class, be provided to members of a class certified under Rule 23(b)(3)).

Turning to the merits of the objections, as the Silvercrest Funds note, the additional factors a court may wish to consider in evaluating a proposed class action settlement include "[w]hether the class definition is appropriate and fair, taking into account among other things whether it is consistent with the purpose for which the class is certified, whether it may be overinclusive or underinclusive, and whether division into subclasses may be necessary or advisable." *Prudential*, 148 F.3d at 323 n.73 (citation omitted). Here, however, the class definition is consistent with the purpose for which the class was certified. From the outset, this action was brought for the benefit of bondholders entitled to a distribution under the Hospital's reorganization plan, who stood to recover less under the plan than they would have received had Defendants maintained a perfected security interest in the collateral securing the bonds. Consistent with this purpose, the class definition was based on the terms of the plan itself, which provided for distribution of the proceeds of the settlement of the adversary proceeding to holders of an "Allowed Class A3 Claim" and established a record date beyond which transfers of such

claims would not be recognized. The plan was never intended to benefit post-bankruptcy purchasers of the bonds, and such purchasers were thus never intended to be part of the class in this case.[8]

Contrary to the Silvercrest Funds' assertion, moreover, the Funds (and, presumably, Steglitz) received notice of the December 7, 2011, record date before July 2018. The Silvercrest Funds were one of the larger institutional investors in the bonds, and representatives of Silvercrest have been in communication with class counsel about this litigation since at least October 2012. *See* Decl. of Lisa M. Port ¶ 4 & Ex. B, Sept. 13, 2018, ECF No. 261-1.[9] Not only were the Funds aware of the class certification proceedings in this case, but Silvercrest Managing Director Douglas M. Stevenson submitted a declaration in support of the Plaintiff's motion for class certification in February 2015, addressing the Funds' level of involvement in the efforts to settle the adversary proceeding. *See* Decl. of Douglas M. Stevenson, Feb. 27, 2015, ECF No. 118-5. And when Plaintiff's motion for class certification was granted in October 2016, class counsel emailed the decision to Stevenson, *see* Port Decl. ¶ 6 & Ex. D, ECF No. 261-1, putting him on notice that the class was defined as "all persons or entities who are holders of an Allowed Class A3 Claim pursuant to Section 5.1.3(A)(ii) of Lower Bucks Hospital's plan of reorganization," Mem. 1 n.2, 24, Oct. 5, 2016, ECF No. 146.

Although the order granting class certification did not specify the record date for holders of an Allowed Class A3 Claim, this information was provided in the notice of pendency of class

---

[8] Indeed, the Complaint in *Becker II* described the class as composed of "all holders of the Bonds as of January 13, 2010, the date on which [the Hospital] filed its petition for reorganization under Chapter 11 of the Bankruptcy Code." Compl. in Civ. No. 12-6412 ¶ 6, ECF No. 1.

[9] Steglitz has also been in communication with class counsel about this litigation during the pendency of this case. *See* Port Decl. ¶ 10 & Ex. H, ECF No. 261-1.

action, which was sent to both Stevenson and Appel at addresses they provided to Heffler Claims Group, LLC, the settlement and notice administrator in this case, in September or October 2017. *See* Aff. of Lisa Luciotti, ¶¶ 4-5 & Exs. A & B, Sept. 12, 2018, ECF No. 261-2. While Appel denies ever receiving the notice of pendency of class action, Appel Decl. ¶ 11, ECF No. 257-1, Stevenson confirmed to class counsel that he had "received and read" the notice—which explicitly identified December 7, 2011, as the record date—in October 2017, Port Decl. ¶ 3 & Ex. A, ECF No. 261-1. Yet despite receiving this notice, Stevenson raised no objection to the class definition, and did not seek to opt out of the class, even as the case proceeded to trial six months later, in April 2018, with Stevenson and Appel as potential witnesses. *See id.* ¶ 8 & Ex. F. This failure to object is significant as the case was tried on behalf of the same class that now stands to benefit from the settlement. Had the case gone to the jury instead of settling, after-acquired bonds still would not have been eligible to receive a share of any recovery, as those bonds are not part of the certified class in this case. While it is regrettable that the bonds continued to trade after the cancellation date, the exclusion of post-record date purchases from the class does not render the settlement unfair to the class in this case.[10]

---

[10] At the fairness hearing, the Silvercrest Funds sought to downplay the significance of the notice of pendency of class action, stressing that by the time the notice was sent to class members, they had already purchased most of the after-acquired bonds. But when the Funds (and Steglitz) purchased those additional bonds, they were well aware of the Hospital's bankruptcy proceedings, including the adversary proceeding, *see* Stevenson Decl. ¶ 6(a), (b), ECF No. 118-5; Port Decl. Exs. G, H, ECF No. 261-1, and knew or should have known that payment on the bonds was dependent upon the terms of the Hospital's reorganization plan, of which they had notice, *see* Mem. 5, Oct. 5, 2016, ECF No. 146 (noting that before the reorganization plan was approved, multiple notices and a disclosure statement were sent to record holders of the bonds). Although Stevenson, in his declaration in support of the motion for class certification, asserted the Silvercrest Funds did not review the settlement documents in the adversary proceeding or the Hospital's reorganization plan, Stevenson Decl. ¶ 6(d), ECF No. 118-5, he did not dispute that the Funds received those materials.

As an alternative to redefining the class, the Silvercrest Funds urge the court to modify the release in the settlement to exclude a release of BNYM with respect to any bonds that continued to trade after the record date. The Funds argue the release is overbroad insofar as it purports to release claims against BNYM with respect to purchases of bonds that are not part of the class and will not share in the settlement. Plaintiff does not object to modifying the release to exclude claims by class members relating to bonds acquired after the record date. BNYM opposes the request, however, arguing the release is a necessary part of the negotiated settlement.

As previously noted, it is not clear that the Court has authority to modify the release absent the consent of the parties. *See, e.g.*, *Ehrheart*, 609 F.3d at 593 (holding a district court is not a party to a class action settlement and cannot "modify the terms of a voluntary settlement between the parties"); Stipulation and Agreement of Settlement ¶ 49, ECF No. 249-1 ("The terms of the Settlement, as reflected in this Stipulation, may not be modified or amended, nor may any of its provisions be waived, except by a writing signed on behalf of both the Plaintiff and Defendants (or their successors-in-interest) and approval of the Court . . . ."). Even if the Court possesses such authority, however, exercising it would put an end to the settlement, as BNYM has represented that in the event of such a modification, it would exercise its right to terminate the settlement. *See* Stipulation and Agreement of Settlement ¶ 41(a)(iv), ECF No. 249-1 (providing that "Plaintiff and Defendants shall each have the right to terminate the Settlement and this Stipulation," upon written notice, if, inter alia, "the Court enters a Judgment that materially varies from the form of judgment provided for in this Stipulation").

As Plaintiff notes, the release does not pose an issue for post-record date purchasers who did not also hold bonds on the record date, as such purchasers are not members of the class and

are therefore not bound by the settlement, including the release therein.[11]  Rather, the release is only an issue for post-record date purchasers who are also class members and who therefore had notice of the Hospital's reorganization plan, which provided for cancellation of the bonds as of the plan's effective date and established a record date for distributions under the plan.  Class members who purchased additional bonds after the record date had an ample basis to consider the risks of such purchases, and the Court is not persuaded that inclusion of the release renders the settlement unfair in these circumstances.

Upon consideration of the factors set forth in *Girsh* and Rule 23(e)(2), as well as the relevant *Prudential* factors, the Court finds the proposed settlement is fair, reasonable and adequate.  Plaintiff's motion for final approval of settlement will therefore be granted.

Finally, the Court turns to class counsel's request for an award of attorneys' fees and litigation expenses.  Class counsel seek an award of attorneys' fees in the amount of $2.15 million, plus interest at the same rate as earned by the Settlement Fund, and reimbursement of $273,284.51 in litigation expenses.

"[A] thorough judicial review of fee applications is required in all class action settlements."  *Prudential*, 148 F.3d at 333 (alteration in original) (citation omitted).  In evaluating fee applications, "courts typically apply either the percentage-of-recovery method or the lodestar method," though "the percentage-of-recovery method is generally favored in

---

[11] It is not clear what proportion of post-record date purchases were made by class members. The parties agree the total face value of the bonds sold since December 7, 2011, is approximately $4.9 million, though the amount paid for the bonds is considerably less—approximately $1.2 million—reflective of their distressed status.  Almost half of the bonds purchased after the record date, with a face value of $2.355 million (approximately 48% of the total face value of the post-record date bonds purchased), were purchased by the Silvercrest Funds.  Although Steglitz and his clients account for some of the remaining 52%, the extent of their post-record date purchases is not clear from the record.  The identities of the remaining post-record date purchasers are unknown.

common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'" *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2006) (quoting *Prudential*, 148 F.3d at 333). "Regardless of the method chosen, . . . it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation." *Id.*

In determining a fee award in a common fund case, a district court should consider the following factors:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiff's counsel; and (7) the awards in similar cases.

*Id.* at 301 (citation omitted). These factors support approval of the fee request in this case.

Although the settlement in this case is likely to benefit a large number of investors, having been mailed to more than 500 potential class members and their nominees, the size of the fund created is a matter of some debate. While the settlement provides for a payment of $13.5 million, the Silvercrest Funds, in their objection to the fee request, maintain that the "value added" by the settlement is only approximately $3.15 million, as the remaining $10.35 million of the fund was awarded to the bondholders under the Hospital's reorganization plan. The Silvercrest Funds argue the $2.15 million fee request is unreasonably high in relation to the $3.15 million value added in this case. As class counsel note, however, this argument incorrectly assumes that absent the filing of this litigation, the bondholders would have received the full $10.35 million awarded in the reorganization plan. This assumption fails to account for BNYM's claimed indemnification and charging lien rights, including the right to deduct from the bondholders' funds bankruptcy-related expenses BNYM incurred prior to the plan's

confirmation.[12]  In February 2017, BNYM estimated that it had incurred some $2.22 million in pre-confirmation bankruptcy-related expenses.  *See* Port Decl. Ex. K, ECF No. 261-1.  Taking this additional $2.22 million into account, the "value added" in this case is at least $5.37 million, and the requested fee represents 40% of that amount, a percentage that is entirely reasonable in the circumstances of this case.  *See, e.g.*, *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 736 (3d Cir. 2001) (noting that "fee awards have ranged from nineteen percent to forty-five percent of the settlement fund"); *cf. Rite Aid*, 396 F.3d at 302 (recognizing that "it may be appropriate for percentage fees awarded in large recovery cases to be smaller in percentage terms than those with smaller recoveries").  Moreover, class counsel's efforts prevented the balance of the funds awarded to the bondholders in the reorganization plan from being further eroded.

Despite the large number of settlement notices that were distributed, only two objections to the settlement were submitted, neither of which challenged the settlement amount, and only one of those objections concerns class counsel's fee request.  As discussed above, moreover, these objection lack merit.

Class counsel's skill and efficiency also weigh in favor of approving the requested fee award.  Although this case was reassigned to this Court relatively late in the proceedings, in the time the case has been before this Court, class counsel skillfully defended against a litany of pretrial motions, including a new motion to dismiss, motions in limine, and several *Daubert* motions.  Class counsel's skill was also apparent at trial.  This favorable settlement is attributable in large part to class counsel's zealous advocacy for the class and vigorous prosecution of this action in the face of formidable opposition from Defendants.

---

[12] BNYM's right to be indemnified and/or exercise a first-priority charging lien for bankruptcy-related expenses incurred prior to January 19, 2012, was not resolved on summary judgment and had not been resolved when the settlement was reached.

The complexity and duration of the litigation likewise support class counsel's fee request. As discussed, this litigation presented a high degree of complexity, requiring litigation in the Bankruptcy Court regarding the third-party release, two rounds of bankruptcy appeals, and the need for multiple experts. The litigation also spanned more than six years in the District Court alone and would likely have generated an appeal even if Plaintiff had obtained a favorable jury verdict.

As class counsel undertook this representation entirely on a contingent fee basis, the risk of nonpayment in this action was significant, particularly in light of the risks counsel faced in establishing damages in *Becker I* and the possibility that Defendants would eventually prevail on the issue of their indemnification rights, which could have substantially reduced, if not eliminated, any recovery.

Perhaps most significant in the analysis of class counsel's fee request is the substantial time class counsel have devoted to this case throughout its more than six-year history. Class counsel have expended over than 7,575 hours and incurred $273,284.51 in expenses in prosecuting this action for the benefit of the class. This significant investment of time and resources was necessary to enable counsel to effectively prosecute the case, especially in light of Defendants' aggressive litigation strategy and substantial motions practice throughout the life of the case.

The reasonableness of the requested fee award is confirmed by considering what class counsel's fee would be under the lodestar method. "The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Rite Aid*, 396 F.3d at 305. Typically, the lodestar

figure is less than the fee requested based on the percentage-of-recovery method, and the court must determine whether the increase (or "multiplier") is justified under the circumstances. *See id.* at 305-06.

The declarations submitted in this case show that Plaintiff's counsel expended a total of 7,575.55 hours of attorney and professional support staff time prosecuting this case at rates ranging from $170 to $850 per hour, for a total lodestar amount of $4,706,091. The requested fee of $2.15 million (before interest) thus represents a *discount* of more than $2.5 million dollars or 54% of the lodestar amount.

Class counsel also seek reimbursement of $273,284.51 in litigation expenses, significantly less than the $325,000 counsel reserved the right to seek in the settlement. The expenses for which counsel seek reimbursement include trial-related costs, and expenses, online research, court reporting and transcripts, photocopying, travel, postage expenses, and, most significantly, expert fees, which constitute $108,950.37 of the amount requested.

Upon consideration of the factors discussed above, the Court finds the attorneys' fees and litigation expenses requested by class counsel are reasonable, and class counsel's motion for an award of attorneys' fees and reimbursement litigation expenses will therefore be granted.

**CONCLUSION**

For the reasons set forth above, Plaintiff's motion for final approval of settlement and class counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses will be granted. An appropriate judgment and order follow.

BY THE COURT:

                                       ___ /s/ Juan R. Sánchez ___
                                       Juan R. Sánchez, C.J.